# EXHIBIT A

Electronically Filed
7/22/2025 10:16 AM
Fourth Judicial District, Ada County
Trent Tripple, Clerk of the Court
By: Breanna Johnson, Deputy Clerk

Matthew T. Christensen, ISB: 7213
JOHNSON MAY
199 N. Capitol Blvd., Ste. 200
Boise, Idaho 83702
Telephone: (208) 384-8588
Facsimile: (208) 629-2157
Email: mtc@johnsonmaylaw.com

## IN THE DISTRICT COURT OF THE FOURTH JUDICIAL DISTRICT
## OF THE STATE OF IDAHO, IN AND FOR THE COUNTY OF ADA

| | |
|---|---|
| Roy Hallett, an individual<br><br>            Plaintiff,<br><br>vs.<br><br>CINEVERSE CORP, a Delaware Corporation,<br>CHRISTOPHER MCGURK, an individual,<br>GARY LOFFREDO, an individual,<br><br>            Defendants. | Case No.: CV01-25-13141<br><br>**COMPLAINT** |

The Plaintiff, Roy Hallett, by and through his counsel of record, JOHNSON MAY, states and alleges against Defendants Cineverse Corp., Christopher McGurk, and Gary Loffredo, (collectively "Defendants") as follows:

### I.  PARTIES, VENUE, AND JURISDICTION

1.      Plaintiff Roy Hallett ("Plaintiff" or "Hallett") is an individual who resides in Idaho.

2.      Plaintiff is an individual investor and resident of Idaho, who purchased shares of Defendant Cineverse during the relevant period and suffered financial losses due to the alleged violations contained in this Complaint.

3.      Defendant Cineverse Corp ("Cineverse") is a Delaware corporation.

4.    Defendant Christopher McGurk ("Mr. McGurk") is an individual, who was operating as the chief executive officer and chairman of Cineverse during the relevant times.

5.    Defendant Gary Loffredo ("Mr. Loffredo") is an individual, who was operating as the chief legal advisor of Cineverese during the relevant times.

6.    Defendants directly or indirectly, made use of means or instruments of transportation or communication in interstate commerce, or of the mails, or of any facility of a national securities exchange in connection with the acts, practices, and courses of business alleged in this Complaint.

7.    Defendants directly solicited contracts and/or business with the Plaintiff in the state of Idaho.  Further, the Defendants tortious acts (as outlined below) caused injury within the state of Idaho.

8.    Venue is proper in Idaho pursuant to Idaho Code § 5-514 because the Defendants transacted business in Idaho with the Plaintiff and the Plaintiffs' tortious actions caused damages to the Plaintiff within the state of Idaho.

## II.    FACTS

9.    On March 31, 2000, Defendant Cineverse, formerly known as Cinedigm, was formed as a Delaware Corporation.

10.    Cineverse is an entertainment company.

11.    Beginning September of 2021, Mr. Hallett began purchasing shares of Defendant Cineverse and continued acquiring shares through January of 2022

12.    In 2021, the stock price of Cineverse began to decline.

13.    On October 11, 2021, Cineverse published a press release containing the following statement from Mr. McGurk,

"So, let me underscore that **we are only making accretive acquisitions** and we will finance those deals as appropriate to ensure that outcome. And we will smartly raise funds to finance those deals based on specific accretive content, technology, and streaming channel opportunities. We are not in the business of raising cash and stockpiling it on our balance sheet. We have turned down multiple opportunities to do that. **We will only look at options to finance accretive deals in the future at the lowest possible cost of capital combined with the highest potential return, to continue to create shareholder value**." (Emphasis added.)

14.    A true and correct copy of this press release is attached as ***Exhibit 1***.

15.    Based on Mr. McGurk's representation, Mr. Hallett continued to hold his stock in Cineverse, believing management was acting in the best interest of shareholders to increase shareholder value.

16.    On September 26, 2022, an article was published quoting Mr. McGurk appraising MatchPoint, a streaming service owned by Cineverse, as being worth $100 million.

17.    A true and correct copy of this article is attached as ***Exhibit 2***.

18.    The article further quoted Mr. McGurk as stating: "So McGurk will continue to stave off buyers (and yes, there are interested parties, he said) for another year or two. "We want to get a little bit bigger, we want to establish Cineverse," McGurk. *Then* maybe they'll sell, and that's no fake."

19.    On June 9, 2023, Cineverse executed a 1-for-20 reverse stock split of its issued and outstanding Class A common stock, whereby every 20 shares of Cineverse's common stock were consolidated into one new share of common stock (the "Reverse Stock Split").

20.    Section 4.3 of the Stock Incentive Plan addresses corporate actions such as the Reverse Stock Split that occurred, stating:

"the Committee, in its sole discretion**, in order to prevent dilution or enlargement of Participants' rights under this Plan**, **shall substitute or adjust**, as applicable, **the number and kind of Shares that may be issued under this Plan or under particular forms of Awards,** the number and kind of Shares subject to outstanding Awards, the

Option Price or Grant Price applicable to outstanding Awards, the Annual Award Limits, and other value determinations applicable to outstanding Awards."

21.    A true and correct copy of the 2017 Stock Incentive Plan is attached here as ***Exhibit 3***.

22.    On August 1, 2023, Mr. McGurk received 195,784 shares (approximately 2.18% of Cineverse at the time) as payment of his annual bonus under the Management Annual Incentive Plan as documented in a Form-4 filed with the Securities and Exchange Commission ("SEC").

23.    A true and correct copy of this Form 4 is attached as ***Exhibit 4***.

24.    Provision 12.1 of the Corporate Stock Incentive Plan limits performance-based compensation to the following:

        a.  Net earnings or Net Income (before or after taxes);
        b.  Earnings per share (basic or diluted);
        c.  Net sales or revenue growth;
        d.  Net operating profit;
        e.  Return measures (including, but not limited to, return on assets, capital, invested capital, equity, sales, or revenue);
        f.  Cash flow (including, but not limited to, throughput, operating cash flow, free cash flow, cash flow return on equity, and cash flow return on investment);
        g.  Earnings before or after taxes, interest, depreciation, and/or amortization;
        h.  Earnings before taxes;
        i.  Gross or operating margins;
        j.  Corporate value measures;
        k.  Capital expenditures;
        l.  Unit volumes;
        m.  Productivity ratios;
        n.  Share price (including, but not limited to, growth measures and total shareholder return);
        o.  Cost or expense;
        p.  Margins (including, but not limited to, debt or profit);
        q.  Operating efficiency;
        r.  Market share;
        s.  Customer satisfaction;
        t.  Working capital targets or any element thereof;
        u.  Economic value added or EVA® (net operating profit after tax minus the sum of capital multiplied by the cost of capital);
        v.  Health, safety and environmental performance;
        w.  Corporate advocacy metrics;

  x. Strategic milestones (including, but not limited to, debt reduction, improvement of cost of debt, equity or capital, completion of projects, achievement of synergies or integration objectives, or improvements to credit rating, inventory turnover, weighted average cost of capital, implementation of significant new processes, productivity or production, product quality, and any combination of the foregoing);

  y. Strategic sustainability metrics (including, but not limited to, corporate governance, enterprise risk management, employee development, and portfolio restructuring);

  b) and (z) Stockholder equity or net worth."

25. In 2023, Cineverse reported a loss of $10 million.

26. The majority of the metrics listed in provision 12.1 relate to the earnings and financial performance of Cineverse.

27. On March 29, 2024, Mr. Hallett discussed Mr. McGurk's 195,784-share bonus with Mr. Loffredo during a phone call and requested more information regarding the basis for the award under the 2017 Incentive Plan.

28. Mr. Loffredo repeatedly asserted that Mr. McGurk's bonus was not earned performance compensation but part of his Stock Appreciation Rights ("SARs") under his compensation plan.

29. This assertion directly contradicts the Form 4, which clearly states that the shares "constitute shares received as payment of annual bonus under Management Annual Incentive Plan." See **Exhibit 4**.

30. Upon information and belief, due to Cineverse's $10 million loss in 2023, the lack of application of Section 4.3 of the Incentive Plan that should have occurred after the reverse stock split, and the contradictory statement of Mr. Loffredo, the award of Mr. McGurk's bonus was improperly granted to Mr. McGurk in violation of the Stock Incentive Plan.

31.    On December 8, 2023, Defendant Cineverse approved Amendment No. 6 that diluted existing shareholders' stock by approximately 50%. This was accomplished by doubling the shares owned by management of the company without regard to Section 4.3 of the Incentive Plan.

32.    A true and correct copy of Amendment No. 6 is attached as ***Exhibit 5***.

33. On March 8, 2024, Mr. Hallett submitted a formal Demand for Inspections of Books and Records on the Defendant Cineverse.

34. A true and correct copy is attached as ***Exhibit 6.***

35. On March 29, 2024 and May 17, 2024, Mr. Loffredo and Mr. Hallett had follow-up discussions on the phone regarding Mr. Hallett's records request.

36. During these phone conversations, Mr. Hallett inquired about the offers made for Cineverse, as referenced in public communications asking Mr. Loffredo how much money had been lost to shareholders by rejecting those offers.

37. Mr. Loffredo stated that no offers had been made for Cineverse.

38. This statement contradicts previous public statements made to *IndieWire* and other media sources, which acknowledged interest from potential buyers. See ***Exhibit 7***.

39. Upon information and belief, following the Plaintiff's records request, Cineverse retained attorneys Matt Murphey and Spencer Crawford.

40. On August 9, 2024, during a conference call, Matt Murphey and Spencer Crawford informed Mr. Hallett that the requested records were ready but would only be provided after Mr. Hallett signed a Non-Disclosure Agreement ("NDA").

41. On August 28, 2024, Mr. Hallett signed the requested NDA in reliance on Matt Murphey's and Spencer Crawford's representations that if he signed the NDA the documents would be produced to him.

42. Despite signing the NDA, the documents were never provided to Mr. Hallett.

43. On September 6, 2024, Mr. Hallett sent a follow-up email requesting the production of the promised documents.

44. Matt Murphey responded to Mr. Hallett's follow up by directing him to coordinate with Mr. Loffredo for the documents request.

45. Mr. Hallett attempted to obtain the documents that were purportedly ready from Mr. Loffredo in a series of communications.

46. To date, Mr. Hallett has never received any of the documents or records that he originally requested in March of 2024.

### III.    CLAIMS

### FIRST CLAIM FOR RELIEF – BREACH OF CONTRACT

47.    Plaintiff incorporates each of the allegations set forth in the preceding paragraphs as though fully set forth herein.

48.    The Plaintiff invested money in Cineverse as a shareholder.

49.    As a shareholder, the Plaintiff is entitled to certain information pursuant to relevant statutes and the corporation's governing documents.

50.    The corporation and its officers have not provided the information required by law pursuant to the governing documents.

51.    The corporation and its officers have not provided the information required pursuant to Idaho law.

52.    As a result of the corporation and the officers' conduct, they have breached the company governing documents.

53.    Plaintiff requests and is entitled to an award of damages resulting from company and officers' breach in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF –
## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

54.    Plaintiff incorporates each of the allegations set forth in the preceding paragraphs as though fully set forth herein.

55.    Pursuant to the governing documents and Idaho law, the corporation and its officers are required to refrain from unreasonable conduct which has the effect of preventing Plaintiff from receiving the fruits of its bargain.

56.    The corporation and the officers failed to perform their obligations in good faith under the relevant governing documents.

57.    The corporation and/or its officers have violated, nullified, and/or significantly impaired the Plaintiff from receiving the fruits of its bargain.

58.    As a direct and proximate result of the Defendants actions, Plaintiff has been damaged.

59.    Plaintiff requests and is entitled to an award of damages resulting from the Defendants' breach in an amount to be proven at trial.

## THIRD CLAIM FOR RELIEF –
## BREACH OF FIDUCIARY DUTIES

60.     Plaintiff incorporates each of the allegations set forth in the preceding paragraphs as though fully set forth herein.

61.     McGurk and Loffredo owe fiduciary duties to Plaintiff including the duty of care and the duty of loyalty.

62.     McGurk and Loffredo were at all relevant times officers of Cineverse.

63.     The duty of loyalty requires McGurk and Loffredo to refrain from usurping the Plaintiff's economic expectancy of receiving money and/or funds from the investments.

64.     The duty of care requires McGurk and Loffredo in the conduct of agents of Plaintiff to refrain from engaging in willful or intentional misconduct.

65.     McGurk and Loffredo breached the aforementioned duties of loyalty and care owed to Plaintiff.

66.     As a direct and proximate result of McGurk and Loffredo's actions, Plaintiff has been damaged.

67.     Plaintiff requests, and is entitled to: (i) an award of damages resulting from the breaches of fiduciary duty in an amount to be proven at trial, and/or (ii) an order from the Court requiring that these Defendants forfeit over to Plaintiff an amount justly due based on the Defendants' usurpation of the economic expectancy of Plaintiff's investments.

## FOURTH CLAIM FOR RELIEF –
## FRAUD

68. Plaintiff incorporates each of the allegations set forth in the preceding paragraphs as though fully set forth herein.

69. Cineverse, McGurk and/or Loffredo have made material, false statements and/or representations of fact to the Plaintiff.

70. Cineverse, McGurk and/or Loffredo made these material, false statements and/or representations of fact to the Plaintiff when they knew the statements and/or representations were false.

71. Cineverse, McGurk and/or Loffredo made these material, false statements and/or representations of fact to the Plaintiff knowing that the Plaintiff would rely upon the statements and representations and that the Plaintiff was ignorant of these statements and representations.

72. The Plaintiff justifiably relied upon Cineverse, McGurk and/or Loffredo's statements and representations and suffered injuries as a result.

## FIFTH CLAIM FOR RELIEF –
## INTENTIONAL INTERFERENCE WITH ECONOMIC ADVANTAGE

73. Plaintiff incorporates each of the allegations set forth in the preceding paragraphs as though fully set forth herein.

74. Plaintiff had a valid economic expectancy in the investments in the assets of Cineverse.

75. Upon information and belief, all Defendants had knowledge of this expectancy.

76. The Defendants, through the conduct described in this Complaint, intentionally interfered with that expectancy, knowing that such interference was certain or substantially certain to occur, and which did occur, inducing termination of that expectancy in whole or in part.

77. Defendants' interference was wrongful by some measure beyond the fact of the interference itself.

78. As a direct and proximate result of Defendants' actions, Plaintiff has been damaged.

79.    Plaintiff requests, and is entitled to, an award of damages in an amount to be proven at trial for said intentional interference with Plaintiff's prospective economic advantages.

## SIXTH CLAIM FOR RELIEF –
## UNJUST ENRICHMENT

80.    Plaintiff incorporates each of the allegations set forth in the preceding paragraphs as though fully set forth herein.

81.    Plaintiff invested considerable money pursuant to the company governing documents.

82.    Defendants have been unjustly enriched at the expense of Plaintiff to Plaintiff's detriment.

83.    Plaintiff requests and is entitled to an award of damages in an amount to be proven at trial for said unjust enrichment.

## SEVENTH CLAIM FOR RELIEF –
## ACCOUNTING

84.    Plaintiff incorporates each of the allegations set forth in the preceding paragraphs as though fully set forth herein.

85.    Plaintiff is entitled to a complete accounting of Cineverse's financial documents, from inception to present day, or 2013 to present, as described, and all documents related to the activities, affairs, and financial condition of the companies.

86.    Plaintiff is entitled to a complete accounting of all funds received and disbursed, to and from Cineverse.

87.    Plaintiff is entitled to a complete accounting regarding the assets of Cineverse, including but not limited to what the company's assets are and where they are located.

88.     Plaintiff does not have access to Cineverse's records and books.

89.     As a shareholder, the Plaintiff is entitled to inspect and copy all of the records of Cineverse upon notice, and notice was properly given.

90.     The ability to inspect, given the claims at issue, are of paramount importance and could be significantly damaging to the Plaintiff if not immediately provided.


## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff respectfully requests that the Court enter judgment as follows:

(a) Issue findings of fact and conclusions that the Defendants committed the alleged violations;

(b) That this Court find for the Plaintiff on each and every claim of this Complaint and award Plaintiff the relief sought in each claim of the Complaint;

(c) For an award of Plaintiff's costs and reasonable attorney's fees; and

(d) Grant such other and further relief as this Court may determine to be just and necessary.

DATED this 18th day of July 2025.



        */s/* Matt Christensen
        MATTHEW T. CHRISTENSEN
        Attorney for Roy Hallett

# EXHIBIT 1

EX-99.1 4 ea148684ex99-1_cinedigm.htm PRESS RELEASE DATED OCTOBER 11, 2021



## Cinedigm Chairman and CEO Chris McGurk Highlights Positive Business Results at Annual Stockholder Meeting

LOS ANGELES — (October 11, 2021) — **Cinedigm Corp.** (NASDAQ: CIDM), the leading independent streaming entertainment company super-serving enthusiast fan bases, today released comments by Chris McGurk, Chairman and CEO, highlighting the Company's positive business results at the Annual Stockholder Meeting held on October 11, 2021.

Comments:

"Although I presented a business update when we last spoke less than 3 weeks ago, I did not want to miss the opportunity to address our stockholders once again today, because our remarkable business progress has continued unabated.

In just the last 20 days we announced several key initiatives to further drive our streaming business forward:

- We added six more of our streaming channels to Dish Network's Sling TV, including the Bob Ross and Real Madrid channels;
- We relaunched our independent cinema channel Fandor, called the "Netflix of indie film" by the Wall Street Journal, with a new look, much wider distribution footprint and hundreds of new films and series; We also added enhanced community features like podcasts and the revived editorial site Keyframe, all powered by our proprietary, industry-leading Matchpoint technology;
- We announced a partnership with the iconic choreographer and pop culture influencer Laurieann Gibson – to launch the BOP channel, the first-ever streaming channel devoted to all things Dance. Laurieann has developed the visual style for dozens of the world's largest artists and will bring her decades of experience building iconic brands to bear with this new global streaming service;
- We announced a partnership with Artificial Intelligence pioneer Papercup to help take the incredibly successful Bob Ross streaming channel global using Papercup's AI dubbing technology; and,
- Just today we announced the continuation of our very successful distribution partnership with Crown Media Family Networks, the Hallmark Channel, which for years has been a premiere supplier of quality family entertainment to audiences around the world.

It's very likely that this heavy volume of quality deal flow will continue for the foreseeable future.

With a successful portfolio of more than two dozen targeted enthusiast streaming channels, a huge distribution footprint into more than 1 billion streaming devices, a distribution library of more than 40,000 hours of quality film and TV content and our industry leading Matchpoint streaming technology, Cinedigm is a clear top choice for branded partners and companies looking to enter the streaming space quickly, effectively and successfully. So, look for our stream of new initiatives and partnerships to continue…..and also stay tuned for some very interesting Cinedigm NFT news as well.



Also we expect our recent record growth to continue. Having just reported 2 quarters in a row of triple digit streaming revenue growth, and having booked net income of over \$5 million last quarter, we once again had a very strong fiscal second quarter even though it is a seasonally slow period. We are very eager to speak with you again in November about our second quarter results ended September 30th, and rapid business progress.

With zero debt, a coveted public currency and the strongest balance sheet in our history, we will continue to pursue the successful streaming asset acquisition strategy that, in just the last 10 months, added 5 streaming channels, more than 15,000 films and TV episodes, full ownership of our proprietary Matchpoint streaming technology and a business footprint in the high growth South Asia and India markets.

Our unique competitive streaming position as the only independent media company with a vast content library, a successful 6-year track record of launching and managing streaming channels, a state-of-the-art proprietary streaming platform and a huge distribution footprint has led us to a robust queue of additional streaming acquisition targets.

Our acquisition philosophy is relatively simple: We target technology, content and streaming channel assets that we believe 100% support and build our streaming future. We focus on accretive acquisitions that can immediately benefit from our infrastructure, technology, content and distribution to ensure synergies and growth. We will only buy assets at multiples far below our own projected trading multiples, with a focus on our own proprietary deal flow. Much like companies that have grown rapidly via M&A like Zynga and Cisco, we view our competencies in M&A and our platform approach to be a significant competitive advantage.

So, let me underscore that we are only making accretive acquisitions and we will finance those deals as appropriate to ensure that outcome. And we will smartly raise funds to finance those deals based on specific accretive content, technology and streaming channel opportunities. We are not in the business of raising cash and stockpiling it on our balance sheet. We have turned down multiple opportunities to do that. We will only look at options to finance accretive deals in the future at the lowest possible cost of capital combined with the highest potential return to continue to create shareholder value.

I would also like to touch on the proposal to have the option to do a reverse stock split. It has no impact on our go forward strategy. As I have said previously, this was an option to give us flexibility. Now that our stock price has almost quadrupled this year and we have analyst price targets pointing considerably northward from today's price as well as the robust deal flow and strong results we expect to report again in the near future, a reverse split option is not necessary.

I would like to thank all of our stockholders for their support."

###

2

# EXHIBIT 2

GOT A TIP?                    **Indie**Wire                    NEWSLETTERS

☰            NEWS    FILM    TV    AWARDS    VIDEO            🔍

HOME / FEATURES / GENERAL

# Elvis and Bob Ross Deepfakes? They May Be Cinedigm's Future

Look out, Netflix: Here comes fake Bob Ross painting fake happy trees on Cineverse.

BY TONY MAGLIO ⊠
SEPTEMBER 26, 2022 4:00 PM

 

Bob Ross and Elvis Presley *Getty*

After seven years and as many acquisitions, **Cinedigm** CEO Chris McGurk bundled his company's 30 best streaming assets — including The El Rey Network, Fandor, Documrama, and The **Elvis** Presley Channel — into free ad-supported network **Cineverse**, which launched September 15. McGurk believes "if we achieve our loftiest dreams," Cineverse could eventually

ADVERTISEMENT

**Indie**Wire
# Daily Headlines

Daily Headlines covering Film, TV and more.

Enter your email address

SUBSCRIBE

Your Privacy Rights

Penske Media Corporation (PMC) uses first and third-party cookies, pixels, scripts and similar technologies to enable PMC and third-party service providers and partners to collect information about you and your interactions with our sites and services (including clicks, cursor movement and screen recordings). Learn more about our practices and your choices in our Privacy Policy. By continuing to use our sites or services, you agree to our Terms of Use (including the class action waiver and arbitration provisions) and Privacy Policy, which have recently changed.

**Read Next:** Barry Keoghan Has Read a Script for the 'Peaky...

NEWSLETTERS

He believes Cineverse represents an opportunity that major streamers have overlooked, to their tremendous detriment; he believes they are "collectively losing $10 billion a year."

ADVERTISEMENT

*FredMeyer* **Fred Meyer**                                                    ✕
Valid Sep 3 - Sep 10
4 Days Left

See M

ADVERTISEMENT

## Must Read



CRITICISM
**The 25 Best Movies of 2023**



FEATURES
**The Best TV Shows of 2023**



FEATURES
**The 15 Best First Features of 2023**

## Related Stories



**Tom Hanks Offered Austin Butler 'Masters of the Air' After...**



**From Australia to Vegas, All Roads Led Cinematographer...**

Cineverse is built on Cinedigm's proprietary Matchpoint technology, which allows its users to "create and manage compelling ad-supported and subscription-based video streaming services at scale across any platform efficiently and cost-effectively." It's also available for third-party licensing; McGurk says Matchpoint "would cost somebody $100 million" to build today.

**Your Privacy Rights**

Penske Media Corporation (PMC) uses first and third-party cookies, pixels, scripts and similar technologies to enable PMC and third-party service providers and partners to collect information about you and your interactions with our sites and services (including clicks, cursor movement and screen recordings). Learn more about our practices and your choices in our **Privacy Policy**. By continuing to use our sites or services, you agree to our **Terms of Use** (including the class action waiver and arbitration provisions) and Privacy Policy, which have recently changed.

**Read Next:** Barry Keoghan Has Read a Script for the 'Peaky...

NEWSLETTERS

**More From IndieWire**



NEWS
**Jesse Eisenberg Says Kieran Culkin Is an 'Unusual' Actor: He...**



VENICE
**'Joker: Folie à Deux' Review: Todd Phillips' Musical...**

"I like to think we're a version of AMC Networks with better technology, a bigger library, and a hybrid revenue model," he said. "We're way ahead of them on advertising and FAST." He also views Cineverse as being in a better place than the similarly structured **Chicken Soup for the Soul Entertainment**, which carries $69 million in debt; Cinedigm has none.

Cineverse launched with 87 million monthly viewers across Cinedigm's footprint on mobile, connected TVs, and social networks. The service consists of 40,000 library titles ("almost all independent") that have amassed "billions and billions of minutes" watched, McGurk said.

McGurk also has a big idea to plant a flag in the originals game. "On our **Bob Ross** Channel and on our Elvis Channel, we're considering deepfake Bob Ross and deepfake Elvis," he said. "Bob Ross died in 1992; we have his library. It's an enormously successful channel. It's probably our most successful channel. Imagine if we could have Deepfake Bob Ross with A.I. creating new painting and new episodes. A.I. dubbed into 10 different languages overseas."

Your Privacy Rights

Penske Media Corporation (PMC) uses first and third-party cookies, pixels, scripts and similar technologies to enable PMC and third-party service providers and partners to collect information about you and your interactions with our sites and services (including clicks, cursor movement and screen recordings). Learn more about our practices and your choices in our Privacy Policy. By continuing to use our sites or services, you agree to our Terms of Use (including the class action waiver and arbitration provisions) and Privacy Policy, which have recently changed.

Yeah, imagine that for just a moment while staring at the face of the guy who's just crazy enough to do it.



Cinedigm CEO Chris McGurk *Cinedigm*

McGurk said he is in preliminary talks with representatives for the Presley and Ross brands. No one's talking about new Elvis movies at this point, but the deepfake technology could be used to create digital presenters and channel interstitials.

It'd be "cheap" to pull off, McGurk said, and "there's a good chance" that Authentic Brands, the brand-management company that controls Elvis' copyright, will agree. "There are so many deepfake Elvises out there, why not control their own?"

While McGurk is the head honcho at Cinedigm who can make such a move, shareholders are *his* boss and currently they don't feel a hunk-a hunk-a burnin' love. When Cinedigm was in the business of digitizing movie theaters, the NASDAQ-traded CIDM shares were worth as much as $133

Your Privacy Rights

Penske Media Corporation (PMC) uses first and third-party cookies, pixels, scripts and similar technologies to enable PMC and third-party service providers and partners to collect information about you and your interactions with our sites and services (including clicks, cursor movement and screen recordings). Learn more about our practices and your choices in our **Privacy Policy**. By continuing to use our sites or services, you agree to our **Terms of Use** (including the class action waiver and arbitration provisions) and Privacy Policy, which have recently changed.

**Read Next:** Barry Keoghan Has Read a Script for the 'Peaky...

NEWSLETTERS

ADVERTISEMENT

McGurk, who owns 5 percent of the company, believes Cineverse can turn it around. "I think we're tremendously undervalued," he told us. "Everybody got creamed in the streaming and tech sector and no one's recovered."

So McGurk will continue to stave off buyers (and yes, there are interested parties, he said) for another year or two. "We want to get a little bit bigger, we want to establish Cineverse," McGurk. *Then* maybe they'll sell, and that's no fake.

READ MORE:

BOB ROSS | CINEDIGM | ELVIS

# Daily Headlines

Daily Headlines covering Film, TV and more.

SUBSCRIBE

ADVERTISEMENT

Your Privacy Rights

Penske Media Corporation (PMC) uses first and third-party cookies, pixels, scripts and similar technologies to enable PMC and third-party service providers and partners to collect information about you and your interactions with our sites and services (including clicks, cursor movement and screen recordings). Learn more about our practices and your choices in our Privacy Policy. By continuing to use our sites or services, you agree to our Terms of Use (including the class action waiver and arbitration provisions) and Privacy Policy, which have recently changed.

# EXHIBIT 3

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
## Washington, DC 20549

# FORM 8-K

# CURRENT REPORT

**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**August 31, 2017**
(Date of earliest event reported)

# Cinedigm Corp.

(Exact name of registrant as specified in its charter)

| **Delaware** | **001-31810** | **22-3720962** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

| **45 West 36 th Street, 7 th Floor, New York, New York** | **10018** |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

**212-206-8600**
(Registrant's telephone number, including area code)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions ( *see* General Instruction A.2. below):

☐    Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐    Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐    Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐    Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

☐ Emerging growth company

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 5.02    Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers**

(e)    At the Annual Meeting of Stockholders on August 31, 2017 (the "Annual Meeting") of Cinedigm Corp. (the "Company"), the stockholders of the Company approved the Company's 2017 Equity Incentive Plan (the "Plan"). The Plan provides for the issuance of up to 2,098,270 shares of the Company's Class A common stock, par value $0.001 per share (the "Common Stock"), in the form of various awards, including stock options, stock appreciation rights, stock, restricted stock, restricted stock units, performance awards and cash awards. The Compensation Committee of the Company's Board of Directors is authorized to administer the Plan and make grants thereunder.

The foregoing description is qualified in its entirety by reference to the Plan, which is filed as Exhibit 10.1 to this Form 8-K and is hereby incorporated by reference.

### Item 5.07    Submission of Matters to a Vote of Security Holders.

At the Annual Meeting, the stockholders of the Company voted on eight proposals. Proxies for the Annual Meeting were solicited pursuant to Regulation 14A under the Securities Exchange Act of 1934, as amended. There was no solicitation of proxies in opposition to management's nominees as listed in the proxy statement and all of management's nominees were elected to our Board of Directors. Details of the voting are provided below:

**Proposal 1:**

To elect four (4) members of the Company's Board of Directors to serve until the 2017 Annual Meeting of Stockholders (or until successors are elected or directors resign or are removed).

|  | Votes For | Votes Withheld | Broker Non-Votes |
|---|---|---|---|
| Christopher J. McGurk | 8,234,322 | 771,391 | 3,016,495 |
| Peter C. Brown | 7,977,445 | 1,028,268 | 3,016,495 |
| Patrick W. O'Brien | 7,966,162 | 1,039,551 | 3,016,495 |
| Zvi M. Rhine | 8,237,109 | 768,604 | 3,016,495 |

**Proposal 2:**

|  | Votes For | Votes Against | Abstentions | Broker Non-Votes |
|---|---|---|---|---|
| To approve by non-binding vote, executive compensation. | 7,445,551 | 1,404,539 | 155,623 | 3,016,495 |

**Proposal 3:**

|  | Votes For | Votes Against | Abstentions | Broker Non-Votes |
|---|---|---|---|---|
| To ratify the appointment of EisnerAmper LLP as our independent auditors for the fiscal year ending March 31, 2017. | 11,637,573 | 353,158 | 31,477 | N/A |

**Proposal 4:**

|  | Votes For | Votes Against | Abstentions | Broker Non-Votes |
|---|---|---|---|---|
| To approve the issuance of shares of Class A common stock in connection with an investment in the Company and related exchanges of the Company's convertible notes. | 8,504,784 | 497,222 | 3,707 | 3,016,495 |

2

**Proposal 5:**

|  | Votes For | Votes Against | Abstentions | Broker Non-Votes |
|---|---|---|---|---|
| To amend the Company's Certificate of Incorporation to increase the number of authorized shares of Class A Common Stock | 8,495,039 | 507,455 | 3,219 | 3,016,495 |

**Proposal 6:**

|  | Votes For | Votes Against | Abstentions | Broker Non-Votes |
|---|---|---|---|---|

To amend the Company's Certificate of Incorporation to eliminate certain transfer restrictions set forth in Section 4.4 of the Certificate of Incorporation.

|  | 8,102,613 | 894,937 | 8,163 | 3,016,495 |
|---|---|---|---|---|

**Proposal 7:**

| | Votes For | Votes Against | Abstentions | Broker Non-Votes |
|---|---|---|---|---|
| To amend the Company's Certificate of Incorporation to eliminate the Class B common stock and the Series B Junior Participating Preferred Stock | 8,534,049 | 467,318 | 4,346 | 3,016,495 |

**Proposal 8:**

| | Votes For | Votes Against | Abstentions | Broker Non-Votes |
|---|---|---|---|---|
| To approve the 2017 Equity Incentive Plan. | 7,592,945 | 1,270,046 | 142,722 | 3,016,495 |

**Item 9.01    Financial Statements and Exhibits.**

| Exhibit Number | Description |
|---|---|
| 10.1 | 2017 Equity Incentive Plan. |
| 99.1 | Press Release dated August 31, 2017 |

3

---

**SIGNATURE**

Pursuant to the requirements of Section 13 or 15 (d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Dated: August 31, 2017

By:    /s/ Gary S. Loffredo

Name:    Gary S. Loffredo

Title:    President of Digital Cinema, General Counsel & Secretary

4

---

**EXHIBIT INDEX**

| Exhibit Number | Description |
|---|---|
| 10.1 | 2017 Equity Incentive Plan. |
| 99.1 | Press Release dated August 31, 2017 |

5

Exhibit 10.1

**Cinedigm Corp.**
**2017 Incentive Plan**

**TABLE OF CONTENTS**

| | | Page |
|---|---|---|
| Article 1. | Establishment, Purpose, and Duration | 1 |
| Article 2. | Definitions | 1 |
| Article 3. | Administration | 7 |
| Article 4. | Shares Subject to this Plan and Maximum Awards | 8 |
| Article 5. | Eligibility and Participation | 10 |
| Article 6. | Stock Options | 10 |
| Article 7. | Stock Appreciation Rights | 12 |
| Article 8. | Restricted Stock and Restricted Stock Units | 13 |
| Article 9. | Performance Units/Performance Shares | 15 |
| Article 10. | Cash-Based Awards and Other Stock-Based Awards | 16 |
| Article 11. | Transferability of Awards | 16 |
| Article 12. | Performance Measures | 17 |
| Article 13. | Nonemployee Director Awards | 19 |
| Article 14. | Minimum Vesting of Share-Based Awards | 19 |
| Article 15. | Dividend Equivalents | 19 |
| Article 16. | Beneficiary Designation | 20 |
| Article 17. | Rights of Participants | 20 |
| Article 18. | Change of Control | 20 |
| Article 19. | Amendment, Modification, Suspension, and Termination | 22 |
| Article 20. | Withholding | 23 |
| Article 21. | Successors | 24 |
| Article 22. | General Provisions | 24 |

**Cinedigm Corp.**
**2017 Incentive Plan**

**Article 1.     Establishment, Purpose, and Duration**

 **1.1     Establishment** . Cinedigm Corp., a Delaware corporation (hereinafter referred to as the "Company"), establishes an incentive compensation plan to be known as the Cinedigm Corp. 2017 Incentive Plan (hereinafter referred to as the "Plan"), as set forth in this document.

 This Plan permits the grant of Nonqualified Stock Options, Incentive Stock Options, Stock Appreciation Rights, Restricted Stock, Restricted Stock Units, Performance Shares, Performance Units, Cash-Based Awards, and Other Stock-Based Awards.

 This Plan's effective date is the date the Plan is approved by the Company's shareholders (the "Effective Date"), and the Plan shall remain in effect as provided in Section 1.3 hereof. Upon its effectiveness, the Plan shall supersede the Existing Incentive Plan (as defined herein) such that no further Awards shall be made under the Existing Incentive Plan. This Plan shall not, in any way, affect awards under the Existing Incentive Plan that are outstanding as of the Effective Date.

 **1.2     Purpose of this Plan** . The purpose of the Plan is to (a) advance the interests of the Company and its stockholders by providing incentives and rewards to those individuals who are in a position to contribute to the long term growth and profitability of the Company; (b) assist the Company and its Subsidiaries and Affiliates in attracting, retaining, and developing highly qualified Employees, Third Party Service Providers, and Nonemployee Directors for the successful conduct of their business; and (c) make the Company's compensation program competitive with those of other major employers.

 **1.3     Duration of this Plan** . Unless sooner terminated as provided herein, this Plan shall terminate ten (10) years from the Effective Date. After this Plan is terminated, no Awards may be granted but Awards previously granted shall remain outstanding in accordance with their applicable terms and conditions and this Plan's terms and conditions. Notwithstanding the foregoing, no Incentive Stock Options may be granted more than ten (10) years after the earlier of (a) adoption of this Plan by the Board, or (b) the Effective Date.

**Article 2.     Definitions**

 Whenever used in this Plan, the following terms shall have the meanings set forth below, and when the meaning is intended, the initial letter of the word shall be capitalized.

 **2.1     "Affiliate"** shall mean any corporation or other entity (including, but not limited to, a partnership or a limited liability company), that is affiliated with the Company through stock or equity ownership or otherwise, and is designated as an Affiliate for purposes of this Plan by the Committee.

 **2.2     "Annual Award Limit"** or **"Annual Award Limits"** have the meaning set forth in Section 4.1.

 **2.3     "Award"** means, individually or collectively, a grant under this Plan of Nonqualified Stock Options, Incentive Stock Options, SARs, Restricted Stock, Restricted Stock Units, Performance Shares, Performance Units, Cash-Based Awards, or Other Stock-Based Awards, in each case subject to the terms of this Plan.

 **2.4     "Award Agreement"** means either (i) a written agreement entered into by the Company and a Participant setting forth the terms and provisions applicable to an Award granted under this Plan, or (ii) a written or electronic statement issued by the Company to a Participant describing the terms and provisions of such Award, including any amendment or modification thereof. The Committee may provide for the use of electronic, internet, or other non-paper Award Agreements, and the use of electronic, internet, or other non-paper means for the acceptance thereof and actions thereunder by a Participant.

 **2.5     "Board"** or **"Board of Directors"** means the Board of Directors of the Company.

 **2.6     "Cash-Based Award"** means an Award, denominated in cash, granted to a Participant as described in Article 10.

2.7 "**Cause**" means, unless otherwise specified in an Award Agreement or in an applicable employment agreement between the Company (or its applicable subsidiary or Affiliate) and a Participant, with respect to any Participant, as determined by the Committee in its sole discretion, the Participant's:

(a) Conviction of, or plea of *nolo contendere* to, a felony or other crime involving moral turpitude;

(b) material breach of a material provision of a term of employment (or other service provider function) that is not corrected within thirty (30) days following written notice of such breach sent by the Company to the Participant;

(c) willful misconduct in the performance of material duties;

(d) performance of material duties that is grossly negligent; or

(e) failure to attempt to fully comply with any lawful directive of the Board which is not corrected within thirty (30) days following written notice of such breach sent by the Company to the Participant.

Whether or not "Cause" exists shall be determined solely by the Company in its reasonable, good faith discretion.

2.8 "**Change of Control**" means the occurrence of any of the following events:

(a) Any one person, or more than one person acting as a group, acquires ownership of stock (as determined under Code Section 318(a)) of the Company that, together with stock held by such person or group, constitutes more than fifty percent (50%) of the total fair market value or total voting power of the stock of the Company; provided, however, that if any one person or more than one person acting as a group, is considered to own more than fifty percent (50%) of the total fair market value or total voting power of the stock of the Company, the acquisition of additional stock by the same person or persons is not considered to cause a Change in Control of the Company. This paragraph applies only when there is a transfer of stock of the Company (or issuance of stock of the Company) and stock in the Company remains outstanding after the transaction;

(b) any one person, or more than one person acting as a group, acquires (or has acquired during the 12-month period ending on the date of the most recent acquisition by such person or persons) ownership of stock (as determined under Code Section 318(a)) of the Company possessing thirty percent (30%) or more of the total voting power of the stock of the Company; provided, however, that if any one person or more than one person acting as a group, is considered to own thirty percent (30%) or more of the total voting power of the stock of the Company, the acquisition of additional stock by the same person or persons is not considered to cause a Change in Control of the Company;

(c) the consummation of a Merger (as defined below), unless, following such Merger, stock possessing at least fifty percent (50%) of the total combined voting power of the issued and outstanding shares of all classes of Company Voting Securities of the corporation resulting from such Merger is beneficially owned, directly or indirectly, by individuals and entities who were beneficial owners of the then-outstanding Company Voting Securities immediately prior to such Merger in substantially the same proportion as their ownership immediately prior to such Merger;

(d) individuals who are members of the Board as of the Effective Date of this Plan (the "Incumbent Directors") cease for any reason to constitute at least a majority of the members of the Board; provided, however, that any individual becoming a director subsequent to the date of this Plan whose appointment to the Board or nomination for election by the Company was approved by a vote of at least a majority of the Incumbent Directors then in office (unless such appointment or election was at the request of an unrelated third party who has taken steps reasonably calculated to result in a Change in Control as described in paragraphs (a), (b) or (c) of this Section 2.8 and who has indicated publicly an intent to seek control of the Company) shall be treated from the date of his appointment or election as an Incumbent Director;

(e) consummation of a complete liquidation or dissolution of the Company; or

(f)    any one person, or more than one person acting as a group, acquires (or has acquired during the 12-month period ending on the date of the most recent acquisition by such person or persons) assets from the Company that have a total gross fair market value equal to or more than forty percent (40%) of the total gross fair market value of all of the assets of the Company immediately prior to such acquisition(s); provided, however, that a transfer of assets by the Company is not treated as a Change in Control if the assets are transferred to (A) a shareholder of the Company (immediately before the asset transfer) in exchange for or with respect to its stock; (B) an entity, fifty percent (50%) or more of the total value or voting power of which is owned, directly or indirectly, by the Company; (C) a person, or more than one person acting as a group, that owns, directly or indirectly, fifty percent (50%) or more of the total value or voting power of all outstanding stock of the Company; or (D) an entity, at least fifty percent (50%) percent of the total value or voting power of which is owned, directly or indirectly, by a person described in the previous subsection (C). For purposes of this paragraph, (1) gross fair market value means the value of the assets of the Company, or the value of the assets being disposed of, determined without regard to any liabilities associated with such assets, and (2) a person's status is determined immediately after the transfer of the assets.

For purposes of this Section 2.8, "Company Voting Securities" shall mean the combined voting power of all outstanding classes of common stock of the Company and all other outstanding securities of the Company entitled to vote generally in the election of directors of the Company and "Merger" shall mean any merger, reorganization, consolidation, share exchange, transfer of assets or other transaction having similar effect involving the Company.

**2.9**    **"Code"** means the U.S. Internal Revenue Code of 1986, as amended from time to time. For purposes of this Plan, references to sections of the Code shall be deemed to include references to any applicable regulations thereunder and any successor or similar provision.

**2.10**    **"Committee"** means the Compensation Committee of the Board or such other Committee appointed by the Board for the purpose of administering this Plan comprised solely of two or more members of the Board who qualify as "non-employee" directors within the meaning of Rule 16b-3 under the Exchange Act, as "outside" directors within the meaning of § 162(m) of the Code, and as "independent" directors within the meaning of NASDAQ Rule 4200(b)(15).

**2.11**    **"Company"** or **"Corporation"** means Cinedigm Corp., a Delaware corporation, and any successor thereto as provided in Article 20 herein.

**2.12**    **"Covered Employee"** means any Employee who is a "covered employee," as defined in Code Section 162(m).

**2.13**    **"Effective Date"** has the meaning set forth in Section 1.1.

**2.14**    **"Employee"** means any individual performing services for the Company, an Affiliate, or a Subsidiary and designated as an employee of the Company, its Affiliates, and/or its Subsidiaries on the payroll records thereof. An Employee shall not include any individual during any period he or she is classified or treated by the Company, Affiliate, and/or Subsidiary as an independent contractor, a consultant, or any employee of an employment, consulting, or temporary agency or any other entity other than the Company, Affiliate, and/or Subsidiary, without regard to whether such individual is subsequently determined to have been, or is subsequently retroactively reclassified as a common-law employee of the Company, Affiliate, and/or Subsidiary during such period.

**2.15**    **"Exchange Act"** means the Securities Exchange Act of 1934, as amended from time to time, or any successor act thereto.

**2.16**    **"Existing Incentive Plan"** means the Second Amended and Restated 2000 Equity Incentive Plan of Access Integrated Technologies, Inc., as previously amended, restated, supplemented or otherwise modified prior to the Effective Date.

**2.17**    **"Full Value Award"** means an Award other than in the form of an ISO, NQSO, or SAR, and which is settled by the issuance of Shares.

**2.18**    **"Good Reason"** means, unless otherwise specified in an Award Agreement or in an applicable employment agreement between the Company (or its applicable Subsidiary or Affiliate) and a Participant, with respect to any Participant, as

determined by the Committee in its sole discretion without the Employee's written consent:

(a)    a material and substantially adverse reduction in title or job responsibilities compared with title or job responsibilities on the Effective Date;

(b)    the Company's requiring the office nearest to the Employee's principal residence to be located at a place that is more than fifty (50) miles from where such office is currently located; or

(c)    any material breach of an employment agreement by the Company.

Notwithstanding the foregoing, Good Reason will be deemed to exist only in the event that: (x) the Employee gives written notice to the Company of his or her claim of Good Reason and the specific grounds for his claim within ninety (90) days following the occurrence of the event upon which his claim rests, (y) the Company fails to cure such breach within thirty days (30) of receiving such notice ("Cure Period"), and (z) the Employee gives written notice to the Company to terminate his employment within fifteen (15) days following the Cure Period.

**2.19**    **"Grant Date"** means the date an Award is granted to a Participant pursuant to the Plan.

**2.20**    **"Grant Price"** means the price established at the time of grant of an SAR pursuant to Article 7, used to determine whether there is any payment due upon exercise of the SAR.

**2.21**    **"Incentive Stock Option"** or **"ISO"** means an Option to purchase Shares granted under Article 6 to an Employee and that is designated as an Incentive Stock Option and that is intended to meet the requirements of Code Section 422, or any successor provision.

**2.22**    **"Insider"** shall mean an individual who is, on the relevant date, an officer, or director of the Company, or a more than ten percent (10%) beneficial owner (as that term is defined in Section 13d-3 of the Exchange Act) of any class of the Company's equity securities that is registered pursuant to Section 12 of the Exchange Act, as determined by the Board in accordance with Section 16 of the Exchange Act.

**2.23**    **"Market Price"** means the closing price of the Class A Common Stock of the Company as reported on the NASDAQ Global Market or such other primary market or exchange on which the Class A Common Stock may, from time to time, trade (the "Market"), on the date for which a Market Price is to be determined under this Plan. To the extent an Option or SAR is granted on a date that the Market is closed, the Market Price shall be the closing price on the last preceding trading day.

5

**2.24**    **"Nonemployee Director"** means a member of the Company's Board of Directors who is not an Employee of the Company or its Affiliates or Subsidiaries.

**2.25**    **"Nonqualified Stock Option"** or **"NQSO"** means an Option that is not intended to meet the requirements of Code Section 422, or that otherwise does not meet such requirements.

**2.26**    **"Option"** means an Incentive Stock Option or a Nonqualified Stock Option, as described in Article 6.

**2.27**    **"Option Price"** means the price at which a Share may be purchased by a Participant pursuant to an Option.

**2.28**    **"Other Stock-Based Award"** means an equity-based or equity-related Award not otherwise described by the terms of this Plan, granted pursuant to Article 10.

**2.29**    **"Participant"** means any eligible individual as set forth in Article 5 to whom an Award is granted.

**2.30**    **"Performance-Based Compensation"** means compensation under an Award for which (i) the Performance Measures for the Performance Period have been designated by the Committee not later than the earlier of (a) ninety (90) days after the beginning of the Performance Period, or (b) the date as of which twenty-five percent (25%) of such period of time has elapsed, and (ii) the Award is otherwise intended to satisfy the requirements of Code Section 162(m) for certain performance-based compensation paid to Covered Employees. Notwithstanding the foregoing, nothing in this Plan shall be construed to mean that an Award which does not satisfy the requirements for performance-based compensation under

Code Section 162(m) does not constitute performance-based compensation for other purposes, including Code Section 409A.

2.31    **"Performance Measures"** means measures as described in Article 12 on which the performance goals are based and which are approved by the Company's shareholders pursuant to this Plan in order to qualify Awards as Performance-Based Compensation.

2.32    **"Performance Period"** means the period of time during which the Performance Measures must be met in order to determine the amount and/or vesting of an Award.

2.33    **"Performance Share"** means an Award under Article 9 herein and subject to the terms of this Plan, denominated in Shares, the value of which at the time it is payable is determined by the extent to which the applicable Performance Measures have been achieved.

2.34    **"Performance Unit"** means an Award under Article 9 herein and subject to the terms of this Plan, denominated in units, the value of which at the time it is payable is determined as a function of the extent to which corresponding Performance Measures have been achieved.

2.35    **"Period of Restriction"** means the period when Restricted Stock or Restricted Stock Units are subject to a substantial risk of forfeiture (based on the passage of time, the achievement of Performance Measures or other performance goals, or upon the occurrence of other events as determined by the Committee, in its discretion), as provided in Article 8.

2.36    **"Plan"** means this Cinedigm Corp. 2017 Incentive Plan.

2.37    **"Plan Year"** means the twelve (12) month period beginning each April 1 $^{st}$ .

2.38    **"Restricted Stock** " means an Award granted to a Participant pursuant to Article 8.

2.39    **"Restricted Stock Unit"** means an Award granted to a Participant pursuant to Article 8, except no Shares are actually awarded to the Participant on the Grant Date.

2.40    **"Share"** means a share of Class A Common Stock, $0.001 par value, of the Company.

2.41    **"Stock Appreciation Right"** or " **SAR** " means an Award, designated as an SAR, pursuant to the terms of Article 7 herein.

2.42    **"Subsidiary"** means any corporation or other entity, whether domestic or foreign, in which the Company has or obtains, directly or indirectly, a proprietary interest of more than fifty percent (50%) by reason of stock ownership or otherwise.

2.43    **"Third Party Service Provider"** means any consultant, agent, advisor, or independent contractor who renders services to the Company, a Subsidiary, or an Affiliate that (a) are not in connection with the offer and sale of Company's securities in a capital raising transaction, and (b) do not directly or indirectly promote or maintain a market for the Company's securities.

## Article 3.    Administration

3.1    **General** . The Committee shall be responsible for administering this Plan, subject to this Article 3 and the other provisions of this Plan. The Committee may employ attorneys, consultants, accountants, agents, and other individuals, any of whom may be an Employee, and the Committee, the Company, and its officers and directors shall be entitled to rely upon the advice, opinions, or valuations of any such individuals. All actions taken and all interpretations and determinations made by the Committee shall be final and binding upon the Participants, the Company, and all other interested individuals.

**3.2**      **Authority of the Committee** . The Committee shall have full and exclusive discretionary power to interpret the terms and the intent of this Plan and any Award Agreement or other agreement or document ancillary to or in connection with this Plan, to determine eligibility for Awards and to adopt such rules, regulations, forms, instruments, and guidelines for administering this Plan as the Committee may deem necessary or proper. Such authority shall include, but not be limited to, selecting Award recipients; determining the types and amount of Awards to be granted to a recipient (including setting the Option Price and Grant Price, so long as it is not lower than the applicable Market Price or such other higher limit as required under applicable law); establishing all Award terms and conditions, including the terms and conditions set forth in Award Agreements; granting Awards as an alternative to or as the form of payment for grants or rights earned or due under compensation plans or arrangements of the Company; construing any ambiguous provision of the Plan or any Award Agreement; establishing administrative regulations to further the purpose of the Plan; and, subject to Article 19, adopting modifications and amendments to this Plan or any Award Agreement, including without limitation, any that are necessary to comply with the laws of the countries and other jurisdictions in which the Company, its Affiliates, and/or its Subsidiaries operate. The Committee also shall have the ability to delegate to the Chief Executive Officer of the Company the right to allocate Awards among eligible individuals who are not Insiders, provided that such delegation is subject to such terms and conditions as the Committee in its discretion shall determine.

**3.3**      **Delegation.** The Committee may delegate to one or more of its members or to one or more officers of the Company, and/or its Subsidiaries and Affiliates or to one or more agents or advisors such administrative duties or powers as it may deem advisable, and the Committee or any individuals to whom it has delegated duties or powers as aforesaid may employ one or more individuals to render advice with respect to any responsibility the Committee or such individuals may have under this Plan.

**Article 4.**      **Shares Subject to this Plan and Maximum Awards**

**4.1**      **Number of Shares Available for Awards and Maximum Amount of Non-Share Awards.**

Subject to adjustment as provided in Section 4.3:

(a)      The maximum number of Shares available for issuance to Participants under this Plan, inclusive of Shares issued and Shares underlying outstanding awards granted on or after the Effective Date, is 2,108,270 Shares, which includes 128,270 unused Shares carried over from the Existing Incentive Plan.

(b)      The maximum number of Shares subject to Options or SARs granted in any one (1) Plan Year to any one Participant shall be 400,000.

(c)      The maximum number of Shares subject to all Full Value Awards granted in any one (1) Plan Year to any one Participant shall be 400,000.

---

8

(d)      With respect to Awards granted under the Plan that are (i) intended to satisfy the "performance-based" compensation exception contained in Code Section 162(m), and (ii) payable other than in Shares, the maximum amount payable to a Participant in any year is $5,000,000.

(e)      The maximum number of Shares that may be issued in the aggregate to all Nonemployee Directors in any one (1) Plan Year shall be 300,000.

**4.2**      **Share Usage.** Shares covered by an Award shall only be counted as used to the extent they are actually issued. With respect to Options and SARs, the number of Shares available for Awards under the Plan pursuant to Section 4.1, shall be reduced by one Share for each Share covered by such Award or to which such Award relates. The number of Shares available for Awards under the Plan shall be reduced by one Share for each Share covered by such Award or to which such Award relates. Awards that do not entitle the holder thereof to receive or purchase Shares shall not be counted against the aggregate number of Shares available for Awards under the Plan. In addition, any Shares related to Awards which terminate by expiration, forfeiture, cancellation, or otherwise without the issuance of such Shares shall be available again for grant under this Plan. In no event, however, will the following Shares again become available for Awards or increase the number of Shares available for grant under the Plan: (i) Shares tendered by the Participant in payment of the exercise price of an Option; (ii) Shares withheld from exercised Awards for tax withholding purposes; (iii) Shares subject to a SAR that are not issued in connection with the settlement of that SAR; and (iv) Shares repurchased by the Company with proceeds received from the exercise of an Option. The Shares available for issuance under this Plan shall be authorized and unissued Shares.

**4.3**      **Adjustments in Authorized Shares** . In the event of any corporate event or transaction (including, but not limited to, a change in the Shares of the Company or the capitalization of the Company) such as a merger, consolidation, reorganization, recapitalization,

separation, partial or complete liquidation, stock dividend, stock split, reverse stock split, split up, spin-off or other distribution of stock or property of the Company, combination of Shares, exchange of Shares, dividend in kind, or other like change in capital structure, number of outstanding Shares or distribution (other than normal cash dividends) to shareholders of the Company, or any similar corporate event or transaction, the Committee, in its sole discretion, in order to prevent dilution or enlargement of Participants' rights under this Plan, shall substitute or adjust, as applicable, the number and kind of Shares that may be issued under this Plan or under particular forms of Awards, the number and kind of Shares subject to outstanding Awards, the Option Price or Grant Price applicable to outstanding Awards, the Annual Award Limits, and other value determinations applicable to outstanding Awards.

The Committee, in its sole discretion, may also make appropriate adjustments in the terms of any Awards under this Plan to reflect or relate to such changes or distributions and to modify any other terms of outstanding Awards, including modifications of Performance Measures and changes in the length of Performance Periods. The determination of the Committee as to the foregoing adjustments, if any, shall be conclusive and binding on Participants under this Plan.

Subject to the provisions of Article 19 and notwithstanding anything else herein to the contrary, without affecting the number of Shares reserved or available hereunder, the Committee may authorize the issuance or assumption of benefits under this Plan in connection with any merger, consolidation, acquisition of property or stock, or reorganization upon such terms and conditions as it may deem appropriate (including, but not limited to, a conversion of equity awards into Awards under this Plan in a manner consistent with paragraph 53 of FASB Interpretation No. 44), subject to compliance with the rules under Code Sections 422 and 424, as and where applicable.

### Article 5. Eligibility and Participation

**5.1 Eligibility** . Individuals eligible to participate in this Plan include all Employees, Nonemployee Directors, and Third Party Service Providers.

**5.2 Actual Participation** . Subject to the provisions of this Plan, the Committee may, from time to time, select from all eligible individuals those individuals to whom Awards shall be granted and shall determine, in its sole discretion, the nature of any and all terms permissible by law, and the amount of each Award.

### Article 6. Stock Options

**6.1 Grant of Options** . Subject to the terms and provisions of this Plan, Options may be granted to Participants in such number, and upon such terms, and at any time and from time to time as shall be determined by the Committee, in its sole discretion.

**6.2 Award Agreement** . Each Option grant shall be evidenced by an Award Agreement that shall specify the Option Price, the maximum duration of the Option, the number of Shares to which the Option pertains, the conditions upon which an Option shall become vested and exercisable, and such other provisions as the Committee shall determine which are not inconsistent with the terms of this Plan. The Award Agreement also shall specify whether the Option is intended to be an ISO or a NQSO.

**6.3 Option Price** . The Option Price for each grant of an Option under this Plan shall be determined by the Committee in its sole discretion and shall be specified in the Award Agreement; provided, however, the Option Price must be at least equal to one hundred percent (100%) of the Market Price of the Shares as determined on the Grant Date. If the Participant to whom an ISO is granted owns, at the time of the grant, more than ten percent (10%) of the combined voting power of the Company, or its Subsidiaries or Affiliates, the exercise price of each Share subject to such Option shall be not less than one hundred ten percent (110%) of the closing price described in the preceding sentence.

**6.4 Term of Options** . Each Option granted to a Participant shall expire at such time as the Committee shall determine at the time of grant; provided, however, no Option shall be exercisable later than the day before the tenth (10th) anniversary date of its Grant Date (or in the case of an ISO granted to a Participant who at the time of grant owns stock representing more than ten percent (10%) of the combined voting power of the Company, or its Subsidiaries or Affiliates, no later than the day before the fifth (5th) anniversary date of its Grant Date). Notwithstanding the foregoing, for Nonqualified Stock Options granted to Participants outside the United States, the Committee has the authority to grant Nonqualified Stock Options that have a term greater than ten (10) years.

**6.5    Exercise of Options** . Subject to Section 6.8, Options granted under this Article 6 shall be exercisable at such times and be subject to such restrictions and conditions as the Committee shall in each instance approve, which terms and restrictions need not be the same for each grant or for each Participant.

**6.6    Payment** . Options granted under this Article 6 shall be exercised by the delivery of a notice of exercise to the Company or an agent designated by the Company in a form specified or accepted by the Committee, or by complying with any alternative procedures which may be authorized by the Committee, setting forth the number of Shares with respect to which the Option is to be exercised, accompanied by full payment for the Shares.

A condition of the issuance of the Shares as to which an Option shall be exercised shall be the payment of the Option Price. The Option Price of any Option shall be payable to the Company in full either: (a) in cash or its equivalent; (b) by tendering (either by actual delivery or attestation) previously acquired Shares having an aggregate Market Price at the time of exercise equal to the Option Price (provided that except as otherwise determined by the Committee, the Shares that are tendered must have been held by the Participant for at least six (6) months (or such other period, if any, as the Committee may permit) prior to their tender to satisfy the Option Price if acquired under this Plan or any other compensation plan maintained by the Company or have been purchased on the open market); (c) by a cashless (broker-assisted) exercise; (d) by the Company withholding Shares that otherwise would be delivered to the exerciser pursuant to the exercise of the Option in an amount equaling the value of the exercise price; (e) by a combination of (a), (b), (c) and/or (d); or (f) any other method approved or accepted by the Committee in its sole discretion.

Subject to any governing rules or regulations, as soon as practicable after receipt of written notification of exercise and full payment (including satisfaction of any applicable tax withholding), the Company shall deliver to the Participant evidence of book entry Shares, or upon the Participant's request, Share certificates in an appropriate amount based upon the number of Shares purchased under the Option(s).

Unless otherwise determined by the Committee, all payments under all of the methods indicated above shall be paid in United States dollars.

**6.7    Restrictions on Share Transferability** . The Committee may impose such restrictions on any Shares acquired pursuant to the exercise of an Option granted under this Article 6 as it may deem advisable, including, without limitation, minimum holding period requirements, or restrictions under applicable federal securities laws, requirements of any stock exchange or market upon which such Shares are then listed and/or traded, or any blue sky or state securities laws applicable to such Shares.

**6.8    Termination of Employment** . Each Participant's Award Agreement shall set forth the extent to which the Participant shall have the right to exercise the Option following termination of the Participant's employment or provision of services to the Company, its Affiliates, and/or its Subsidiaries, as the case may be. Such provisions shall be determined in the sole discretion of the Committee, shall be included in the Award Agreement entered into with each Participant, need not be uniform among all Options issued pursuant to this Article 6, and may reflect distinctions based on the reasons for termination. Unless otherwise provided in an Award Agreement, the right to exercise an Option shall terminate on the date the Participant's employment, or service on the Board or to the Company, terminates.

**6.9    Notification of Disqualifying Disposition** . If any Participant shall make any disposition of Shares issued pursuant to the exercise of an ISO under the circumstances described in Code Section 421(b) (relating to certain disqualifying dispositions), such Participant shall notify the Company of such disposition within ten (10) days thereof.

**6.10    Limits on Incentive Stock Options** . The aggregate fair market value of all Shares with respect to which ISOs are exercisable for the first time by a Participant in any one calendar year, under this Plan or any other stock option plan maintained by the Company (or by any subsidiary or parent of the Company), shall not exceed $100,000. The fair market value of such Shares shall be the mean closing price of the Shares as reported on the Market on the date the related ISO is granted.

## Article 7.    Stock Appreciation Rights

**7.1    Grant of SARs** . Subject to the terms and conditions of this Plan, SARs may be granted to Participants at any time and from time to time as shall be determined by the Committee. Subject to the terms and conditions of this Plan, the Committee shall have complete discretion in determining the number of SARs granted to each Participant and, consistent with the provisions of this Plan, in determining the terms and conditions pertaining to such SARs. The Grant Price for each grant of an SAR shall be determined by the Committee and shall be specified in the Award Agreement; provided, however, the Grant Price on the Grant Date must be at least equal to one hundred percent (100%) of the Market Price of the Shares as determined on the Grant Date.

**7.2** **SAR Agreement** . Each SAR Award shall be evidenced by an Award Agreement that shall specify the Grant Price, the term of the SAR, and such other provisions as the Committee shall determine.

**7.3** **Term of SAR** . The term of an SAR granted under this Plan shall be determined by the Committee, in its sole discretion, and except as determined otherwise by the Committee and specified in the SAR Award Agreement, no SAR shall be exercisable later than the tenth (10 th ) anniversary date of its grant. Notwithstanding the foregoing, for SARs granted to Participants outside the United States, the Committee has the authority to grant SARs that have a term greater than ten (10) years.

---

12

---

**7.4** **Exercise of SARs** . SARs may be exercised upon whatever terms and conditions the Committee, in its sole discretion, imposes.

**7.5** **Settlement of SARs** . Upon the exercise of an SAR, a Participant shall be entitled to receive payment from the Company in an amount determined by multiplying:

(a)    The excess of the Market Price of a Share on the date of exercise over the Grant Price; by

(b)    The number of Shares with respect to which the SAR is exercised.

At the discretion of the Committee, the payment upon SAR exercise may be in cash, Shares, or any combination thereof, or in any other manner approved by the Committee in its sole discretion. The Committee's determination regarding the form of SAR payout shall be set forth in the Award Agreement pertaining to the grant of the SAR.

**7.6** **Termination of Employment** . Each Award Agreement shall set forth the extent to which the Participant shall have the right to exercise the SAR following termination of the Participant's employment with or provision of services to the Company, its Affiliates, and/or its Subsidiaries, as the case may be. Such provisions shall be determined in the sole discretion of the Committee, shall be included in the Award Agreement entered into with Participants, need not be uniform among all SARs issued pursuant to this Plan, and may reflect distinctions based on the reasons for termination. Unless otherwise provided in an Award Agreement, the right to exercise the SAR shall terminate on the date the Participant's employment, or service on the Board or to the Company, terminates.

**7.7** **Other Restrictions.** The Committee shall impose such other conditions and/or restrictions on any Shares received upon exercise of an SAR granted pursuant to this Plan as it may deem advisable or desirable. These restrictions may include, but shall not be limited to, a requirement that the Participant hold the Shares received upon exercise of an SAR for a specified period of time.

**Article 8.** **Restricted Stock and Restricted Stock Units**

**8.1** **Grant of Restricted Stock or Restricted Stock Units.** Subject to the terms and provisions of this Plan, the Committee, at any time and from time to time, may grant Shares of Restricted Stock and/or Restricted Stock Units to Participants in such amounts as the Committee shall determine. Restricted Stock Units shall be similar to Restricted Stock except that no Shares are actually awarded to the Participant on the Grant Date.

**8.2** **Restricted Stock or Restricted Stock Unit Agreement** . Each Restricted Stock and/or Restricted Stock Unit grant shall be evidenced by an Award Agreement that shall specify the Period(s) of Restriction, the number of Shares of Restricted Stock or the number of Restricted Stock Units granted, and such other provisions as the Committee shall determine.

---

13

---

**8.3** **Other Restrictions** . The Committee shall impose such other conditions and/or restrictions on any Shares of Restricted Stock or Restricted Stock Units granted pursuant to this Plan as it may deem advisable including, without limitation, restrictions based upon the achievement of specific Performance Measures or other performance goals, time-based restrictions on vesting following the attainment of the Performance Measures or other performance goals, time-based restrictions, and/or restrictions under applicable laws or under the requirements of any stock exchange or market upon which such Shares are listed or traded, or holding requirements or sale restrictions placed on the Shares by the Company upon vesting of such Restricted Stock or Restricted Stock Units.

To the extent deemed appropriate by the Committee, the Company may retain the certificates representing Shares of Restricted Stock in the Company's possession until such time as all conditions and/or restrictions applicable to such Shares have been satisfied or lapse.

Except as otherwise provided in this Article 8, Shares of Restricted Stock covered by each Restricted Stock Award shall become freely transferable by the Participant after all conditions and restrictions applicable to such Shares have been satisfied or lapse (including satisfaction of any applicable tax withholding obligations), and Restricted Stock Units shall be paid in cash, Shares, or a combination of cash and Shares as the Committee, in its sole discretion shall determine.

**8.4    Certificate Legend** . In addition to any legends placed on certificates pursuant to Section 8.3, each certificate representing Shares of Restricted Stock granted pursuant to this Plan may bear a legend such as the following or as otherwise determined by the Committee in its sole discretion:

The sale or transfer of Shares of stock represented by this certificate, whether voluntary, involuntary, or by operation of law, is subject to certain restrictions on transfer as set forth in the Cinedigm Corp. 2017 Incentive Plan, and in the associated Award Agreement. A copy of this Plan and such Award Agreement may be obtained from Cinedigm Corp..

**8.5    Voting Rights** . Unless otherwise determined by the Committee and set forth in a Participant's Award Agreement, to the extent permitted or required by law, as determined by the Committee, Participants holding Shares of Restricted Stock granted hereunder may be granted the right to exercise full voting rights with respect to those Shares during the Period of Restriction. A Participant shall have no voting rights with respect to any Restricted Stock Units granted hereunder.

**8.6    Termination of Employment** . Each Award Agreement shall set forth the extent to which the Participant shall have the right to retain Restricted Stock and/or Restricted Stock Units following termination of the Participant's employment with or provision of services to the Company, its Affiliates, and/or its Subsidiaries, as the case may be. Such provisions shall be determined in the sole discretion of the Committee, shall be included in the Award Agreement entered into with each Participant, need not be uniform among all Shares of Restricted Stock or Restricted Stock Units issued pursuant to this Plan, and may reflect distinctions based on the reasons for termination.

14

**8.7    Section 83(b) Election** . The Committee may provide in an Award Agreement that the Award of Restricted Stock is conditioned upon the Participant making or refraining from making an election with respect to the Award under Code Section 83(b). If a Participant makes an election pursuant to Code Section 83(b) concerning a Restricted Stock Award, the Participant shall be required to file promptly a copy of such election with the Company.

**Article 9.    Performance Units/Performance Shares**

**9.1    Grant of Performance Units/Performance Shares** . Subject to the terms and provisions of this Plan, the Committee, at any time and from time to time, may grant Performance Units and/or Performance Shares to Participants in such amounts and upon such terms as the Committee shall determine. Performance Units and Performance Shares that are earned (as described in Section 9.3) may be subject to vesting requirements as set forth in the applicable Award Agreement. Except as the Committee may otherwise provide in an Award Agreement, Performance Units and Performance Shares may not vest prior to the expiration of at least one (1) year of a Performance Period.

**9.2    Value of Performance Units/Performance Shares** . Each Performance Unit shall have an initial value that is established by the Committee at the time of grant. Each Performance Share shall have an initial value equal to the Marker Price of a Share on the Grant Date. The Committee shall set Performance Measures in its discretion which, depending on the extent to which they are met, will determine the value and/or number of Performance Units/Performance Shares that may be earned by the Participant.

**9.3    Earning of Performance Units/Performance Shares** . Subject to the terms of this Plan, after the applicable Performance Period and vesting period, if any, have ended, the holder of Performance Units/Performance Shares shall be entitled to receive payout on the value and number of Performance Units/Performance Shares earned by the Participant over the Performance Period, to be determined as a function of the extent to which the corresponding Performance Measures have been achieved.

**9.4    Form and Timing of Payment of Performance Units/Performance Shares** . Payment of earned and vested Performance Units/Performance Shares shall be as determined by the Committee and as evidenced in the Award Agreement. Subject to the terms of this Plan, the Committee, in its sole discretion, may pay earned and vested Performance Units/Performance Shares in the form of cash or in Shares (or in a combination thereof). Any Shares may be granted subject to any restrictions deemed appropriate by the

Committee. The determination of the Committee with respect to the form of payout of such Awards shall be set forth in the Award Agreement pertaining to the grant of the Award.

**9.5      Termination of Employment** . Each Award Agreement shall set forth the extent to which the Participant shall have the right to retain Performance Units and/or Performance Shares following termination of the Participant's employment with the Company, its Affiliates, and/or its Subsidiaries, as the case may be. Such provisions shall be determined in the sole discretion of the Committee, shall be included in the Award Agreement entered into with each Participant, need not be uniform among all Awards of Performance Units or Performance Shares issued pursuant to this Plan, and may reflect distinctions based on the reasons for termination.

---

---

## Article 10.      Cash-Based Awards and Other Stock-Based Awards

**10.1      Grant of Cash-Based Awards** . Subject to the terms and provisions of the Plan, the Committee, at any time and from time to time, may grant Cash-Based Awards to Participants in such amounts and upon such terms as the Committee may determine.

**10.2      Other Stock-Based Awards** . The Committee may grant other types of equity-based or equity-related Awards not otherwise described by the terms of this Plan (including the grant or offer for sale of unrestricted Shares) in such amounts and subject to such terms and conditions, as the Committee shall determine. Such Awards may involve the transfer of actual Shares to Participants, or payment in cash or otherwise of amounts based on the value of Shares and may include, without limitation, Awards designed to comply with or take advantage of the applicable local laws of jurisdictions other than the United States.

**10.3      Value of Cash-Based and Other Stock-Based Awards** . Each Cash-Based Award shall specify a payment amount or payment range as determined by the Committee. Each Other Stock-Based Award shall be expressed in terms of Shares or units based on Shares, as determined by the Committee. The Committee may establish performance goals in its discretion. If the Committee exercises its discretion to establish performance goals, the number and/or value of Cash-Based Awards or Other Stock-Based Awards that will be paid out to the Participant will depend on the extent to which the performance goals are met.

**10.4      Payment of Cash-Based Awards and Other Stock-Based Awards** . Payment, if any, with respect to a Cash-Based Award or an Other Stock-Based Award shall be made in accordance with the terms of the Award, in cash or Shares as the Committee determines.

**10.5      Termination of Employment** . The Committee shall determine the extent to which the Participant shall have the right to receive Cash-Based Awards or Other Stock-Based Awards following termination of the Participant's employment with or provision of services to the Company, its Affiliates, and/or its Subsidiaries, as the case may be. Such provisions shall be determined in the sole discretion of the Committee, such provisions shall be included in the Award Agreement entered into with each Participant, but need not be uniform among all Awards of Cash-Based Awards or Other Stock-Based Awards issued pursuant to the Plan, and may reflect distinctions based on the reasons for termination.

## Article 11.      Transferability of Awards

**11.1      Transferability.** Except as provided in Section 11.2 below, during a Participant's lifetime, his or her Awards shall be exercisable only by the Participant (except Options and SARs may be exercised by the Participant's duly appointed personal representative). Awards shall not be transferable other than by will or the laws of descent and distribution; no Awards shall be subject, in whole or in part, to attachment, execution, or levy of any kind; and any purported transfer in violation hereof shall be null and void. The Committee may establish such procedures as it deems appropriate for a Participant to designate a beneficiary to whom any amounts payable or Shares deliverable in the event of, or following, the Participant's death, may be provided.

---

---

**11.2      Committee Action.** The Committee may, in its discretion, determine that notwithstanding Section 11.1, any or all Awards (other than ISOs) shall be transferable to and exercisable by such transferees, and subject to such terms and conditions, as the Committee may deem appropriate; provided, however, no Award may be transferred for value (as defined in the General Instructions to Form S-8).

## Article 12.      Performance Measures

**12.1**     **Performance Measures** . The Performance Measures upon which the payment or vesting of an Award to a Covered Employee that is intended to qualify as Performance-Based Compensation shall be limited to the following:

(a)     Net earnings or Net Income (before or after taxes);

(b)     Earnings per share (basic or diluted);

(c)     Net sales or revenue growth;

(d)     Net operating profit;

(e)     Return measures (including, but not limited to, return on assets, capital, invested capital, equity, sales, or revenue);

(f)     Cash flow (including, but not limited to, throughput, operating cash flow, free cash flow, cash flow return on equity, and cash flow return on investment);

(g)     Earnings before or after taxes, interest, depreciation, and/or amortization;

(h)     Earnings before taxes;

(i)     Gross or operating margins;

(j)     Corporate value measures;

(k)     Capital expenditures;

(l)     Unit volumes;

(m)     Productivity ratios;

(n)     Share price (including, but not limited to, growth measures and total shareholder return);

(o)     Cost or expense;

(p)     Margins (including, but not limited to, debt or profit);

(q)     Operating efficiency;

(r)     Market share;

(s)     Customer satisfaction;

(t)     Working capital targets or any element thereof;

(u)     Economic value added or EVA® (net operating profit after tax minus the sum of capital multiplied by the cost of capital);

(v)     Health, safety and environmental performance;

(w)     Corporate advocacy metrics;

(x)     Strategic milestones (including, but not limited to, debt reduction, improvement of cost of debt, equity or capital, completion of projects, achievement of synergies or integration objectives, or improvements to credit rating, inventory turnover, weighted average cost of capital, implementation of significant new processes, productivity or production, product quality, and any combination of the foregoing);

(y)    Strategic sustainability metrics (including, but not limited to, corporate governance, enterprise risk management, employee development, and portfolio restructuring); and

(z)    Stockholder equity or net worth.

Any one or more Performance Measure(s) may be used to measure the performance of any Participant, the Company, Subsidiary, and/or Affiliate as a whole or any business unit or line of business of the Company, Subsidiary, and/or Affiliate or any combination thereof, as the Committee may deem appropriate, or any of the above Performance Measures on an absolute, gross, total, net per share, average, adjusted or relative basis (or measure based on changes therein), including, as compared to the performance of a group of comparator companies, or published or special index that the Committee, in its sole discretion, deems appropriate, or the Company may select Performance Measure (n) above as compared to various stock market indices. The Committee also has the authority to provide for accelerated vesting of any Award based on the achievement of performance goals pursuant to the Performance Measures specified in this Article 12.

18

**12.2    Evaluation of Performance.** The Committee may provide in any such Award that any evaluation of performance may include or exclude any of the following events that occurs during a Performance Period: (a) asset write-downs, (b) litigation or claim judgments or settlements, (c) the effect of changes in tax laws, accounting principles, or other laws or provisions affecting reported results, (d) any reorganization and restructuring programs, (e) unusual and/or nonrecurring items as described in management's discussion and analysis of financial condition and results of operations appearing in the Company's annual report to shareholders for the applicable year, (f) acquisitions or divestitures, and (g) foreign exchange gains and losses. To the extent such inclusions or exclusions affect Awards to Covered Employees, they shall be prescribed in a form that meets the requirements of Code Section 162(m) for deductibility.

**12.3    Adjustment of Performance-Based Compensation.** The Committee shall not use discretion to adjust the payout of Performance-Based Compensation upwards once the Performance Measures have been established. The Committee shall retain the discretion to adjust such Awards downward, either on a formula or discretionary basis or any combination, as the Committee determines.

**12.4    Committee Discretion.** In the event that applicable tax and/or securities laws change to permit Committee discretion to alter the governing Performance Measures without obtaining shareholder approval of such changes, the Committee shall have sole discretion to make such changes without obtaining shareholder approval. In addition, in the event that the Committee determines that it is advisable to grant Awards that are not Performance-Based Compensation, the Committee may make such grants without satisfying the requirements of Code Section 162(m) and base vesting on Performance Measures other than those set forth in Section 12.1.

## Article 13.    Nonemployee Director Awards

The Board or Committee shall determine all Nonemployee Director Awards. The terms and conditions of any grant to any such Nonemployee Director shall be set forth in an Award Agreement.

## Article 14.    Minimum Vesting of Share-Based Awards

Notwithstanding any other provision of this Plan to the contrary, Awards granted pursuant to Article 6, 7 and 8 of this Plan shall be subject to a minimum vesting period of at least one (1) year, provided, however, (a) such vesting may be cliff or graded (starting no earlier than one (1) year after grant), (b) the Committee may provide for earlier vesting as specified in an Award Agreement, and (c) no more than five percent (5%) of the maximum number of Shares authorized for issuance under this Plan pursuant to Section 4.1(a) may be granted with a minimum vesting period of less than one (1) year.

## Article 15.    Dividend Equivalents

Any Participant selected by the Committee may be granted dividend equivalents based on the dividends declared on Shares that are subject to any Award, to be credited as of dividend payment dates, during the period between the date the Award is granted and the date the Award is exercised, vests or expires, as determined by the Committee. Such dividend equivalents shall be converted to cash or additional Shares by such formula and at such time and subject to such limitations as may be determined by the Committee. Notwithstanding the foregoing, for all Awards, the payment of dividends prior to an Award becoming vested shall be prohibited, and the Committee shall determine the extent to which dividends may accrue during the vesting period and become payable upon vesting. Dividends and dividend equivalents may not be paid on unexercised Options and SARs.

**Article 16.        Beneficiary Designation**

Each Participant under this Plan may, from time to time, name any beneficiary or beneficiaries (who may be named contingently or successively) to whom any benefit under this Plan is to be paid in case of his death before he receives any or all of such benefit. Each such designation shall revoke all prior designations by the same Participant, shall be in a form prescribed by the Committee, and will be effective only when filed by the Participant in writing with the Company, or the Company's designated agent, during the Participant's lifetime. In the absence of any such beneficiary designation, benefits remaining unpaid or rights remaining unexercised at the Participant's death shall be paid to or exercised by the Participant's executor, administrator, or legal representative.

**Article 17.        Rights of Participants**

**17.1        Employment** . Nothing in this Plan or an Award Agreement shall interfere with or limit in any way the right of the Company, its Affiliates, and/or its Subsidiaries, to terminate any Participant's employment, or service on the Board or to the Company, at any time or for any reason not prohibited by law, nor confer upon any Participant any right to continue his employment, or service as a Nonemployee Director or Third Party Service Provider, for any specified period of time.

Neither an Award nor any benefits arising under this Plan shall constitute an employment contract with the Company, its Affiliates, and/or its Subsidiaries and, accordingly, subject to Articles 3 and 19, this Plan and the benefits hereunder may be terminated at any time in the sole and exclusive discretion of the Committee without giving rise to any liability on the part of the Company, its Affiliates, and/or its Subsidiaries.

**17.2        Participation** . No individual shall have the right to be selected to receive an Award under this Plan, or, having been so selected, to be selected to receive a future Award.

**17.3        Rights as a Shareholder** . Except as otherwise provided herein, a Participant shall have none of the rights of a shareholder with respect to Shares covered by any Award until the Participant becomes the record holder of such Shares.

**Article 18.        Change of Control**

**18.1        Change of Control of the Company** . Notwithstanding any other provision of this Plan to the contrary, the provisions of this Article 18 shall apply in the event of a Change of Control, unless otherwise determined by the Committee in connection with the grant of an Award as reflected in the applicable Award Agreement or severance compensation agreement.

(a)        If, upon a Change of Control, a Participant receives a new Award which qualifies as a "Replacement Award" (as defined below), the Replacement Award shall continue subject to the terms of the Replacement Award.

(b)        If, upon a Change of Control that results in the Company's Shares no longer being traded on the NASDAQ Global Market or another established securities market and no Replacement Award is granted to a Participant, the unvested portion of an Award whose vesting is based only on a service requirement shall become immediately vested and exercisable, as applicable, upon the Change of Control.

(c)        Notwithstanding subparagraph (a) and except as may be otherwise provided in an Award Agreement, upon a Change of Control, with respect to Awards that are Performance Shares or Performance Units issued pursuant to Article 9 of the Plan, a pro-rata portion of the Award shall be immediately earned, vested and payable; such portion shall be determined based on the portion of the Performance Period that has elapsed as of (i) the date of the Change of Control, if the Performance Measure is based on stock price, or (ii) the end of the last full calendar quarter preceding or commensurate with the date of the Change of Control if the Performance Measure is not based on stock price (in each case, the "Adjusted Measurement Date"). The Award amount that will be considered earned and payable will be calculated based on the higher of target or actual performance measured as of the Adjusted Measurement Date. To the extent any earned Awards that are Performance Shares or Performance Units have not been paid prior to the Change of Control because they are subject to vesting, such earned but unvested Awards shall become immediately vested, and payable upon the Change of Control.

(d)        Except as provided in subparagraph (c) or as otherwise provided in an Award Agreement, if, following a Change of Control, the Company's Shares continue to be traded on the NASDAQ Global Market or another established securities market, outstanding

Awards shall continue in effect and be treated as Replacement Awards as described in subparagraph (a).

(e)    Notwithstanding any of subparagraphs (a), (b) or (d) of this Section 18.1, the Committee may, in its sole discretion, determine that any or all outstanding Awards granted under the Plan, whether or not exercisable, will be canceled and terminated, and that in connection with such cancellation and termination, the holder of such Award may receive for each Share subject to such Awards a cash payment (or the delivery of shares of stock, other securities or a combination of cash, stock and securities equivalent to such cash payment) equal to the difference, if any, between the consideration received by shareholders of the Company in respect of a Share in connection with such transaction and the purchase price per share, if any, under the Award multiplied by the number of Shares subject to such Award; provided that if such product is zero or less or to the extent that the Award is not then exercisable, the Awards will be canceled and terminated without payment therefor.

21

**18.2    Replacement Awards.** An Award shall be considered a Replacement Award if: (i) it has a value at least equal to the value of the Award it is replacing as determined by the Committee in its sole discretion; (ii) it relates to publicly traded equity securities of the Company or its successor in the Change of Control or another entity that is affiliated with the Company or its successor following the Change of Control; and (iii) its other terms and conditions are not less favorable to the Participant than the terms and conditions of the Award it is replacing (including the provisions that would apply in the event of a subsequent Change of Control). Without limiting the generality of the foregoing, the Replacement Award may take the form of a continuation of the Award it is replacing if the requirements of the preceding sentence are satisfied. The determination of whether the conditions of this Section 18.2 are satisfied shall be made by the Committee, as constituted immediately before the Change of Control, in its sole discretion.

**18.3    Reduction of Excess Parachute Payments** . Except as may be provided in a severance compensation agreement between the Company and the Participant, if, in connection with a Change of Control, a Participant's Award will cause the Participant to be liable for federal excise tax under Code Section 4999 levied on certain "excess parachute payments" as defined in Code Section 280G ("Excise Tax"), then the payments made pursuant to the Awards shall be reduced (or repaid to the Company, if previously paid or provided) as provided below:

(a)    If the payments due upon a Change of Control under this Plan and any other agreement between a Participant and the Company, exceed 2.99 times the Participant's "base amount," as defined in Code Section 280G, and it is determined that any Excise Tax is payable by a Participant, the Participant shall receive either (i) all payments otherwise due; or (ii) the reduced payment amount described in the next sentence, whichever will provide the Participant with the greater after-tax economic benefit taking into account for these purposes any applicable Excise Tax. To the extent necessary, and in compliance with the Code, a reduced payment amount shall be calculated by reducing the payments to the minimum extent necessary so that no portion of any payment, as so reduced or repaid, constitutes an excess parachute payment. .

(b)    Whether payments are to be reduced pursuant to this Section 18.3, and the extent to which they are to be so reduced, will be determined solely by the Company in good faith and the Company will notify the Participant in writing of its determination.

(c)    In no event shall a Participant be entitled to receive any kind of gross-up payment or Excise Tax reimbursement from the Company.

**Article 19.    Amendment, Modification, Suspension, and Termination**

**19.1    Amendment, Modification, Suspension, and Termination.** Subject to Section 19.3, the Committee may, at any time and from time to time, alter, amend, modify, suspend, or terminate this Plan and any Award Agreement in whole or in part; provided, however, that, (i) without the prior approval of the Company's shareholders and except as provided in Section 4.3, Options or SARs issued under this Plan will not be repriced, repurchased (including a cash buyout), replaced, or regranted through cancellation, or by lowering the Option Price of a previously granted Option or the Grant Price of a previously granted SAR, (ii) any amendment of the Plan must comply with the rules of the Market, and (iii) no material amendment of this Plan shall be made without shareholder approval if shareholder approval is required by law, regulation, or stock exchange rule.

22

**19.2    Adjustment of Awards Upon the Occurrence of Certain Unusual or Nonrecurring Events** . Subject to the requirements of Sections 12.2 and 12.3, the Committee may make adjustments in the terms and conditions of, and the criteria included in, Awards in recognition of unusual or nonrecurring events (including, without limitation, the events described in Section 4.3 hereof) affecting the Company or the financial statements of the Company or of changes in applicable laws, regulations, or accounting principles, whenever the Committee determines that such adjustments are appropriate in order to prevent unintended dilution or enlargement of the benefits or potential benefits intended to be made available under this Plan. The determination of the Committee as to the foregoing adjustments, if any, shall be conclusive and binding on Participants under this Plan.

**19.3    Awards Previously Granted** . Notwithstanding any other provision of this Plan to the contrary (other than Section 19.4), no termination, amendment, suspension, or modification of this Plan or an Award Agreement shall adversely affect in any material way any Award previously granted under this Plan, without the written consent of the Participant holding such Award.

**19.4    Amendment to Conform to Law.** Notwithstanding any other provision of this Plan to the contrary, the Committee may amend the Plan or an Award Agreement, to take effect retroactively or otherwise, as deemed necessary or advisable for the purpose of conforming the Plan or an Award Agreement to any present or future law relating to plans of this or similar nature (including, but not limited to, Code Section 409A), and to the administrative regulations and rulings promulgated thereunder. By accepting an Award under this Plan, a Participant agrees to any amendment made pursuant to this Section 19.4 to any Award granted under the Plan without further consideration or action.

**19.5    Compliance with the Exchange Act.** It is the Company's intent that the Plan comply in all respects with Rule 16b-3 under the Exchange Act and any related regulations. If any provision of this Plan is later found not to be in compliance with such Rule and regulations, the provisions shall be deemed null and void. All grants to, and exercises of Options by Insiders under this Plan shall be executed in accordance with the requirements of Section 16 of the Exchange Act and regulations promulgated thereunder.

## Article 20.    Withholding

**20.1    Tax Withholding** . The Company shall have the power and the right to deduct or withhold from any amounts due and owing to the Participant, or require a Participant to remit to the Company, up to the maximum statutory amount to satisfy federal, state, and local taxes, domestic or foreign, required by law or regulation to be withheld with respect to any taxable event arising as a result of this Plan.

**20.2    Share Withholding** . With respect to withholding required upon the lapse of restrictions on Restricted Stock and Restricted Stock Units, or upon the achievement of Performance Measures related to Performance Shares, or any other taxable event arising as a result of an Award granted hereunder, the Committee may establish provisions in the applicable Award Agreements to satisfy the withholding requirement, in whole or in part, by having the Company withhold whole Shares having a Market Price on the date the tax is to be determined up to the maximum statutory total tax withholding that could be imposed on the transaction.

## Article 21.    Successors

All obligations of the Company under this Plan with respect to Awards granted hereunder shall be binding on any successor to the Company, regardless of whether the existence of such successor is the result of a direct or indirect purchase, merger, consolidation, or otherwise, of all or substantially all of the business and/or assets of the Company.

## Article 22.    General Provisions

**22.1    Forfeiture Events.** Any Awards granted under the Plan will be subject to recoupment in accordance with any clawback policy that the Company currently has in effect, or is required to adhere to, adopt or modify, pursuant to the listing standards of any national securities exchange or association on which the Company's securities are listed or as is otherwise required by the Dodd-Frank Wall Street Reform and Consumer Protection Act or the Sarbanes-Oxley Act of 2002, or other applicable law ("Clawback Policy"). In addition, the Committee or the Board may impose such clawback, suspension, restriction, recovery, or recoupment provisions in an Award Agreement as the Committee or the Board determines necessary or appropriate, including, but not limited to, a reacquisition right in respect of previously acquired Shares or other cash or property, including the gains realized thereon, as set forth in the Award Agreement. These conditions may include, without limitation, actions by the Participant which constitute a conflict of interest with the Company, are prejudicial to the Company's interests, or are in violation of any non-compete agreement or obligation, any confidentiality agreement or obligation, the Company's applicable policies or the Participant's terms and conditions of employment. The Committee may require, upon exercise, payment or delivery pursuant to an award, that the Participant certify in a manner acceptable to the Company that he or she is in compliance with the terms and conditions of the Award. No recovery of compensation under this Section will be an event giving rise to a right to resign for "good reason" or "constructive termination" (or similar term) under any agreement or otherwise with the Company.

**22.2    Legend** . The certificates for Shares may include any legend which the Committee deems appropriate to reflect any restrictions on transfer of such Shares.

**22.3    Gender and Number** . Except where otherwise indicated by the context, any masculine term used herein also shall include the feminine, the plural shall include the singular, and the singular shall include the plural.

**22.4    Severability** . In the event any provision of this Plan shall be held illegal or invalid for any reason, the illegality or invalidity shall not affect the remaining parts of this Plan, and this Plan shall be construed and enforced as if the illegal or invalid provision had not been included.

24

**22.5    Requirements of Law** . The granting of Awards and the issuance of Shares under this Plan shall be subject to all applicable laws, rules, and regulations, and to such approvals by any governmental agencies or national securities exchanges as may be required.

**22.6    Delivery of Title** . The Company shall have no obligation to issue or deliver evidence of title for Shares issued under this Plan prior to:

    (a)    Obtaining any approvals from governmental agencies that the Company determines are necessary or advisable; and

    (b)    Completion of any registration or other qualification of the Shares under any applicable national or foreign law or ruling of any governmental body that the Company determines to be necessary or advisable.

**22.7    Inability to Obtain Authority** . The inability of the Company to obtain authority from any regulatory body having jurisdiction, which authority is deemed by the Company's counsel to be necessary to the lawful issuance and sale of any Shares hereunder, shall relieve the Company of any liability in respect of the failure to issue or sell such Shares as to which such requisite authority shall not have been obtained.

**22.8    Investment Representations** . The Committee may require any individual receiving Shares pursuant to an Award under this Plan to represent and warrant in writing that the individual is acquiring the Shares for investment and without any present intention to sell or distribute such Shares.

**22.9    Employees Based Outside the United States** . Notwithstanding any provision of this Plan to the contrary, in order to comply with the laws in other countries in which the Company, its Affiliates, and/or its Subsidiaries operate or have Employees, Nonemployee Directors, or Third Party Service Providers, the Committee, in its sole discretion, shall have the power and authority to:

    (a)    Determine which Affiliates and Subsidiaries shall be covered by this Plan;

    (b)    Determine which Employees, Nonemployee Directors, and/or Third Party Service Providers outside the United States are eligible to participate in this Plan;

    (c)    Modify the terms and conditions of any Award granted to Employees, Nonemployee Directors, and/or Third Party Service Providers outside the United States to comply with applicable foreign laws;

    (d)    Establish subplans and modify exercise procedures and other terms and procedures, to the extent such actions may be necessary or advisable. Any subplans and modifications to Plan terms and procedures established under this Section 21.9 by the Committee shall be attached to this Plan document as appendices; and

25

    (e)    Take any action, before or after an Award is made, that it deems advisable to obtain approval or comply with any necessary local government regulatory exemptions or approvals.

Notwithstanding the above, the Committee may not take any actions hereunder, and no Awards shall be granted, that would violate applicable law.

**22.10    Uncertificated Shares** . To the extent that this Plan provides for issuance of certificates to reflect the transfer of Shares, the transfer of such Shares may be effected on a noncertificated basis, to the extent not prohibited by applicable law or the rules of any stock exchange.

**22.11    Unfunded Plan** . Participants shall have no right, title, or interest whatsoever in or to any investments that the Company, and/or its Subsidiaries, and/or its Affiliates may make to aid it in meeting its obligations under this Plan. Nothing contained in this Plan, and no action taken pursuant to its provisions, shall create or be construed to create a trust of any kind, or a fiduciary relationship between the Company and any Participant, beneficiary, legal representative, or any other individual. To the extent that any individual acquires a right to receive payments from the Company, its Subsidiaries, and/or its Affiliates under this Plan, such right shall be no greater than the right of an unsecured general creditor of the Company, a Subsidiary, or an Affiliate, as the case may be. All payments to be made hereunder shall be paid from the general funds of the Company, a Subsidiary, or an Affiliate, as the case may be and no special or separate fund shall be established and no segregation of assets shall be made to assure payment of such amounts except as expressly set forth in this Plan.

**22.12    No Fractional Shares** . No fractional Shares shall be issued or delivered pursuant to this Plan or any Award. The Committee shall determine whether cash, Awards, or other property shall be issued or paid in lieu of fractional Shares or whether such fractional Shares or any rights thereto shall be forfeited or otherwise eliminated.

**22.13    Retirement and Welfare Plans** . Neither Awards made under this Plan nor Shares or cash paid pursuant to such Awards, except pursuant to Covered Employee annual incentive awards, may be included as "compensation" for purposes of computing the benefits payable to any Participant under the Company's or any Subsidiary's or Affiliate's retirement plans (both qualified and non-qualified) or welfare benefit plans unless such other plan expressly provides that such compensation shall be taken into account in computing a Participant's benefit.

**22.14    Deferred Compensation.** If any Award would be considered non-qualified deferred compensation as defined under Code Section 409A and if this Plan fails to meet the requirements of Code Section 409A with respect to such Award, then such Award shall be null and void. However, the Committee may permit deferrals of compensation pursuant to the terms of a Participant's Award Agreement, a separate plan or a subplan which meets the requirements of Code Section 409A and any related guidance. Additionally, to the extent any Award is subject to Code Section 409A, notwithstanding any provision herein to the contrary, the Plan does not permit the acceleration or delay of the time or schedule of any distribution related to such Award, except as permitted by Code Section 409A, the regulations thereunder, and/or the Secretary of the United States Treasury. To the extent the Plan or an Award Agreement is required to be interpreted under Code Section 409A, such interpretation shall be consistent, to the extent feasible as determined by the Company, with the intent to not cause the imposition of penalties under Code Section 409A.

**22.15    Nonexclusivity of this Plan** . The adoption of this Plan shall not be construed as creating any limitations on the power of the Board or Committee to adopt such other compensation arrangements as it may deem desirable for any Participant.

**22.16    No Constraint on Corporate Action.** Nothing in this Plan shall be construed to: (i) limit, impair, or otherwise affect the Company's or a Subsidiary's or an Affiliate's right or power to make adjustments, reclassifications, reorganizations, or changes of its capital or business structure, or to merge or consolidate, or dissolve, liquidate, sell, or transfer all or any part of its business or assets; or (ii) limit the right or power of the Company or a Subsidiary or an Affiliate to take any action which such entity deems to be necessary or appropriate.

**22.17    Governing Law** . The Plan and each Award Agreement shall be governed by the laws of the State of Delaware, excluding any conflicts or choice of law rule or principle that might otherwise refer construction or interpretation of this Plan to the substantive law of another jurisdiction. Unless otherwise provided in the Award Agreement, recipients of an Award under this Plan are deemed to submit to the exclusive jurisdiction and venue of the federal or state courts of Delaware, to resolve any and all issues that may arise out of or relate to this Plan or any related Award Agreement.

**22.18    Section 162(m).** It is the intention of the Company that, unless otherwise provided by the Committee, awards determined in accordance with this Plan shall be excluded from the deduction limitations contained in Code Section 162(m). Therefore, subject to the Committee's determination that an Award need not meet the Performance-Based Compensation exception contained in Code section 162(m), if any Plan provision is found not to be in compliance with such exception, that provision shall be deemed amended so that the Plan does so

comply to the extent permitted by law and deemed advisable by the Committee, and in all such events the Plan shall be construed in favor of its meeting the Performance-Based Compensation exception contained in Code Section 162(m).

As evidence of its adoption of this amendment and restatement of the Plan, the Company has caused this document to be executed by its duly authorized officer the 31 $^{st}$ day of August, 2017.

**CINEDIGM CORP.**

By: /s/ Christopher J. McGurk
       Name: Christopher J. McGurk
       Title: Chief Executive Officer

27



**Cinedigm Stockholders Approve Bison Transaction**

LOS ANGELES (August 31, 2017)--  Cinedigm Corp. (NASDAQ: CIDM) announced today that the proposal included in its recent proxy to issue 20,000,000 shares to sell to Bison Entertainment Investment Limited, the wholly owned subsidiary of Bison Holding Company Ltd. ("Bison Capital"), has been approved by the Company's stockholders at their annual meeting. The Company has agreed to sell to Bison Capital 20,000,000 shares (the "Shares") of Cinedigm's Class A common stock, par value $0.001 per share, for an aggregate purchase price of up to $30,000,000, of which up to 400,000 of the Shares may be sold to members of the Company's management instead of Bison Capital.

The transaction, when consummated, will result in Bison having majority voting control of Cinedigm and 2 of 7 seats on the Cinedigm Board of Directors.

Chris McGurk, Cinedigm Chairman and Chief Executive Officer, noted, " We believe this transaction with Bison will be game changing for Cinedigm as it will create multiple significant financial, strategic and operational opportunities for the Company. "

The Bison transaction is subject to certain other approvals including CFIUS review (Committee on Foreign Investment in the United States).

**About Cinedigm:**

Cinedigm powers custom content solutions to the world's largest retail, media and technology companies. We provide premium feature films and series to digital platforms including iTunes, Netflix, and Amazon, cable and satellite providers including Comcast, Dish Network and DirecTV, and major retailers including Walmart and Target. Leveraging Cinedigm's unique capabilities, content and technology, the Company has emerged as a leader in the fast-growing over-the-top (OTT) channel business, with four channels under management that reach hundreds of millions of devices while also providing premium content and service expertise to the entire OTT ecosystem. Learn more about Cinedigm at www.cinedigm.com.

www.cinedigm.com. [CIDM-E]

Cinedigm Corporation
Jill Newhouse Calcaterra, 310-466-5135
jcalcaterra@cinedigm.com

# EXHIBIT 4

SEC Form 4

# FORM 4

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Estimated average burden | |
| hours per response: | 0.5 |

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934 or Section 30(h) of the Investment Company Act of 1940

☐ Check this box to indicate that a transaction was made pursuant to a contract, instruction or written plan for the purchase or sale of equity securities of the issuer that is intended to satisfy the affirmative defense conditions of Rule 10b5-1(c). See Instruction 10.

| 1. Name and Address of Reporting Person<sup></sup> MCGURK CHRISTOPHER J | 2. Issuer Name and Ticker or Trading Symbol Cineverse Corp. [ CNVS ] | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|

| (Last)           (First)           (Middle) | | X   Director    10% Owner |
|---|---|---|
| 244 FIFTH AVENUE, SUITE M289 | 3. Date of Earliest Transaction (Month/Day/Year) 08/01/2023 | X   Officer (give title below)   Other (specify below) |
| C/O CINEVERSE CORP. | | CEO and Chairman |

| (Street) | 4. If Amendment, Date of Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
|---|---|---|
| NEW YORK    NY    10001 | | X   Form filed by One Reporting Person |
| (City)        (State)        (Zip) | | Form filed by More than One Reporting Person |

## Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Class A Common Stock | 08/01/2023 | | A | | 195,784(1) | A | $0 | 292,519 | D | |
| Class A Common Stock | | | | | | | | 19,116 | I | By Christopher and Jamie McGurk Living Trust(2) |

## Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned
(e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Stock Option (Right to buy) | $280 | | | | | | | (3) | 08/22/2023 | Class A Common Stock | 7,500 | | 7,500 | D | |
| Stock Appreciation Right | $29.4 | | | | | | | (4) | 06/07/2028 | Class A Common Stock | 35,000 | | 35,000 | D | |
| Stock Appreciation Right | $10.8 | | | | | | | (5) | 11/19/2030 | Class A Common Stock | 125,000 | | 125,000 | D | |
| Stock Appreciation Right | $9.6 | | | | | | | (6) | 10/17/2032 | Class A Common Stock | 125,000 | | 125,000 | D | |

**Explanation of Responses:**

1. Constitutes shares received as payment of annual bonus under Management Annual Incentive Plan.

2. The reporting person is a trustee of the Christopher and Jamie McGurk Living Trust.

3. One-third of the options vested on March 31 of each of 2015, 2016 and 2017.

# EXHIBIT 5

Exhibit 10.1

# AMENDMENT NO. 6
## TO
## CINEVERSE CORP. 2017 EQUITY INCENTIVE PLAN

AMENDMENT NO. 6, dated as of December 8, 2023 (this "Amendment"), to the 2017 Equity Incentive Plan (as amended, the "Plan") of Cineverse Corp., a Delaware corporation (the "Corporation").

WHEREAS, the Corporation maintains the Plan, effective as of August 31, 2017; and

WHEREAS, the Board of Directors of the Corporation deems it to be in the best interest of the Corporation and its stockholders to amend the Plan in order to increase the maximum number of shares of the Corporation's Class A Common Stock, par value $.001 per share, which may be issued and sold under the Plan from 904,913 shares to 2,054,913 shares.

NOW, THEREFORE, BE IT RESOLVED the Plan is hereby amended as follows:

1. The first sentence of Section 4.1(a) shall be revised and amended to read as follows:

"The maximum number of Shares available for issuance to Participants under this Plan, inclusive of Shares issued and Shares underlying outstanding awards granted on or after the Effective Date, is 2,054,913 Shares, which includes 6,414 unused Shares carried over from the Existing Incentive Plan."

2. This Amendment shall be effective as of the date first set forth above.

3. In all respects not amended, the Plan is hereby ratified and confirmed and remains in full force and effect.

CINEVERSE CORP.

By: /s/Gary S. Loffredo
Name: Gary S. Loffredo
Title: Chief Legal Officer, Secretary and Senior Advisor

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, DC 20549**

**FORM 10-K**

(Mark One)

☒ ANNUAL REPORT UNDER SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

**For the fiscal year ended: March 31, 2023**

☐ TRANSITION REPORT UNDER SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

**Commission File Number: 000-31810**

# Cineverse Corp.

(Exact name of registrant as specified in its charter)

| **Delaware** | **22-3720962** |
|---|---|
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification No.) |
| **244 Fifth Avenue, Suite M289, New York, NY** | **10001** |
| (Address of principal executive offices) | (Zip Code) |

**(212) 206-8600**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol | Name of each exchange on which registered |
|---|---|---|
| **CLASS A COMMON STOCK, PAR VALUE $0.001 PER SHARE** | **CNVS** | **NASDAQ CAPITAL MARKET** |

Securities registered pursuant to Section 12(g) of the Act: **NONE**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.     Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Exchange Act.     Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.     Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).     Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act

| Large accelerated filer | Accelerated filer | Non-accelerated filer | Smaller reporting company | Emerging growth company |
|---|---|---|---|---|
| ☐ | ☐ | ☒ | ☒ | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).     Yes ☐ No ☒

The aggregate market value of the voting and non-voting common equity held by non-affiliates of the issuer based on a price of $7.90 per share, the closing price of such common equity on the Nasdaq Global Market, as of September 30, 2022, was $58,637,073.46. For purposes of the foregoing calculation, all directors, officers and shareholders who beneficially own 10% of the shares of such common equity have been deemed to be affiliates, but the Company disclaims that any of such persons are affiliates.

As of June 27, 2023, 11,682,903 shares of Class A Common Stock, $0.001 par value were outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

None.

- restructuring or refinancing our remaining indebtedness; and

- seeking additional funding.

We cannot assure you, however, that our business will generate sufficient cash flow from operations, or that we will be able to make future borrowings in amounts sufficient to enable us to pay the principal and interest on our current indebtedness or to fund our other liquidity needs. We may need to refinance all or a portion of our indebtedness on or before maturity. We cannot assure you that we will be able to refinance any of our indebtedness on commercially reasonable terms or at all.

### *We have incurred long term losses.*

We have incurred long term losses and have financed our operations principally through equity investments and borrowings. As of March 31, 2023, we had negative working capital, defined as current assets less current liabilities, of $(7.8) million, and cash and cash equivalents of $7.2 million, total equity of $39.1 million, and $8.8 million net cash flows used in operating activities.

Our net losses and cash outflows may increase as and to the extent that we increase the size of our business operations, increase our sales and marketing activities, increase our content distribution rights acquisition activities, enlarge our customer support and professional services and acquire additional businesses. These efforts may prove to be more expensive than we currently anticipate which could further increase our losses. We must continue to increase our revenues in order to become profitable. We cannot reliably predict when, or if, we will become profitable. Even if we achieve profitability, we may not be able to sustain it. If we cannot generate operating income or positive cash flows in the future, we will be unable to meet our working capital requirements.

### *Many of our corporate actions may be controlled by our officers, directors and principal stockholders; these actions may benefit these principal stockholders more than our other stockholders.*

As of June 21, 2023, our directors, executive officers and principal stockholders, those known by us to beneficially own more than 5% of the outstanding shares of our Common Stock, beneficially own, directly or indirectly, in the aggregate, approximately 13.3% of our outstanding Common Stock. Certain of these stockholders are under the common control of one of our directors. These stockholders, as a group, may have significant influence over our business affairs, with the ability to control matters requiring approval by our security holders, including elections of directors and approvals of mergers or other business combinations. In addition, certain corporate actions directed by our officers may not necessarily inure to the proportional benefit of our other stockholders.

### *We are subject to risks from our equity investment in a foreign company.*

In November 2017, Bison, a Hong Kong-based entity that does business in mainland China as well as other locations, became our majority owner, although their ownership has since been reduced to less than 10%. In January 2018, we announced a strategic alliance with A Metaverse Company, a leading Chinese entertainment company, formerly Starrise Media Holdings Limited ("Metaverse"), to release films in China theatrically and to digital platforms, and to evaluate opportunities to jointly produce Chinese/American film co-productions, and in February and April 2020, we acquired approximately 26% of the outstanding ordinary shares of Metaverse, which percentage has declined to approximately 17%. Metaverse's ordinary shares are listed on the Hong Kong Stock Exchange, although the trading of such shares was halted on April 1, 2022. We have partnered with Metaverse in the past, and continue to do so, with respect to the release of U.S.-sourced content in China and China-sourced content in the U.S. We may experience consequences from economic and regulatory events and requirements outside of the United States that affect the value of these shares and their value to us, including changes in regulatory requirements that affect Metaverse, fluctuations in international currency exchange rates, volatility in international political and economic environments, public disclosure requirements, and unforeseen developments and conditions, including terrorism, war, epidemics and international tensions and conflicts. No assurance can be made that, if we were to sell these shares on the Hong Kong Stock Exchange in Hong Kong currency, we would receive the full value in U.S. dollars upon repatriating the proceeds, based on fluctuating currency exchange rates.

9

Our business could be adversely affected by the effects of a widespread outbreak of contagious disease, including the outbreak of COVID-19. The COVID-19 pandemic and related economic repercussions created significant volatility and uncertainty impacting the Company's results during recent years. As part of our Content & Entertainment segment, the Company sells DVDs and Blu-ray discs at brick-and-mortar stores. With the closure of non-essential retail stores beginning in the spring of 2020, the sale of physical discs through our retail partners declined although this was partially offset by digital purchases of physical product. However, the level of these sales has substantially recovered.

**Risks Related to Common Stock**

***The liquidity of our Common Stock is uncertain; the limited trading volume of our Common Stock may depress the price of such stock or cause it to fluctuate significantly.***

Although our Common Stock is listed on Nasdaq, there has been a limited public market for our Common Stock and there can be no assurance that a more active trading market for our Common Stock will develop. As a result, you may not be able to sell your shares of our Common Stock in short time periods, or possibly at all. The absence of an active trading market may cause the price per share of our Common Stock to fluctuate significantly.

***Substantial resales or future issuances of our Common Stock could depress our stock price.***

The market price for our Common Stock could decline, perhaps significantly, as a result of resales or issuances of a large number of shares of our Common Stock in the public market or even the perception that such resales or issuances could occur. In addition, we have outstanding a substantial number of options and warrants exercisable for shares of our Common Stock that may be exercised in the future. These factors could also make it more difficult for us to raise funds through future offerings of our equity securities.

***You will incur substantial dilution as a result of certain future equity issuances.***

We have a substantial number of options and warrants currently outstanding which may be immediately exercised for shares of Common Stock. To the extent that these options or warrants are exercised, or to the extent we issue additional shares of Common Stock in the future, as the case may be, there will be further dilution to holders of shares of the Common Stock.

***Our issuance of preferred stock could adversely affect holders of Common Stock.***

Our Board of Directors is authorized to issue series of preferred stock without any action on the part of our holders of Common Stock. Our Board of Directors (the "Board of Directors") also has the power, without stockholder approval, to set the terms of any such series of preferred stock that may be issued, including voting rights, dividend rights, preferences over our Common Stock with respect to dividends or if we liquidate, dissolve or wind up our business and other terms. If we issue preferred stock in the future that has preference over our Common Stock with respect to the payment of dividends or upon our liquidation, dissolution or winding up, or if we issue preferred stock with voting rights that dilute the voting power of our Common Stock, the rights of holders of our Common Stock or the price of our Common Stock could be adversely affected.

***Our stock price has been volatile and may continue to be volatile in the future; this volatility may affect the price at which you could sell our Common Stock.***

The trading price of our Common Stock has been volatile and may continue to be volatile in response to various factors, some of which are beyond our control. Any of the factors listed below could have a material adverse effect on an investment in our securities:

- actual or anticipated fluctuations in our quarterly financial results or the quarterly financial results of companies perceived to be similar to us;

- changes in the market's expectations about our operating results;

# EXHIBIT 6

## CONFIDENTIALITY AND NON-DISCLOSURE AGREEMENT GOVERNING THE INSPECTION OF BOOKS AND RECORDS

IT IS HEREBY STIPULATED AND AGREED, by and between Cineverse Corp. (the "Company") and Roy Hallett ("Stockholder"), that this Confidentiality and Non-Disclosure Agreement Governing the Inspection of Books and Records (the "Agreement"), dated as of ~~June~~ *August* 28, 2024, shall govern all information and documents of any kind or type (the "Documents") made available for inspection by the Company or its counsel in response to or in connection with Stockholder's demand letter dated March 8, 2024 seeking to inspect documents pursuant to Section 220 of the Delaware General Corporation Law.

1.    The Company shall produce to the Stockholder copies of Documents called for by the Demand, as modified by such limitations as to scope as may be mutually agreed by the Company and the Stockholder. The Company may designate as "Confidential" any Documents that the Company believes contain confidential information ("Confidential Information"). The Company shall have the right to designate Documents as Confidential Information by stamping the Document (or any page thereof) with the legend "Confidential." The inadvertent failure by the Company to designate material as "Confidential" shall not be a waiver by the Company of any claim of confidentiality as to such material or subject matter.

2.    Stockholder shall not use, utilize, exploit, disclose, publish, disseminate or communicate the contents of Confidential Information to anyone, either directly or indirectly, except as expressly allowed by this Agreement. By producing any Confidential Information to Stockholder, the Company does not admit that Stockholder has a proper purpose for the inspection of such information and expressly reserves the right to assert that: the Demand does not comply with Delaware law or any other applicable law; Stockholder has not stated a proper purpose; the stated purposes of the Demand are not Stockholder's actual purpose; the stated purposes of the Demand do not have a credible basis; the Demand is overly broad and seeks documents not

reasonably related to Stockholder's stated purpose; and that for any other reason, Stockholder is not entitled to the inspection demanded.

3.    Stockholder reserves all rights to seek or enforce his legal rights as a stockholder of the Company, including his rights pursuant to Section 220 of the Delaware General Corporation Law, and his right to challenge a designation of Confidential in any subsequent derivative action, to the extent permitted by Delaware law. The Company reserves all of its rights and defenses with respect to any action or proceeding initiated by Stockholder, whether pursuant to Section 220 or otherwise.

4.    Confidential Information may be used by Stockholder solely for the purposes stated in the Demand, subject to any modifications or amendments agreed to by the Company and Stockholder, except that Confidential Information shall not be used to assist, support or facilitate any litigation of any kind other than (a) stockholder derivative litigation on behalf of the Company in the Delaware Court of Chancery or, if the Court of Chancery lacks subject matter jurisdiction, in another court in Delaware having proper jurisdiction, concerning the subject matters described in the Demand, or (b) intervention in stockholder derivative litigation on behalf of the Company concerning the subject matters described in the Demand. Stockholder will ensure that any complaint or other filing made in such derivative litigation that contains Confidential Information shall be filed under seal as a "Confidential Filing" pursuant to Delaware Court of Chancery Rule 5.1 or, if such complaint or filing is made in a different Court, pursuant to that Court's rules governing confidentiality. Confidential Information shall not be used for any other purpose, including, without limitation, any business, commercial, or political purpose.

5.    Confidential Information may be disclosed by Stockholder only to his legal and financial advisors, other legal counsel, consultants or experts as Stockholder has retained for the purpose of fulfilling the purposes stated in the Demand (the "Qualified Persons"), and (b) to any appropriate court as provided for in this Agreement. Any Qualified Person to whom

Stockholder discloses Confidential Information shall safeguard such Confidential Information to prevent disclosure to any others and will not maintain or store the Confidential Information in such a way that creates an unreasonable risk of deliberate or inadvertent disclosure of the Confidential Information to others. Stockholder agrees that, prior to disclosing any Confidential Information to any Qualified Person, Stockholder will ensure that such Qualified Person executes <u>Exhibit A</u> attached hereto. Stockholder and each Qualified Person will not maintain or store the Confidential Information in such a way that creates an unreasonable risk of deliberate or inadvertent disclosure of the Confidential Information to others.

6.      The Company expressly reserves the right to withhold or redact documents protected from disclosure by the attorney-client privilege, the work product privilege or any other applicable privilege or doctrine.

7.      If information subject to a claim of attorney-client privilege, attorney work product or any other privilege or protection is inadvertently produced to Stockholder, such production shall in no way prejudice or otherwise constitute a waiver of any claim of privilege, work product or other privilege or protection. If a claim of inadvertent production is made with respect to information, then in the custody of Stockholder, Stockholder shall promptly return or destroy the information and all copies thereof to the Company, and Stockholder shall not use such information for any purpose. Stockholder shall promptly certify such destruction in writing. Should Stockholder thereafter seek to compel production of such material, Stockholder shall not assert the fact or circumstance of the inadvertent production as a ground for compelling production of such information or any other information to Stockholder or any other person.

8.      If Stockholder or a Qualified Person to whom disclosure of Confidential Information has been made believes that he, she or it may be compelled by interrogatory, subpoena, civil investigatory demand or any similar process relating to any legal proceeding, investigation or

hearing to disclose any Confidential Information, he, she or it shall (a) provide the Company and its counsel with prompt written notice within three business days of the receipt of such request so that the Company may seek a protective order or other appropriate remedy; (b) reasonably cooperate with the Company in pursuing any such course of action; and (c) not voluntarily produce or disclose Confidential Information to any person or entity not a party to this Agreement without the prior consent of the Company pending any ruling from a court of competent jurisdiction requiring such production or disclosure. In the event that a protective order or other remedy is not obtained, Stockholder and any such Qualified Person shall disclose only such Confidential Information as they are legally compelled to disclose and shall exercise best efforts to obtain assurances that confidential treatment will be accorded to any Confidential Information that is compelled to be disclosed.

9.     Any notice required or permitted herein shall be made to the Company by sending notice in the timeliest fashion to its counsel at Richards, Layton & Finger, P.A. Notice may be made by e-mail.

10.     Stockholder agrees that the stockholder derivative lawsuit referenced in Paragraph 4 above, if one is filed, shall be filed in the Delaware Court of Chancery or, if the Court of Chancery lacks subject matter jurisdiction, another court in Delaware having proper jurisdiction. All documents and information made available for inspection by the Company in response to the Demand shall be deemed incorporated by reference into any complaint, petition or other court filing Stockholder files that (i) relies upon Confidential Information or (ii) otherwise concerns the subject matter identified in the Demand, to the extent permitted by Delaware law.

11.     If Stockholder determines to commence a lawsuit using Confidential Information, Stockholder and counsel retained by Stockholder shall comply with Delaware Court of Chancery Rule 5.1, or other similar provision, governing confidential treatment for complaints, and redact all references to Confidential Information in any pleadings filed with the court, serve

an unredacted copy of such pleadings on the Company's counsel, and file a motion to file the legal pleading and any other documents containing Confidential Information under seal. If such permission is denied, Stockholder or counsel retained by Stockholder shall provide three business days' written notice to the Company prior to the filing of any such legal pleading with the court in an unredacted form.

12.     The parties and their counsel agree that any claim, dispute, controversy or causes of action between or among the parties to this Agreement or any of their affiliates concerning this Agreement (including the negotiation, execution or performance hereof) and/or the Company's document production in response to the Demand (including, but not limited to, any claim by Stockholder that the terms and restrictions of this Agreement should not apply to any Confidential Information) shall be heard and determined exclusively in the Delaware Court of Chancery or, in the event that the Delaware Court of Chancery declines to accept jurisdiction over such litigation, any state or federal court of competent jurisdiction located in the State of Delaware. Stockholder agrees and consents to submit to personal jurisdiction of the Delaware Court of Chancery in connection with any matter to enforce any provision of this Agreement, agrees not to attempt to deny or defeat such personal jurisdiction by motion or other request, and agrees and consents to service of process in connection with any such action by registered or certified mail.

13.     Stockholder agrees that if Stockholder decides that he does not intend to pursue the Demand any further, Stockholder will promptly so inform the Company in writing.

14.     Stockholder and any Qualified Person(s) with whom Confidential Information was shared will destroy all Confidential Information (including any notes or other documents that refer to such Confidential Information) promptly upon completing the purposes described in the Demand or in no event later than six months after: (i) the entry of a final judgment, or the conclusion of any appeals therefrom, in any stockholder derivative lawsuit referenced in Paragraph 4, or (ii) the date on which Stockholder informs the Company in writing that

Stockholder does not intend to pursue the Demand any further. When the Confidential Information is destroyed, Stockholder and any Qualified Persons who received the information will certify, upon written request from the Company, that they have so destroyed such documents. Notwithstanding this provision, Stockholder may retain copies of all formal correspondence and/or court filings pertaining to this Demand.

15.     Stockholder and any Qualified Person to whom Confidential Information is disclosed agree that the Company would not have an adequate remedy at law in the event that this Agreement is breached outside the context of shareholders rights and agree that the Company will be entitled to seek specific performance and/or injunctive relief with respect to the terms hereof. Such remedies shall not be deemed to be the exclusive remedies for any breach of this Agreement but shall be in addition to any other remedies which may exist at law or in equity.

16.     This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to its conflict of laws principles.

17.     This Agreement may be executed in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute one and the same instrument.

18.     This Agreement may not be amended, modified, or waived except by a separate writing executed by the Stockholder or counsel retained by Stockholder and the Company or its counsel that expressly so amends, modifies, or waives this Agreement.

19.     The waiver by any party of any breach of this Agreement shall not be deemed or construed as a waiver of any other right under or breach of this Agreement. Failure or delay in exercising any right, power, or privilege hereunder shall not operate as a waiver thereof,

and no single or partial exercise of any right, power, or privilege hereunder shall preclude any other or further exercise of any right, power or privilege.

20.    This Agreement and any writing(s) memorializing the agreed-upon scope of production as contemplated by Paragraph 1 hereof together constitute the only agreement between each of the Stockholder and the Company with respect to the subject matter hereof and supersedes all prior agreements, understandings, negotiations, and discussions, whether oral or written.

21.    If any portion of this Agreement should be deemed by a court or other tribunal of valid jurisdiction to be void or unenforceable, in whole or in part, the other provisions of this Agreement shall continue to be valid and the parties shall replace the void or unenforceable provision with one that is valid and enforceable and most nearly approximates their original intentions.

22.    This Agreement will be deemed to have been mutually prepared by the parties (including each Qualified Person) and will not be construed against any of them by reason of authorship.

STIPULATED AND AGREED TO BY:

RICHARDS, LAYTON & FINGER, P.A.

By: _____

Roy Hallett
1552 N Azurite Place
Kuna, ID 83634
(208) 219-2850

*Stockholder*

By: _____

Matthew W. Murphy, Esq.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
(302) 651-7700

*Attorney for Cineverse Corp.*

# EXHIBIT 7

# Chairman's Letter to Cinedigm Shareholders Outlines Stock Repurchase Program, Acquisition of Leading Faith and Family Streaming Properties and the Company's Future Outlook

March 02, 2023 at 11:16 am EST

Share

LOS ANGELES, March 2, 2023 /PRNewswire/ -- **Cinedigm Corp.** ("Cinedigm" or the "Company") (NASDAQ: CIDM), a premier content streaming technology and entertainment company super-serving enthusiast audiences, today released the following comments by Chairman and CEO Chris McGurk:



Dear Fellow Shareholders,

Following a quarter that underscored how our diversified strategy led to very strong top and bottom-line performance, I would like to discuss the stock repurchase program we announced yesterday and share why it is tangible evidence of the confidence that the Board of Directors and I have in the future of the Company.

## Cinedigm Stock Repurchase Program

Effective immediately, Cinedigm is implementing a stock repurchase program of up to 10 million shares. Our Board has authorized the Company to repurchase Class A shares from time to time in the open market over the next 12 months at its discretion.

Why are we doing this? Our balance sheet is very strong, with essentially no debt, and our recent upside performance has increased our cash on hand even further from the end of last quarter. This gives us complete confidence that we can execute this significant stock repurchase program without hampering planned operating expenditures, such as key content acquisitions. Most importantly, we believe that purchasing undervalued Cinedigm shares is a superb investment strategy for the Company.

Clearly, macroeconomic and geopolitical factors have severely depressed equity markets across the board, especially for companies of our size and in our sector. Rather than relying solely on quarterly reports and day-to-day announcements about Company activities, this program allows us to directly show you that we are confident in the strategy and goals we have laid out. We are effectively putting our money where our mouth is.

I personally own more than two million shares of Cinedigm stock, so I understand the frustration that all our shareholders are feeling now, particularly given our strong operational and financial performance. With this repurchase program, we are choosing signal that we fully agree with the analysts who study and follow Cinedigm, and who have targeted our stock price at $2.25-$5.00 per share.

They are correct in doing so, given Cinedigm's rapid growth, including the creation of dozens of new jobs, as we develop industry-leading new technology and bypass the major studios and streaming "gatekeepers" to provide enthusiast audiences the films and TV programs they cannot find elsewhere.

This plan is also important in relation to our NASDAQ listing minimum price issue. On that matter, I believe there is potential to further extend our cure period.

## Content Strategy – Spanning Horror to Faith & Family

This week, we announced the acquisition of two established faith and family media properties, Dove.org and Christian Cinema, from the Giving Company. This is our eighth acquisition in the past two years, and like the others, it emphasizes how Cinedigm's unique content strategy, distribution footprint, and technology capabilities meet the needs of enthusiast audiences.

Among our more than two dozen streaming brands, the Dove Channel is one of our most successful, rapidly growing in a segment of the industry that is estimated to be a $1.5 billion revenue business in North America, with a projected compound growth rate of 20% over the next five years. This past weekend's box office success of "Jesus Revolution" demonstrates the huge opportunity in this important and growing entertainment segment.

Dove.org, best known for the "Dove Seal of Approval" given to thousands of titles over the years, publishes movie reviews, news, podcasts, and movie ratings for films, TV shows,

video games, and online content through its website, email newsletters, and social channels to help families make more informed media choices. Alongside Christian Cinema, a leading TVOD service for faith-based films that we will be expanding on the content and distribution side, we have a great opportunity to grow our customer base, add immediately accretive revenue, and gain multiple new avenues for growth across all touchpoints, from theatrical releases to streaming exclusives and more. Dove.org has been our partner on the Dove Channel for years, so it will fit perfectly with the 360-degree approach we are taking with faith & family.

In fact, this approach has been very successful for us in the horror genre, which couldn't be more different, yet has a similarly passionate fan base. We are now well-positioned to compete in two of the hottest genres in Hollywood, as we look to take this winning approach to other genres in which we have a strong presence, including anime, Asian content, and indie film. We will continue to look for other accretive M&A opportunities that support this strategy while we fully leverage our content expertise, our growing 60,000 title library, and our best-in-class proprietary Matchpoint content and streaming technology platform.

## Cinedigm's Future

Over the last few years, we have completely transformed Cinedigm from its original incarnation as a digital cinema technology innovator into a leading, pure-play, independent streaming content and technology company. Not only have we doubled the size of our content and streaming business over the last two years, but we have also attained a scale that puts us on a similar revenue and audience track as Pluto TV and Tubi just a few years before they were acquired by Paramount and FOX, respectively.

But we are not stopping there. Our goal is to build a business that can stand shoulder-to-shoulder with the largest platforms in the industry, but to do so while being profitable. We are fully committed to achieving that goal by the end of this fiscal year, through aggressively streamlining and the successful implementation of the high margin, low incremental-cost business initiatives that we have repeatedly highlighted over the last year: our flagship ad-supported service Cineverse; Cinedigm Ad Solutions; the Cinedigm Podcast Network; and our Matchpoint platform, which we like to call our "Operating System for Streaming."

Looking to the future, I'd like to emphasize the following points:

- Our key strategic initiatives have been very successful, giving us renewed confidence in achieving our Company goal of more than 50% per year streaming revenue growth and $150 million in annual revenues within 2-4 years while significantly improving our margins to attain sustained profitability.

- The heart of any streaming service is its film and TV library, and we have been focused on building one of the largest and most diverse in the industry. From major theatrical hits and Academy Award winners, to anime, faith & family, and horror favorites, to name a few, we now have close to 60,000 movies and shows under license – with nearly 25,000 added this year alone. As we race to build the biggest, most diverse library in the world on our quest to become "the Spotify of independent film & TV", we are building both valuable assets and a massive competitive advantage.

- Speaking of competitive advantages, Matchpoint, our streaming OS that powers content management, content preparation, content delivery, programming, video streaming apps, analytics and more, is the ultimate differentiator. It not only powers most of our owned-and-operated streaming services but is also available to third-party partners on a SaaS basis. Like Netflix and Disney Streaming (formerly BAMtech, with the remaining 15% acquired by Disney last year for $900M), Matchpoint gives us a huge competitive, creative and cost-savings advantage within the industry.

  - Our focus has been on leveraging the power of content processing at scale, and by utilizing AI and machine learning, Matchpoint automates tasks that previously required a large army of employees to accomplish by hand. For example, this past January, Matchpoint delivered 9,000 titles comprising 50,000 assets into the streaming ecosystem through 100% machine-based automation. For perspective, that is 2.3 times the total number of movies on Netflix or 7.2 times the number of movies on Hulu that we processed in just a single month.

  - We think Matchpoint is one of our key "secret weapons" that gives us a big competitive and operating advantage, dramatically reduces costs to achieve profitability and supports a much higher valuation for the Company when fully appreciated and understood. As former customers of high-cost (yet ineffective) technology vendors within the streaming technology ecosystem, we have developed what we consider to be a superior, best-in-class platform on the

market today. And now, other key streaming companies that need these technologies (but don't have a decade to waste building them from scratch) are knocking on our door. Expect more news on this front very soon.

- On the back of Matchpoint, our flagship streaming service, Cineverse, recently launched earlier this fiscal year. Our vision is simple: to build a home to access – whether you buy, rent, stream with ads, or subscribe commercial-free – the 97% of movies and shows not available on the major streamers. Our goal is to have hundreds of thousands of titles over the next 30 months that, like Spotify before us, are expertly hand-curated or easily searched. As of today, we now have over 19,000 titles available on Cineverse. Beyond that, we're developing a next-generation assistant with encyclopedic knowledge of our library – and film and TV history in general – that, through natural language conversation, can help you find your next favorite content based on mood, theme, daypart, and more. From our partnership with genomic indexing company Katch, to our own proprietary algorithms, we hope to make finding something to watch nearly as fun as the watching itself.

- Beyond Cineverse, Cinedigm continues to be a leader in the free, ad-supported streaming television (FAST) market, one of the fastest growing and most profitable segments of the streaming industry. Having launched our first FAST channel in 2016, we were one of the early pioneers in the segment and have built a portfolio of more than two dozen properties. As this market heats up, companies ranging from Warner Bros. Discovery to Netflix, Microsoft, Google and others are looking to enter the space, and we expect every major media company in the world that generates advertising from cable and broadcast television to be a FAST player within the next couple of years. As FAST eventually becomes the replacement for basic cable, we find ourselves in an enviable and rare strategic position.

Finally, as Cinedigm has completed its transformation to a streaming content and technology business this fiscal year, I'm excited to announce we will be rebranding the company to reflect this momentous turning point for the company. This branding will accentuate our position and narrative for today and the future. Stay tuned for more details on this over the next few months.

In conclusion, I want to thank all our shareholders for their support and patience. Our future continues to look very bright. I look forward to communicating with all of you again soon.

Sincerely,

Chris McGurk

Chairman & CEO

# EXHIBIT B

 Hearings    Pay    Guide & File    E-File    Terms and Conditions    Support    Lorena   Sign Out

# Roy Hallett Plaintiff, vs. Cineverse Corp, Gary Loffredo, Christopher McGurk Defendant.

AA- ALL INITIAL DISTRICT COURT FILINGS (NOT E, F, AND H1)

## Case Overview

CASE NUMBER
**CV01-25-13141**

STATUS
○ Open

FILED
07/22/2025

LAST UPDATE
8/7/2025

 COURT
Ada County District Court

 JUDICIAL OFFICER
Yee-Wallace, Cynthia

## Parties & Participants

**Hallett, Roy**
*Plaintiff*

**Christensen, Matthew Todd**
*Lead Attorney*

**Cineverse Corp**
*Defendant*

**Loffredo, Gary**
*Defendant*

**McGurk, Christopher**

*Defendant*

# Case Details Timeline

**Upcoming Activity and Details**

There are no upcoming events for this case.

**Past Activity and Details**

Case Timeline (14) | Hearings (0) | Documents (6) | Charges (0) | All

Newest to Oldest

○ **8/7/2025 - Affidavit / Return of Service**

*Documents*
 Affidavit of Service - Gary Loffredo 8/2/25
*Comment*
- Gary Loffredo 8/2/25

○ **8/1/2025 - Affidavit / Return of Service**

*Documents*
Affidavit/Return of Service
*Comment*
(7/28/25) (Cineverse)

○ **7/22/2025 - Civil Case Information Sheet**

○ **7/22/2025 - Summons Issued**

*Documents*
Summons - Cineverse Corp
*Comment*

and Filed - Cineverse Corp

○ **7/22/2025 - Summons Issued**

*Documents*
📄 Summons - Christopher McGurk
*Comment*
and Filed - Christopher McGurk

○ **7/22/2025 - Summons Issued**

*Documents*
📄 Summons - Gary Loffredo
*Comment*
and Filed - Gary Loffredo

○ **7/22/2025 - Complaint Filed**

*Documents*
📄 Complaint

○ **7/22/2025 - New Case - District Civil**

Electronically Filed
7/22/2025 10:16 AM
Fourth Judicial District, Ada County
Trent Tripple, Clerk of the Court
By: Breanna Johnson, Deputy Clerk

Matthew T. Christensen, ISB: 7213
JOHNSON MAY
199 N. Capitol Blvd., Ste. 200
Boise, Idaho 83702
Telephone: (208) 384-8588
Facsimile: (208) 629-2157
Email: mtc@johnsonmaylaw.com

## IN THE DISTRICT COURT OF THE FOURTH JUDICIAL DISTRICT
## OF THE STATE OF IDAHO, IN AND FOR THE COUNTY OF ADA

| | |
|---|---|
| Roy Hallett, an individual<br><br>　　　　　　　Plaintiff,<br><br>vs.<br><br>CINEVERSE CORP, a Delaware Corporation,<br>CHRISTOPHER MCGURK, an individual,<br>GARY LOFFREDO, an individual,<br><br>　　　　　　　Defendants. | Case No.: CV01-25-13141<br><br>**COMPLAINT** |

The Plaintiff, Roy Hallett, by and through his counsel of record, JOHNSON MAY, states and alleges against Defendants Cineverse Corp., Christopher McGurk, and Gary Loffredo, (collectively "Defendants") as follows:

### I.  PARTIES, VENUE, AND JURISDICTION

1.    Plaintiff Roy Hallett ("Plaintiff" or "Hallett") is an individual who resides in Idaho.

2.    Plaintiff is an individual investor and resident of Idaho, who purchased shares of Defendant Cineverse during the relevant period and suffered financial losses due to the alleged violations contained in this Complaint.

3.    Defendant Cineverse Corp ("Cineverse") is a Delaware corporation.

COMPLAINT – Page 1

4.     Defendant Christopher McGurk ("Mr. McGurk") is an individual, who was operating as the chief executive officer and chairman of Cineverse during the relevant times.

5.     Defendant Gary Loffredo ("Mr. Loffredo") is an individual, who was operating as the chief legal advisor of Cineverese during the relevant times.

6.     Defendants directly or indirectly, made use of means or instruments of transportation or communication in interstate commerce, or of the mails, or of any facility of a national securities exchange in connection with the acts, practices, and courses of business alleged in this Complaint.

7.     Defendants directly solicited contracts and/or business with the Plaintiff in the state of Idaho.  Further, the Defendants tortious acts (as outlined below) caused injury within the state of Idaho.

8.     Venue is proper in Idaho pursuant to Idaho Code § 5-514 because the Defendants transacted business in Idaho with the Plaintiff and the Plaintiffs' tortious actions caused damages to the Plaintiff within the state of Idaho.

## II.    FACTS

9.     On March 31, 2000, Defendant Cineverse, formerly known as Cinedigm, was formed as a Delaware Corporation.

10.     Cineverse is an entertainment company.

11.     Beginning September of 2021, Mr. Hallett began purchasing shares of Defendant Cineverse and continued acquiring shares through January of 2022

12.     In 2021, the stock price of Cineverse began to decline.

13.     On October 11, 2021, Cineverse published a press release containing the following statement from Mr. McGurk,

"So, let me underscore that **we are only making accretive acquisitions** and we will finance those deals as appropriate to ensure that outcome. And we will smartly raise funds to finance those deals based on specific accretive content, technology, and streaming channel opportunities. We are not in the business of raising cash and stockpiling it on our balance sheet. We have turned down multiple opportunities to do that. **We will only look at options to finance accretive deals in the future at the lowest possible cost of capital combined with the highest potential return, to continue to create shareholder value**." (Emphasis added.)

14.    A true and correct copy of this press release is attached as ***Exhibit 1***.

15.    Based on Mr. McGurk's representation, Mr. Hallett continued to hold his stock in Cineverse, believing management was acting in the best interest of shareholders to increase shareholder value.

16.    On September 26, 2022, an article was published quoting Mr. McGurk appraising MatchPoint, a streaming service owned by Cineverse, as being worth $100 million.

17.    A true and correct copy of this article is attached as ***Exhibit 2***.

18.    The article further quoted Mr. McGurk as stating: "So McGurk will continue to stave off buyers (and yes, there are interested parties, he said) for another year or two. "We want to get a little bit bigger, we want to establish Cineverse," McGurk. *Then* maybe they'll sell, and that's no fake."

19.    On June 9, 2023, Cineverse executed a 1-for-20 reverse stock split of its issued and outstanding Class A common stock, whereby every 20 shares of Cineverse's common stock were consolidated into one new share of common stock (the "Reverse Stock Split").

20.     Section 4.3 of the Stock Incentive Plan addresses corporate actions such as the Reverse Stock Split that occurred, stating:

"the Committee, in its sole discretion**, in order to prevent dilution or enlargement of Participants' rights under this Plan**, **shall substitute or adjust**, as applicable, **the number and kind of Shares that may be issued under this Plan or under particular forms of Awards,** the number and kind of Shares subject to outstanding Awards, the

Option Price or Grant Price applicable to outstanding Awards, the Annual Award Limits, and other value determinations applicable to outstanding Awards."

21.    A true and correct copy of the 2017 Stock Incentive Plan is attached here as ***Exhibit 3***.

22.    On August 1, 2023, Mr. McGurk received 195,784 shares (approximately 2.18% of Cineverse at the time) as payment of his annual bonus under the Management Annual Incentive Plan as documented in a Form-4 filed with the Securities and Exchange Commission ("SEC").

23.    A true and correct copy of this Form 4 is attached as ***Exhibit 4***.

24.    Provision 12.1 of the Corporate Stock Incentive Plan limits performance-based compensation to the following:

     a.  Net earnings or Net Income (before or after taxes);
     b.  Earnings per share (basic or diluted);
     c.  Net sales or revenue growth;
     d.  Net operating profit;
     e.  Return measures (including, but not limited to, return on assets, capital, invested capital, equity, sales, or revenue);
     f.  Cash flow (including, but not limited to, throughput, operating cash flow, free cash flow, cash flow return on equity, and cash flow return on investment);
     g.  Earnings before or after taxes, interest, depreciation, and/or amortization;
     h.  Earnings before taxes;
     i.  Gross or operating margins;
     j.  Corporate value measures;
     k.  Capital expenditures;
     l.  Unit volumes;
     m.  Productivity ratios;
     n.  Share price (including, but not limited to, growth measures and total shareholder return);
     o.  Cost or expense;
     p.  Margins (including, but not limited to, debt or profit);
     q.  Operating efficiency;
     r.  Market share;
     s.  Customer satisfaction;
     t.  Working capital targets or any element thereof;
     u.  Economic value added or EVA® (net operating profit after tax minus the sum of capital multiplied by the cost of capital);
     v.  Health, safety and environmental performance;
     w.  Corporate advocacy metrics;

x.  Strategic milestones (including, but not limited to, debt reduction, improvement of cost of debt, equity or capital, completion of projects, achievement of synergies or integration objectives, or improvements to credit rating, inventory turnover, weighted average cost of capital, implementation of significant new processes, productivity or production, product quality, and any combination of the foregoing);

y.  Strategic sustainability metrics (including, but not limited to, corporate governance, enterprise risk management, employee development, and portfolio restructuring);

b)  and (z) Stockholder equity or net worth."

25.    In 2023, Cineverse  reported a loss of $10 million.

26.    The majority of the metrics listed in provision 12.1 relate to the earnings and financial performance of Cineverse.

27.    On March 29, 2024, Mr. Hallett discussed Mr. McGurk's 195,784-share bonus with Mr. Loffredo during a phone call and requested more information regarding the basis for the award under the 2017 Incentive Plan.

28.    Mr. Loffredo repeatedly asserted that Mr. McGurk's bonus was not earned performance compensation but part of his Stock Appreciation Rights ("SARs") under his compensation plan.

29.    This assertion directly contradicts the Form 4, which clearly states that the shares "constitute shares received as payment of annual bonus under Management Annual Incentive Plan." See ***Exhibit 4***.

30.    Upon information and belief, due to Cineverse's $10 million loss in 2023, the lack of application of Section 4.3 of the Incentive Plan that should have occurred after the reverse stock split, and the contradictory statement of Mr. Loffredo, the award of Mr. McGurk's bonus was improperly granted to Mr. McGurk in violation of the Stock Incentive Plan.

31.     On December 8, 2023, Defendant Cineverse approved Amendment No. 6 that diluted existing shareholders' stock by approximately 50%.  This was accomplished by doubling the shares owned by management of the company without regard to Section 4.3 of the Incentive Plan.

32.     A true and correct copy of Amendment No. 6 is attached as ***Exhibit 5***.

33. On March 8, 2024, Mr. Hallett submitted a formal Demand for Inspections of Books and Records on the Defendant Cineverse.

34. A true and correct copy is attached as ***Exhibit 6.***

35. On March 29, 2024 and May 17, 2024, Mr. Loffredo and Mr. Hallett had follow-up discussions on the phone regarding Mr. Hallett's records request.

36. During these phone conversations, Mr. Hallett inquired about the offers made for Cineverse, as referenced in public communications asking Mr. Loffredo how much money had been lost to shareholders by rejecting those offers.

37. Mr. Loffredo stated that no offers had been made for Cineverse.

38. This statement contradicts previous public statements made to *IndieWire* and other media sources, which acknowledged interest from potential buyers. See ***Exhibit 7***.

39. Upon information and belief, following the Plaintiff's records request, Cineverse retained attorneys Matt Murphey and Spencer Crawford.

40. On August 9, 2024, during a conference call, Matt Murphey and Spencer Crawford informed Mr. Hallett that the requested records were ready but would only be provided after Mr. Hallett signed a Non-Disclosure Agreement ("NDA").

41. On August 28, 2024, Mr. Hallett signed the requested NDA in reliance on Matt Murphey's and Spencer Crawford's representations that if he signed the NDA the documents would be produced to him.

42. Despite signing the NDA, the documents were never provided to Mr. Hallett.

43. On September 6, 2024, Mr. Hallett sent a follow-up email requesting the production of the promised documents.

44. Matt Murphey responded to Mr. Hallett's follow up by directing him to coordinate with Mr. Loffredo for the documents request.

45. Mr. Hallett attempted to obtain the documents that were purportedly ready from Mr. Loffredo in a series of communications.

46. To date, Mr. Hallett has never received any of the documents or records that he originally requested in March of 2024.

### III.    CLAIMS

### FIRST CLAIM FOR RELIEF –
### BREACH OF CONTRACT

47.    Plaintiff incorporates each of the allegations set forth in the preceding paragraphs as though fully set forth herein.

48.    The Plaintiff invested money in Cineverse as a shareholder.

49.    As a shareholder, the Plaintiff is entitled to certain information pursuant to relevant statutes and the corporation's governing documents.

50.    The corporation and its officers have not provided the information required by law pursuant to the governing documents.

51.    The corporation and its officers have not provided the information required pursuant to Idaho law.

52.    As a result of the corporation and the officers' conduct, they have breached the company governing documents.

53.    Plaintiff requests and is entitled to an award of damages resulting from company and officers' breach in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF –
## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

54.    Plaintiff incorporates each of the allegations set forth in the preceding paragraphs as though fully set forth herein.

55.    Pursuant to the governing documents and Idaho law, the corporation and its officers are required to refrain from unreasonable conduct which has the effect of preventing Plaintiff from receiving the fruits of its bargain.

56.    The corporation and the officers failed to perform their obligations in good faith under the relevant governing documents.

57.    The corporation and/or its officers have violated, nullified, and/or significantly impaired the Plaintiff from receiving the fruits of its bargain.

58.    As a direct and proximate result of the Defendants actions, Plaintiff has been damaged.

59.    Plaintiff requests and is entitled to an award of damages resulting from the Defendants' breach in an amount to be proven at trial.

## THIRD CLAIM FOR RELIEF –
## BREACH OF FIDUCIARY DUTIES

60.     Plaintiff incorporates each of the allegations set forth in the preceding paragraphs as though fully set forth herein.

61.     McGurk and Loffredo owe fiduciary duties to Plaintiff including the duty of care and the duty of loyalty.

62.     McGurk and Loffredo were at all relevant times officers of Cineverse.

63.     The duty of loyalty requires McGurk and Loffredo to refrain from usurping the Plaintiff's economic expectancy of receiving money and/or funds from the investments.

64.     The duty of care requires McGurk and Loffredo in the conduct of agents of Plaintiff to refrain from engaging in willful or intentional misconduct.

65.     McGurk and Loffredo breached the aforementioned duties of loyalty and care owed to Plaintiff.

66.     As a direct and proximate result of McGurk and Loffredo's actions, Plaintiff has been damaged.

67.     Plaintiff requests, and is entitled to: (i) an award of damages resulting from the breaches of fiduciary duty in an amount to be proven at trial, and/or (ii) an order from the Court requiring that these Defendants forfeit over to Plaintiff an amount justly due based on the Defendants' usurpation of the economic expectancy of Plaintiff's investments.

## FOURTH CLAIM FOR RELIEF –
## FRAUD

68. Plaintiff incorporates each of the allegations set forth in the preceding paragraphs as though fully set forth herein.

69. Cineverse, McGurk and/or Loffredo have made material, false statements and/or representations of fact to the Plaintiff.

70. Cineverse, McGurk and/or Loffredo made these material, false statements and/or representations of fact to the Plaintiff when they knew the statements and/or representations were false.

71. Cineverse, McGurk and/or Loffredo made these material, false statements and/or representations of fact to the Plaintiff knowing that the Plaintiff would rely upon the statements and representations and that the Plaintiff was ignorant of these statements and representations.

72. The Plaintiff justifiably relied upon Cineverse, McGurk and/or Loffredo's statements and representations and suffered injuries as a result.

### FIFTH CLAIM FOR RELIEF –
### INTENTIONAL INTERFERENCE WITH ECONOMIC ADVANTAGE

73.    Plaintiff incorporates each of the allegations set forth in the preceding paragraphs as though fully set forth herein.

74.    Plaintiff had a valid economic expectancy in the investments in the assets of Cineverse.

75.    Upon information and belief, all Defendants had knowledge of this expectancy.

76.    The Defendants, through the conduct described in this Complaint, intentionally interfered with that expectancy, knowing that such interference was certain or substantially certain to occur, and which did occur, inducing termination of that expectancy in whole or in part.

77.    Defendants' interference was wrongful by some measure beyond the fact of the interference itself.

78.    As a direct and proximate result of Defendants' actions, Plaintiff has been damaged.

79.    Plaintiff requests, and is entitled to, an award of damages in an amount to be proven at trial for said intentional interference with Plaintiff's prospective economic advantages.

## SIXTH CLAIM FOR RELIEF – UNJUST ENRICHMENT

80.    Plaintiff incorporates each of the allegations set forth in the preceding paragraphs as though fully set forth herein.

81.    Plaintiff invested considerable money pursuant to the company governing documents.

82.    Defendants have been unjustly enriched at the expense of Plaintiff to Plaintiff's detriment.

83.    Plaintiff requests and is entitled to an award of damages in an amount to be proven at trial for said unjust enrichment.

## SEVENTH CLAIM FOR RELIEF – ACCOUNTING

84.    Plaintiff incorporates each of the allegations set forth in the preceding paragraphs as though fully set forth herein.

85.    Plaintiff is entitled to a complete accounting of Cineverse's financial documents, from inception to present day, or 2013 to present, as described, and all documents related to the activities, affairs, and financial condition of the companies.

86.    Plaintiff is entitled to a complete accounting of all funds received and disbursed, to and from Cineverse.

87.    Plaintiff is entitled to a complete accounting regarding the assets of Cineverse, including but not limited to what the company's assets are and where they are located.

88.     Plaintiff does not have access to Cineverse's records and books.

89.     As a shareholder, the Plaintiff is entitled to inspect and copy all of the records of Cineverse upon notice, and notice was properly given.

90.     The ability to inspect, given the claims at issue, are of paramount importance and could be significantly damaging to the Plaintiff if not immediately provided.


## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff respectfully requests that the Court enter judgment as follows:

(a) Issue findings of fact and conclusions that the Defendants committed the alleged violations;

(b) That this Court find for the Plaintiff on each and every claim of this Complaint and award Plaintiff the relief sought in each claim of the Complaint;

(c) For an award of Plaintiff's costs and reasonable attorney's fees; and

(d) Grant such other and further relief as this Court may determine to be just and necessary.

DATED this 18th day of July 2025.


    */s/* Matt Christensen
MATTHEW T. CHRISTENSEN
Attorney for Roy Hallett

COMPLAINT – Page 12

# EXHIBIT 1

EX-99.1 4 ea148684ex99-1_cinedigm.htm PRESS RELEASE DATED OCTOBER 11, 2021



## Cinedigm Chairman and CEO Chris McGurk Highlights Positive Business Results at Annual Stockholder Meeting

LOS ANGELES — (October 11, 2021) — **Cinedigm Corp.** (NASDAQ: CIDM), the leading independent streaming entertainment company super-serving enthusiast fan bases, today released comments by Chris McGurk, Chairman and CEO, highlighting the Company's positive business results at the Annual Stockholder Meeting held on October 11, 2021.

Comments:

"Although I presented a business update when we last spoke less than 3 weeks ago, I did not want to miss the opportunity to address our stockholders once again today, because our remarkable business progress has continued unabated.

In just the last 20 days we announced several key initiatives to further drive our streaming business forward:

- We added six more of our streaming channels to Dish Network's Sling TV, including the Bob Ross and Real Madrid channels;
- We relaunched our independent cinema channel Fandor, called the "Netflix of indie film" by the Wall Street Journal, with a new look, much wider distribution footprint and hundreds of new films and series; We also added enhanced community features like podcasts and the revived editorial site Keyframe, all powered by our proprietary, industry-leading Matchpoint technology;
- We announced a partnership with the iconic choreographer and pop culture influencer Laurieann Gibson – to launch the BOP channel, the first-ever streaming channel devoted to all things Dance. Laurieann has developed the visual style for dozens of the world's largest artists and will bring her decades of experience building iconic brands to bear with this new global streaming service;
- We announced a partnership with Artificial Intelligence pioneer Papercup to help take the incredibly successful Bob Ross streaming channel global using Papercup's AI dubbing technology; and,
- Just today we announced the continuation of our very successful distribution partnership with Crown Media Family Networks, the Hallmark Channel, which for years has been a premiere supplier of quality family entertainment to audiences around the world.

It's very likely that this heavy volume of quality deal flow will continue for the foreseeable future.

With a successful portfolio of more than two dozen targeted enthusiast streaming channels, a huge distribution footprint into more than 1 billion streaming devices, a distribution library of more than 40,000 hours of quality film and TV content and our industry leading Matchpoint streaming technology, Cinedigm is a clear top choice for branded partners and companies looking to enter the streaming space quickly, effectively and successfully. So, look for our stream of new initiatives and partnerships to continue…..and also stay tuned for some very interesting Cinedigm NFT news as well.



Also we expect our recent record growth to continue. Having just reported 2 quarters in a row of triple digit streaming revenue growth, and having booked net income of over $5 million last quarter, we once again had a very strong fiscal second quarter even though it is a seasonally slow period. We are very eager to speak with you again in November about our second quarter results ended September 30th, and rapid business progress.

With zero debt, a coveted public currency and the strongest balance sheet in our history, we will continue to pursue the successful streaming asset acquisition strategy that, in just the last 10 months, added 5 streaming channels, more than 15,000 films and TV episodes, full ownership of our proprietary Matchpoint streaming technology and a business footprint in the high growth South Asia and India markets.

Our unique competitive streaming position as the only independent media company with a vast content library, a successful 6-year track record of launching and managing streaming channels, a state-of-the-art proprietary streaming platform and a huge distribution footprint has led us to a robust queue of additional streaming acquisition targets.

Our acquisition philosophy is relatively simple: We target technology, content and streaming channel assets that we believe 100% support and build our streaming future. We focus on accretive acquisitions that can immediately benefit from our infrastructure, technology, content and distribution to ensure synergies and growth. We will only buy assets at multiples far below our own projected trading multiples, with a focus on our own proprietary deal flow. Much like companies that have grown rapidly via M&A like Zynga and Cisco, we view our competencies in M&A and our platform approach to be a significant competitive advantage.

So, let me underscore that we are only making accretive acquisitions and we will finance those deals as appropriate to ensure that outcome. And we will smartly raise funds to finance those deals based on specific accretive content, technology and streaming channel opportunities. We are not in the business of raising cash and stockpiling it on our balance sheet. We have turned down multiple opportunities to do that. We will only look at options to finance accretive deals in the future at the lowest possible cost of capital combined with the highest potential return to continue to create shareholder value.

I would also like to touch on the proposal to have the option to do a reverse stock split. It has no impact on our go forward strategy. As I have said previously, this was an option to give us flexibility. Now that our stock price has almost quadrupled this year and we have analyst price targets pointing considerably northward from today's price as well as the robust deal flow and strong results we expect to report again in the near future, a reverse split option is not necessary.

I would like to thank all of our stockholders for their support."

###

2

# EXHIBIT 2

GOT A TIP?                    **Indie**Wire                    NEWSLETTERS

☰          NEWS   FILM   TV   AWARDS   VIDEO          🔍

HOME / FEATURES / GENERAL

# Elvis and Bob Ross Deepfakes? They May Be Cinedigm's Future

Look out, Netflix: Here comes fake Bob Ross painting fake happy trees on Cineverse.

BY TONY MAGLIO ⊠
SEPTEMBER 26, 2022 4:00 PM




Bob Ross and Elvis Presley *Getty*

ADVERTISEMENT

After seven years and as many acquisitions, **Cinedigm** CEO Chris McGurk bundled his company's 30 best streaming assets — including The El Rey Network, Fandor, Documrama, and The **Elvis** Presley Channel — into free ad-supported network **Cineverse**, which launched September 15. McGurk believes "if we achieve our loftiest dreams," Cineverse could eventually

**Indie**Wire
# Daily Headlines
Daily Headlines covering Film, TV and more.

Enter your email address
_____
SUBSCRIBE

Your Privacy Rights

Penske Media Corporation (PMC) uses first and third-party cookies, pixels, scripts and similar technologies to enable PMC and third-party service providers and partners to collect information about you and your interactions with our sites and services (including clicks, cursor movement and screen recordings). Learn more about our practices and your choices in our Privacy Policy. By continuing to use our sites or services, you agree to our Terms of Use (including the class action waiver and arbitration provisions) and Privacy Policy, which have recently changed.

NEWSLETTERS

He believes Cineverse represents an opportunity that major streamers have overlooked, to their tremendous detriment; he believes they are "collectively losing $10 billion a year."

ADVERTISEMENT


**Fred Meyer**

Valid Sep 3 - Sep 10
4 Days Left

See M

## Must Read



CRITICISM
**The 25 Best Movies of 2023**



FEATURES
**The Best TV Shows of 2023**



FEATURES
**The 15 Best First Features of 2023**

ADVERTISEMENT

## Related Stories



**Tom Hanks Offered Austin Butler 'Masters of the Air' After...**



**From Australia to Vegas, All Roads Led Cinematographer...**

Cineverse is built on Cinedigm's proprietary Matchpoint technology, which allows its users to "create and manage compelling ad-supported and subscription-based video streaming services at scale across any platform efficiently and cost-effectively." It's also available for third-party licensing; McGurk says Matchpoint "would cost somebody $100 million" to build today.

Your Privacy Rights

Penske Media Corporation (PMC) uses first and third-party cookies, pixels, scripts and similar technologies to enable PMC and third-party service providers and partners to collect information about you and your interactions with our sites and services (including clicks, cursor movement and screen recordings). Learn more about our practices and your choices in our **Privacy Policy**. By continuing to use our sites or services, you agree to our **Terms of Use** (including the class action waiver and arbitration provisions) and Privacy Policy, which have recently changed.

**Read Next:** Barry Keoghan Has Read a Script for the 'Peaky...

NEWSLETTERS

## More From IndieWire



NEWS

**Jesse Eisenberg Says Kieran Culkin Is an 'Unusual' Actor: He...**



VENICE

**'Joker: Folie à Deux' Review: Todd Phillips' Musical...**

"I like to think we're a version of AMC Networks with better technology, a bigger library, and a hybrid revenue model," he said. "We're way ahead of them on advertising and FAST." He also views Cineverse as being in a better place than the similarly structured **Chicken Soup for the Soul Entertainment**, which carries $69 million in debt; Cinedigm has none.

Cineverse launched with 87 million monthly viewers across Cinedigm's footprint on mobile, connected TVs, and social networks. The service consists of 40,000 library titles ("almost all independent") that have amassed "billions and billions of minutes" watched, McGurk said.

McGurk also has a big idea to plant a flag in the originals game. "On our **Bob Ross** Channel and on our Elvis Channel, we're considering deepfake Bob Ross and deepfake Elvis," he said. "Bob Ross died in 1992; we have his library. It's an enormously successful channel. It's probably our most successful channel. Imagine if we could have Deepfake Bob Ross with A.I. creating new painting and new episodes. A.I. dubbed into 10 different languages overseas."

Your Privacy Rights

Penske Media Corporation (PMC) uses first and third-party cookies, pixels, scripts and similar technologies to enable PMC and third-party service providers and partners to collect information about you and your interactions with our sites and services (including clicks, cursor movement and screen recordings). Learn more about our practices and your choices in our Privacy Policy. By continuing to use our sites or services, you agree to our Terms of Use (including the class action waiver and arbitration provisions) and Privacy Policy, which have recently changed.

**Read Next:** Barry Keoghan Has Read a Script for the 'Peaky...

Yeah, imagine that for just a moment while staring at the face of the guy who's just crazy enough to do it.



Cinedigm CEO Chris McGurk *Cinedigm*

McGurk said he is in preliminary talks with representatives for the Presley and Ross brands. No one's talking about new Elvis movies at this point, but the deepfake technology could be used to create digital presenters and channel interstitials.

It'd be "cheap" to pull off, McGurk said, and "there's a good chance" that Authentic Brands, the brand-management company that controls Elvis' copyright, will agree. "There are so many deepfake Elvises out there, why not control their own?"

While McGurk is the head honcho at Cinedigm who can make such a move, shareholders are *his* boss and currently they don't feel a hunk-a hunk-a burnin' love. When Cinedigm was in the business of digitizing movie theaters, the NASDAQ-traded CIDM shares were worth as much as $133

Your Privacy Rights

Penske Media Corporation (PMC) uses first and third-party cookies, pixels, scripts and similar technologies to enable PMC and third-party service providers and partners to collect information about you and your interactions with our sites and services (including clicks, cursor movement and screen recordings). Learn more about our practices and your choices in our Privacy Policy. By continuing to use our sites or services, you agree to our Terms of Use (including the class action waiver and arbitration provisions) and Privacy Policy, which have recently changed.

**Read Next:** Barry Keoghan Has Read a Script for the 'Peaky...

NEWSLETTERS

ADVERTISEMENT

McGurk, who owns 5 percent of the company, believes Cineverse can turn it around. "I think we're tremendously undervalued," he told us. "Everybody got creamed in the streaming and tech sector and no one's recovered."

So McGurk will continue to stave off buyers (and yes, there are interested parties, he said) for another year or two. "We want to get a little bit bigger, we want to establish Cineverse," McGurk. *Then* maybe they'll sell, and that's no fake.

**READ MORE:**

BOB ROSS | CINEDIGM | ELVIS

# Daily Headlines

Daily Headlines covering Film, TV and more.

SUBSCRIBE

ADVERTISEMENT

**Your Privacy Rights**

Penske Media Corporation (PMC) uses first and third-party cookies, pixels, scripts and similar technologies to enable PMC and third-party service providers and partners to collect information about you and your interactions with our sites and services (including clicks, cursor movement and screen recordings). Learn more about our practices and your choices in our **Privacy Policy**. By continuing to use our sites or services, you agree to our **Terms of Use** (including the class action waiver and arbitration provisions) and Privacy Policy, which have recently changed.

# EXHIBIT 3

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, DC 20549

# FORM 8-K

# CURRENT REPORT

**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**August 31, 2017**
(Date of earliest event reported)

# Cinedigm Corp.
(Exact name of registrant as specified in its charter)

| | | |
|---|---|---|
| **Delaware** | **001-31810** | **22-3720962** |
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

| | |
|---|---|
| **45 West 36 th Street, 7 th Floor, New York, New York** | **10018** |
| (Address of principal executive offices) | (Zip Code) |

**212-206-8600**
(Registrant's telephone number, including area code)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions ( *see* General Instruction A.2. below):

☐    Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐    Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐    Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐    Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

☐ Emerging growth company

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 5.02    Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers**

(e)     At the Annual Meeting of Stockholders on August 31, 2017 (the "Annual Meeting") of Cinedigm Corp. (the "Company"), the stockholders of the Company approved the Company's 2017 Equity Incentive Plan (the "Plan"). The Plan provides for the issuance of up to 2,098,270 shares of the Company's Class A common stock, par value $0.001 per share (the "Common Stock"), in the form of various awards, including stock options, stock appreciation rights, stock, restricted stock, restricted stock units, performance awards and cash awards. The Compensation Committee of the Company's Board of Directors is authorized to administer the Plan and make grants thereunder.

The foregoing description is qualified in its entirety by reference to the Plan, which is filed as Exhibit 10.1 to this Form 8-K and is hereby incorporated by reference.

### Item 5.07        Submission of Matters to a Vote of Security Holders.

At the Annual Meeting, the stockholders of the Company voted on eight proposals. Proxies for the Annual Meeting were solicited pursuant to Regulation 14A under the Securities Exchange Act of 1934, as amended. There was no solicitation of proxies in opposition to management's nominees as listed in the proxy statement and all of management's nominees were elected to our Board of Directors. Details of the voting are provided below:

*Proposal 1:*

To elect four (4) members of the Company's Board of Directors to serve until the 2017 Annual Meeting of Stockholders (or until successors are elected or directors resign or are removed).

|  | Votes For | Votes Withheld | Broker Non-Votes |
|---|---|---|---|
| Christopher J. McGurk | 8,234,322 | 771,391 | 3,016,495 |
| Peter C. Brown | 7,977,445 | 1,028,268 | 3,016,495 |
| Patrick W. O'Brien | 7,966,162 | 1,039,551 | 3,016,495 |
| Zvi M. Rhine | 8,237,109 | 768,604 | 3,016,495 |

*Proposal 2:*

|  | Votes For | Votes Against | Abstentions | Broker Non-Votes |
|---|---|---|---|---|
| To approve by non-binding vote, executive compensation. | 7,445,551 | 1,404,539 | 155,623 | 3,016,495 |

*Proposal 3:*

|  | Votes For | Votes Against | Abstentions | Broker Non-Votes |
|---|---|---|---|---|
| To ratify the appointment of EisnerAmper LLP as our independent auditors for the fiscal year ending March 31, 2017. | 11,637,573 | 353,158 | 31,477 | N/A |

*Proposal 4:*

|  | Votes For | Votes Against | Abstentions | Broker Non-Votes |
|---|---|---|---|---|
| To approve the issuance of shares of Class A common stock in connection with an investment in the Company and related exchanges of the Company's convertible notes. | 8,504,784 | 497,222 | 3,707 | 3,016,495 |

*Proposal 5:*

|  | Votes For | Votes Against | Abstentions | Broker Non-Votes |
|---|---|---|---|---|
| To amend the Company's Certificate of Incorporation to increase the number of authorized shares of Class A Common Stock | 8,495,039 | 507,455 | 3,219 | 3,016,495 |

*Proposal 6:*

|  | Votes For | Votes Against | Abstentions | Broker Non-Votes |
|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| To amend the Company's Certificate of Incorporation to eliminate certain transfer restrictions set forth in Section 4.4 of the Certificate of Incorporation. | 8,102,613 | 894,937 | 8,163 | 3,016,495 |

**Proposal 7:**

| | Votes For | Votes Against | Abstentions | Broker Non-Votes |
|---|---|---|---|---|
| To amend the Company's Certificate of Incorporation to eliminate the Class B common stock and the Series B Junior Participating Preferred Stock | 8,534,049 | 467,318 | 4,346 | 3,016,495 |

**Proposal 8:**

| | Votes For | Votes Against | Abstentions | Broker Non-Votes |
|---|---|---|---|---|
| To approve the 2017 Equity Incentive Plan. | 7,592,945 | 1,270,046 | 142,722 | 3,016,495 |

**Item 9.01        Financial Statements and Exhibits.**

| Exhibit Number | Description |
|---|---|
| 10.1 | 2017 Equity Incentive Plan. |
| 99.1 | Press Release dated August 31, 2017 |

3

---

**SIGNATURE**

Pursuant to the requirements of Section 13 or 15 (d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Dated: August 31, 2017

By:      /s/ Gary S. Loffredo
Name:   Gary S. Loffredo
Title:    President of Digital Cinema, General Counsel & Secretary

4

---

**EXHIBIT INDEX**

| Exhibit Number | Description |
|---|---|
| 10.1 | 2017 Equity Incentive Plan. |
| 99.1 | Press Release dated August 31, 2017 |

5

Exhibit 10.1

**Cinedigm Corp.**
**2017 Incentive Plan**

---

**TABLE OF CONTENTS**

| | | Page |
|---|---|---|
| Article 1. | Establishment, Purpose, and Duration | 1 |
| Article 2. | Definitions | 1 |
| Article 3. | Administration | 7 |
| Article 4. | Shares Subject to this Plan and Maximum Awards | 8 |
| Article 5. | Eligibility and Participation | 10 |
| Article 6. | Stock Options | 10 |
| Article 7. | Stock Appreciation Rights | 12 |
| Article 8. | Restricted Stock and Restricted Stock Units | 13 |
| Article 9. | Performance Units/Performance Shares | 15 |
| Article 10. | Cash-Based Awards and Other Stock-Based Awards | 16 |
| Article 11. | Transferability of Awards | 16 |
| Article 12. | Performance Measures | 17 |
| Article 13. | Nonemployee Director Awards | 19 |
| Article 14. | Minimum Vesting of Share-Based Awards | 19 |
| Article 15. | Dividend Equivalents | 19 |
| Article 16. | Beneficiary Designation | 20 |
| Article 17. | Rights of Participants | 20 |
| Article 18. | Change of Control | 20 |
| Article 19. | Amendment, Modification, Suspension, and Termination | 22 |
| Article 20. | Withholding | 23 |
| Article 21. | Successors | 24 |
| Article 22. | General Provisions | 24 |

**Cinedigm Corp.**
**2017 Incentive Plan**

**Article 1.**        **Establishment, Purpose, and Duration**

   **1.1      Establishment** . Cinedigm Corp., a Delaware corporation (hereinafter referred to as the "Company"), establishes an incentive compensation plan to be known as the Cinedigm Corp. 2017 Incentive Plan (hereinafter referred to as the "Plan"), as set forth in this document.

   This Plan permits the grant of Nonqualified Stock Options, Incentive Stock Options, Stock Appreciation Rights, Restricted Stock, Restricted Stock Units, Performance Shares, Performance Units, Cash-Based Awards, and Other Stock-Based Awards.

   This Plan's effective date is the date the Plan is approved by the Company's shareholders (the "Effective Date"), and the Plan shall remain in effect as provided in Section 1.3 hereof. Upon its effectiveness, the Plan shall supersede the Existing Incentive Plan (as defined herein) such that no further Awards shall be made under the Existing Incentive Plan. This Plan shall not, in any way, affect awards under the Existing Incentive Plan that are outstanding as of the Effective Date.

   **1.2      Purpose of this Plan** . The purpose of the Plan is to (a) advance the interests of the Company and its stockholders by providing incentives and rewards to those individuals who are in a position to contribute to the long term growth and profitability of the Company; (b) assist the Company and its Subsidiaries and Affiliates in attracting, retaining, and developing highly qualified Employees, Third Party Service Providers, and Nonemployee Directors for the successful conduct of their business; and (c) make the Company's compensation program competitive with those of other major employers.

   **1.3      Duration of this Plan** . Unless sooner terminated as provided herein, this Plan shall terminate ten (10) years from the Effective Date. After this Plan is terminated, no Awards may be granted but Awards previously granted shall remain outstanding in accordance with their applicable terms and conditions and this Plan's terms and conditions. Notwithstanding the foregoing, no Incentive Stock Options may be granted more than ten (10) years after the earlier of (a) adoption of this Plan by the Board, or (b) the Effective Date.

**Article 2.**        **Definitions**

   Whenever used in this Plan, the following terms shall have the meanings set forth below, and when the meaning is intended, the initial letter of the word shall be capitalized.

   **2.1      "Affiliate"** shall mean any corporation or other entity (including, but not limited to, a partnership or a limited liability company), that is affiliated with the Company through stock or equity ownership or otherwise, and is designated as an Affiliate for purposes of this Plan by the Committee.

   **2.2      "Annual Award Limit"** or **"Annual Award Limits"** have the meaning set forth in Section 4.1.

1

   **2.3      "Award"** means, individually or collectively, a grant under this Plan of Nonqualified Stock Options, Incentive Stock Options, SARs, Restricted Stock, Restricted Stock Units, Performance Shares, Performance Units, Cash-Based Awards, or Other Stock-Based Awards, in each case subject to the terms of this Plan.

   **2.4      "Award Agreement"** means either (i) a written agreement entered into by the Company and a Participant setting forth the terms and provisions applicable to an Award granted under this Plan, or (ii) a written or electronic statement issued by the Company to a Participant describing the terms and provisions of such Award, including any amendment or modification thereof. The Committee may provide for the use of electronic, internet, or other non-paper Award Agreements, and the use of electronic, internet, or other non-paper means for the acceptance thereof and actions thereunder by a Participant.

   **2.5      "Board"** or **"Board of Directors"** means the Board of Directors of the Company.

   **2.6      "Cash-Based Award"** means an Award, denominated in cash, granted to a Participant as described in Article 10.

2.7 "**Cause**" means, unless otherwise specified in an Award Agreement or in an applicable employment agreement between the Company (or its applicable subsidiary or Affiliate) and a Participant, with respect to any Participant, as determined by the Committee in its sole discretion, the Participant's:

(a) Conviction of, or plea of *nolo contendere* to, a felony or other crime involving moral turpitude;

(b) material breach of a material provision of a term of employment (or other service provider function) that is not corrected within thirty (30) days following written notice of such breach sent by the Company to the Participant;

(c) willful misconduct in the performance of material duties;

(d) performance of material duties that is grossly negligent; or

(e) failure to attempt to fully comply with any lawful directive of the Board which is not corrected within thirty (30) days following written notice of such breach sent by the Company to the Participant.

Whether or not "Cause" exists shall be determined solely by the Company in its reasonable, good faith discretion.

2.8 "**Change of Control**" means the occurrence of any of the following events:

(a) Any one person, or more than one person acting as a group, acquires ownership of stock (as determined under Code Section 318(a)) of the Company that, together with stock held by such person or group, constitutes more than fifty percent (50%) of the total fair market value or total voting power of the stock of the Company; provided, however, that if any one person or more than one person acting as a group, is considered to own more than fifty percent (50%) of the total fair market value or total voting power of the stock of the Company, the acquisition of additional stock by the same person or persons is not considered to cause a Change in Control of the Company. This paragraph applies only when there is a transfer of stock of the Company (or issuance of stock of the Company) and stock in the Company remains outstanding after the transaction;

(b) any one person, or more than one person acting as a group, acquires (or has acquired during the 12-month period ending on the date of the most recent acquisition by such person or persons) ownership of stock (as determined under Code Section 318(a)) of the Company possessing thirty percent (30%) or more of the total voting power of the stock of the Company; provided, however, that if any one person or more than one person acting as a group, is considered to own thirty percent (30%) or more of the total voting power of the stock of the Company, the acquisition of additional stock by the same person or persons is not considered to cause a Change in Control of the Company;

(c) the consummation of a Merger (as defined below), unless, following such Merger, stock possessing at least fifty percent (50%) of the total combined voting power of all the issued and outstanding shares of all classes of Company Voting Securities of the corporation resulting from such Merger is beneficially owned, directly or indirectly, by individuals and entities who were beneficial owners of the then-outstanding Company Voting Securities immediately prior to such Merger in substantially the same proportion as their ownership immediately prior to such Merger;

(d) individuals who are members of the Board as of the Effective Date of this Plan (the "Incumbent Directors") cease for any reason to constitute at least a majority of the members of the Board; provided, however, that any individual becoming a director subsequent to the date of this Plan whose appointment to the Board or nomination for election by the Company was approved by a vote of at least a majority of the Incumbent Directors then in office (unless such appointment or election was at the request of an unrelated third party who has taken steps reasonably calculated to result in a Change in Control as described in paragraphs (a), (b) or (c) of this Section 2.8 and who has indicated publicly an intent to seek control of the Company) shall be treated from the date of his appointment or election as an Incumbent Director;

(e) consummation of a complete liquidation or dissolution of the Company; or

(f)    any one person, or more than one person acting as a group, acquires (or has acquired during the 12-month period ending on the date of the most recent acquisition by such person or persons) assets from the Company that have a total gross fair market value equal to or more than forty percent (40%) of the total gross fair market value of all of the assets of the Company immediately prior to such acquisition(s); provided, however, that a transfer of assets by the Company is not treated as a Change in Control if the assets are transferred to (A) a shareholder of the Company (immediately before the asset transfer) in exchange for or with respect to its stock; (B) an entity, fifty percent (50%) or more of the total value or voting power of which is owned, directly or indirectly, by the Company; (C) a person, or more than one person acting as a group, that owns, directly or indirectly, fifty percent (50%) or more of the total value or voting power of all outstanding stock of the Company; or (D) an entity, at least fifty percent (50%) percent of the total value or voting power of which is owned, directly or indirectly, by a person described in the previous subsection (C). For purposes of this paragraph, (1) gross fair market value means the value of the assets of the Company, or the value of the assets being disposed of, determined without regard to any liabilities associated with such assets, and (2) a person's status is determined immediately after the transfer of the assets.

For purposes of this Section 2.8, "Company Voting Securities" shall mean the combined voting power of all outstanding classes of common stock of the Company and all other outstanding securities of the Company entitled to vote generally in the election of directors of the Company and "Merger" shall mean any merger, reorganization, consolidation, share exchange, transfer of assets or other transaction having similar effect involving the Company.

**2.9**    **"Code"** means the U.S. Internal Revenue Code of 1986, as amended from time to time. For purposes of this Plan, references to sections of the Code shall be deemed to include references to any applicable regulations thereunder and any successor or similar provision.

**2.10**    **"Committee"** means the Compensation Committee of the Board or such other Committee appointed by the Board for the purpose of administering this Plan comprised solely of two or more members of the Board who qualify as "non-employee" directors within the meaning of Rule 16b-3 under the Exchange Act, as "outside" directors within the meaning of § 162(m) of the Code, and as "independent" directors within the meaning of NASDAQ Rule 4200(b)(15).

**2.11**    **"Company" or "Corporation"** means Cinedigm Corp., a Delaware corporation, and any successor thereto as provided in Article 20 herein.

**2.12**    **"Covered Employee"** means any Employee who is a "covered employee," as defined in Code Section 162(m).

**2.13**    **"Effective Date"** has the meaning set forth in Section 1.1.

**2.14**    **"Employee"** means any individual performing services for the Company, an Affiliate, or a Subsidiary and designated as an employee of the Company, its Affiliates, and/or its Subsidiaries on the payroll records thereof. An Employee shall not include any individual during any period he or she is classified or treated by the Company, Affiliate, and/or Subsidiary as an independent contractor, a consultant, or any employee of an employment, consulting, or temporary agency or any other entity other than the Company, Affiliate, and/or Subsidiary, without regard to whether such individual is subsequently determined to have been, or is subsequently retroactively reclassified as a common-law employee of the Company, Affiliate, and/or Subsidiary during such period.

**2.15**    **"Exchange Act"** means the Securities Exchange Act of 1934, as amended from time to time, or any successor act thereto.

**2.16**    **"Existing Incentive Plan"** means the Second Amended and Restated 2000 Equity Incentive Plan of Access Integrated Technologies, Inc., as previously amended, restated, supplemented or otherwise modified prior to the Effective Date.

**2.17**    **"Full Value Award"** means an Award other than in the form of an ISO, NQSO, or SAR, and which is settled by the issuance of Shares.

**2.18**    **"Good Reason"** means, unless otherwise specified in an Award Agreement or in an applicable employment agreement between the Company (or its applicable Subsidiary or Affiliate) and a Participant, with respect to any Participant, as

determined by the Committee in its sole discretion without the Employee's written consent:

    (a)    a material and substantially adverse reduction in title or job responsibilities compared with title or job responsibilities on the Effective Date;

    (b)    the Company's requiring the office nearest to the Employee's principal residence to be located at a place that is more than fifty (50) miles from where such office is currently located; or

    (c)    any material breach of an employment agreement by the Company.

Notwithstanding the foregoing, Good Reason will be deemed to exist only in the event that: (x) the Employee gives written notice to the Company of his or her claim of Good Reason and the specific grounds for his claim within ninety (90) days following the occurrence of the event upon which his claim rests, (y) the Company fails to cure such breach within thirty days (30) of receiving such notice ("Cure Period"), and (z) the Employee gives written notice to the Company to terminate his employment within fifteen (15) days following the Cure Period.

**2.19**     **"Grant Date"** means the date an Award is granted to a Participant pursuant to the Plan.

**2.20**     **"Grant Price"** means the price established at the time of grant of an SAR pursuant to Article 7, used to determine whether there is any payment due upon exercise of the SAR.

**2.21**     **"Incentive Stock Option"** or **"ISO"** means an Option to purchase Shares granted under Article 6 to an Employee and that is designated as an Incentive Stock Option and that is intended to meet the requirements of Code Section 422, or any successor provision.

**2.22**     **"Insider"** shall mean an individual who is, on the relevant date, an officer, or director of the Company, or a more than ten percent (10%) beneficial owner (as that term is defined in Section 13d-3 of the Exchange Act) of any class of the Company's equity securities that is registered pursuant to Section 12 of the Exchange Act, as determined by the Board in accordance with Section 16 of the Exchange Act.

**2.23**     **"Market Price"** means the closing price of the Class A Common Stock of the Company as reported on the NASDAQ Global Market or such other primary market or exchange on which the Class A Common Stock may, from time to time, trade (the "Market"), on the date for which a Market Price is to be determined under this Plan. To the extent an Option or SAR is granted on a date that the Market is closed, the Market Price shall be the closing price on the last preceding trading day.

**2.24**     **"Nonemployee Director"** means a member of the Company's Board of Directors who is not an Employee of the Company or its Affiliates or Subsidiaries.

**2.25**     **"Nonqualified Stock Option"** or **"NQSO"** means an Option that is not intended to meet the requirements of Code Section 422, or that otherwise does not meet such requirements.

**2.26**     **"Option"** means an Incentive Stock Option or a Nonqualified Stock Option, as described in Article 6.

**2.27**     **"Option Price"** means the price at which a Share may be purchased by a Participant pursuant to an Option.

**2.28**     **"Other Stock-Based Award"** means an equity-based or equity-related Award not otherwise described by the terms of this Plan, granted pursuant to Article 10.

**2.29**     **"Participant"** means any eligible individual as set forth in Article 5 to whom an Award is granted.

**2.30**     **"Performance-Based Compensation"** means compensation under an Award for which (i) the Performance Measures for the Performance Period have been designated by the Committee not later than the earlier of (a) ninety (90) days after the beginning of the Performance Period, or (b) the date as of which twenty-five percent (25%) of such period of time has elapsed, and (ii) the Award is otherwise intended to satisfy the requirements of Code Section 162(m) for certain performance-based compensation paid to Covered Employees. Notwithstanding the foregoing, nothing in this Plan shall be construed to mean that an Award which does not satisfy the requirements for performance-based compensation under

Code Section 162(m) does not constitute performance-based compensation for other purposes, including Code Section 409A.

2.31    **"Performance Measures"** means measures as described in Article 12 on which the performance goals are based and which are approved by the Company's shareholders pursuant to this Plan in order to qualify Awards as Performance-Based Compensation.

2.32    **"Performance Period"** means the period of time during which the Performance Measures must be met in order to determine the amount and/or vesting of an Award.

2.33    **"Performance Share"** means an Award under Article 9 herein and subject to the terms of this Plan, denominated in Shares, the value of which at the time it is payable is determined by the extent to which the applicable Performance Measures have been achieved.

6

2.34    **"Performance Unit"** means an Award under Article 9 herein and subject to the terms of this Plan, denominated in units, the value of which at the time it is payable is determined as a function of the extent to which corresponding Performance Measures have been achieved.

2.35    **"Period of Restriction"** means the period when Restricted Stock or Restricted Stock Units are subject to a substantial risk of forfeiture (based on the passage of time, the achievement of Performance Measures or other performance goals, or upon the occurrence of other events as determined by the Committee, in its discretion), as provided in Article 8.

2.36    **"Plan"** means this Cinedigm Corp. 2017 Incentive Plan.

2.37    **"Plan Year"** means the twelve (12) month period beginning each April 1 $^{st}$ .

2.38    **"Restricted Stock** " means an Award granted to a Participant pursuant to Article 8.

2.39    **"Restricted Stock Unit"** means an Award granted to a Participant pursuant to Article 8, except no Shares are actually awarded to the Participant on the Grant Date.

2.40    **"Share"** means a share of Class A Common Stock, $0.001 par value, of the Company.

2.41    **"Stock Appreciation Right"** or " **SAR** " means an Award, designated as an SAR, pursuant to the terms of Article 7 herein.

2.42    **"Subsidiary"** means any corporation or other entity, whether domestic or foreign, in which the Company has or obtains, directly or indirectly, a proprietary interest of more than fifty percent (50%) by reason of stock ownership or otherwise.

2.43    **"Third Party Service Provider"** means any consultant, agent, advisor, or independent contractor who renders services to the Company, a Subsidiary, or an Affiliate that (a) are not in connection with the offer and sale of Company's securities in a capital raising transaction, and (b) do not directly or indirectly promote or maintain a market for the Company's securities.

## Article 3.    Administration

3.1    **General** . The Committee shall be responsible for administering this Plan, subject to this Article 3 and the other provisions of this Plan. The Committee may employ attorneys, consultants, accountants, agents, and other individuals, any of whom may be an Employee, and the Committee, the Company, and its officers and directors shall be entitled to rely upon the advice, opinions, or valuations of any such individuals. All actions taken and all interpretations and determinations made by the Committee shall be final and binding upon the Participants, the Company, and all other interested individuals.

7

**3.2** **Authority of the Committee** . The Committee shall have full and exclusive discretionary power to interpret the terms and the intent of this Plan and any Award Agreement or other agreement or document ancillary to or in connection with this Plan, to determine eligibility for Awards and to adopt such rules, regulations, forms, instruments, and guidelines for administering this Plan as the Committee may deem necessary or proper. Such authority shall include, but not be limited to, selecting Award recipients; determining the types and amount of Awards to be granted to a recipient (including setting the Option Price and Grant Price, so long as it is not lower than the applicable Market Price or such other higher limit as required under applicable law); establishing all Award terms and conditions, including the terms and conditions set forth in Award Agreements; granting Awards as an alternative to or as the form of payment for grants or rights earned or due under compensation plans or arrangements of the Company; construing any ambiguous provision of the Plan or any Award Agreement; establishing administrative regulations to further the purpose of the Plan; and, subject to Article 19, adopting modifications and amendments to this Plan or any Award Agreement, including without limitation, any that are necessary to comply with the laws of the countries and other jurisdictions in which the Company, its Affiliates, and/or its Subsidiaries operate. The Committee also shall have the ability to delegate to the Chief Executive Officer of the Company the right to allocate Awards among eligible individuals who are not Insiders, provided that such delegation is subject to such terms and conditions as the Committee in its discretion shall determine.

**3.3** **Delegation.** The Committee may delegate to one or more of its members or to one or more officers of the Company, and/or its Subsidiaries and Affiliates or to one or more agents or advisors such administrative duties or powers as it may deem advisable, and the Committee or any individuals to whom it has delegated duties or powers as aforesaid may employ one or more individuals to render advice with respect to any responsibility the Committee or such individuals may have under this Plan.

### Article 4. Shares Subject to this Plan and Maximum Awards

**4.1** **Number of Shares Available for Awards and Maximum Amount of Non-Share Awards.**

Subject to adjustment as provided in Section 4.3:

(a)    The maximum number of Shares available for issuance to Participants under this Plan, inclusive of Shares issued and Shares underlying outstanding awards granted on or after the Effective Date, is 2,108,270 Shares, which includes 128,270 unused Shares carried over from the Existing Incentive Plan.

(b)    The maximum number of Shares subject to Options or SARs granted in any one (1) Plan Year to any one Participant shall be 400,000.

(c)    The maximum number of Shares subject to all Full Value Awards granted in any one (1) Plan Year to any one Participant shall be 400,000.

---

8

---

(d)    With respect to Awards granted under the Plan that are (i) intended to satisfy the "performance-based" compensation exception contained in Code Section 162(m), and (ii) payable other than in Shares, the maximum amount payable to a Participant in any year is $5,000,000.

(e)    The maximum number of Shares that may be issued in the aggregate to all Nonemployee Directors in any one (1) Plan Year shall be 300,000.

**4.2** **Share Usage.** Shares covered by an Award shall only be counted as used to the extent they are actually issued. With respect to Options and SARs, the number of Shares available for Awards under the Plan pursuant to Section 4.1, shall be reduced by one Share for each Share covered by such Award or to which such Award relates. The number of Shares available for Awards under the Plan shall be reduced by one Share for each Share covered by such Award or to which such Award relates. Awards that do not entitle the holder thereof to receive or purchase Shares shall not be counted against the aggregate number of Shares available for Awards under the Plan. In addition, any Shares related to Awards which terminate by expiration, forfeiture, cancellation, or otherwise without the issuance of such Shares shall be available again for grant under this Plan. In no event, however, will the following Shares again become available for Awards or increase the number of Shares available for grant under the Plan: (i) Shares tendered by the Participant in payment of the exercise price of an Option; (ii) Shares withheld from exercised Awards for tax withholding purposes; (iii) Shares subject to a SAR that are not issued in connection with the settlement of that SAR; and (iv) Shares repurchased by the Company with proceeds received from the exercise of an Option. The Shares available for issuance under this Plan shall be authorized and unissued Shares.

**4.3** **Adjustments in Authorized Shares** . In the event of any corporate event or transaction (including, but not limited to, a change in the Shares of the Company or the capitalization of the Company) such as a merger, consolidation, reorganization, recapitalization,

separation, partial or complete liquidation, stock dividend, stock split, reverse stock split, split up, spin-off or other distribution of stock or property of the Company, combination of Shares, exchange of Shares, dividend in kind, or other like change in capital structure, number of outstanding Shares or distribution (other than normal cash dividends) to shareholders of the Company, or any similar corporate event or transaction, the Committee, in its sole discretion, in order to prevent dilution or enlargement of Participants' rights under this Plan, shall substitute or adjust, as applicable, the number and kind of Shares that may be issued under this Plan or under particular forms of Awards, the number and kind of Shares subject to outstanding Awards, the Option Price or Grant Price applicable to outstanding Awards, the Annual Award Limits, and other value determinations applicable to outstanding Awards.

The Committee, in its sole discretion, may also make appropriate adjustments in the terms of any Awards under this Plan to reflect or relate to such changes or distributions and to modify any other terms of outstanding Awards, including modifications of Performance Measures and changes in the length of Performance Periods. The determination of the Committee as to the foregoing adjustments, if any, shall be conclusive and binding on Participants under this Plan.

Subject to the provisions of Article 19 and notwithstanding anything else herein to the contrary, without affecting the number of Shares reserved or available hereunder, the Committee may authorize the issuance or assumption of benefits under this Plan in connection with any merger, consolidation, acquisition of property or stock, or reorganization upon such terms and conditions as it may deem appropriate (including, but not limited to, a conversion of equity awards into Awards under this Plan in a manner consistent with paragraph 53 of FASB Interpretation No. 44), subject to compliance with the rules under Code Sections 422 and 424, as and where applicable.

## Article 5. Eligibility and Participation

**5.1 Eligibility** . Individuals eligible to participate in this Plan include all Employees, Nonemployee Directors, and Third Party Service Providers.

**5.2 Actual Participation** . Subject to the provisions of this Plan, the Committee may, from time to time, select from all eligible individuals those individuals to whom Awards shall be granted and shall determine, in its sole discretion, the nature of any and all terms permissible by law, and the amount of each Award.

## Article 6. Stock Options

**6.1 Grant of Options** . Subject to the terms and provisions of this Plan, Options may be granted to Participants in such number, and upon such terms, and at any time and from time to time as shall be determined by the Committee, in its sole discretion.

**6.2 Award Agreement** . Each Option grant shall be evidenced by an Award Agreement that shall specify the Option Price, the maximum duration of the Option, the number of Shares to which the Option pertains, the conditions upon which an Option shall become vested and exercisable, and such other provisions as the Committee shall determine which are not inconsistent with the terms of this Plan. The Award Agreement also shall specify whether the Option is intended to be an ISO or a NQSO.

**6.3 Option Price** . The Option Price for each grant of an Option under this Plan shall be determined by the Committee in its sole discretion and shall be specified in the Award Agreement; provided, however, the Option Price must be at least equal to one hundred percent (100%) of the Market Price of the Shares as determined on the Grant Date. If the Participant to whom an ISO is granted owns, at the time of the grant, more than ten percent (10%) of the combined voting power of the Company, or its Subsidiaries or Affiliates, the exercise price of each Share subject to such Option shall be not less than one hundred ten percent (110%) of the closing price described in the preceding sentence.

**6.4 Term of Options** . Each Option granted to a Participant shall expire at such time as the Committee shall determine at the time of grant; provided, however, no Option shall be exercisable later than the day before the tenth (10th) anniversary date of its Grant Date (or in the case of an ISO granted to a Participant who at the time of grant owns stock representing more than ten percent (10%) of the combined voting power of the Company, or its Subsidiaries or Affiliates, no later than the day before the fifth (5th) anniversary date of its Grant Date). Notwithstanding the foregoing, for Nonqualified Stock Options granted to Participants outside the United States, the Committee has the authority to grant Nonqualified Stock Options that have a term greater than ten (10) years.

**6.5**      **Exercise of Options** . Subject to Section 6.8, Options granted under this Article 6 shall be exercisable at such times and be subject to such restrictions and conditions as the Committee shall in each instance approve, which terms and restrictions need not be the same for each grant or for each Participant.

**6.6**      **Payment** . Options granted under this Article 6 shall be exercised by the delivery of a notice of exercise to the Company or an agent designated by the Company in a form specified or accepted by the Committee, or by complying with any alternative procedures which may be authorized by the Committee, setting forth the number of Shares with respect to which the Option is to be exercised, accompanied by full payment for the Shares.

A condition of the issuance of the Shares as to which an Option shall be exercised shall be the payment of the Option Price. The Option Price of any Option shall be payable to the Company in full either: (a) in cash or its equivalent; (b) by tendering (either by actual delivery or attestation) previously acquired Shares having an aggregate Market Price at the time of exercise equal to the Option Price (provided that except as otherwise determined by the Committee, the Shares that are tendered must have been held by the Participant for at least six (6) months (or such other period, if any, as the Committee may permit) prior to their tender to satisfy the Option Price if acquired under this Plan or any other compensation plan maintained by the Company or have been purchased on the open market); (c) by a cashless (broker-assisted) exercise; (d) by the Company withholding Shares that otherwise would be delivered to the exerciser pursuant to the exercise of the Option in an amount equaling the value of the exercise price; (e) by a combination of (a), (b), (c) and/or (d); or (f) any other method approved or accepted by the Committee in its sole discretion.

Subject to any governing rules or regulations, as soon as practicable after receipt of written notification of exercise and full payment (including satisfaction of any applicable tax withholding), the Company shall deliver to the Participant evidence of book entry Shares, or upon the Participant's request, Share certificates in an appropriate amount based upon the number of Shares purchased under the Option(s).

Unless otherwise determined by the Committee, all payments under all of the methods indicated above shall be paid in United States dollars.

**6.7**      **Restrictions on Share Transferability** . The Committee may impose such restrictions on any Shares acquired pursuant to the exercise of an Option granted under this Article 6 as it may deem advisable, including, without limitation, minimum holding period requirements, or restrictions under applicable federal securities laws, requirements of any stock exchange or market upon which such Shares are then listed and/or traded, or any blue sky or state securities laws applicable to such Shares.

---

11

**6.8**      **Termination of Employment** . Each Participant's Award Agreement shall set forth the extent to which the Participant shall have the right to exercise the Option following termination of the Participant's employment or provision of services to the Company, its Affiliates, and/or its Subsidiaries, as the case may be. Such provisions shall be determined in the sole discretion of the Committee, shall be included in the Award Agreement entered into with each Participant, need not be uniform among all Options issued pursuant to this Article 6, and may reflect distinctions based on the reasons for termination. Unless otherwise provided in an Award Agreement, the right to exercise an Option shall terminate on the date the Participant's employment, or service on the Board or to the Company, terminates.

**6.9**      **Notification of Disqualifying Disposition** . If any Participant shall make any disposition of Shares issued pursuant to the exercise of an ISO under the circumstances described in Code Section 421(b) (relating to certain disqualifying dispositions), such Participant shall notify the Company of such disposition within ten (10) days thereof.

**6.10**      **Limits on Incentive Stock Options** . The aggregate fair market value of all Shares with respect to which ISOs are exercisable for the first time by a Participant in any one calendar year, under this Plan or any other stock option plan maintained by the Company (or by any subsidiary or parent of the Company), shall not exceed $100,000. The fair market value of such Shares shall be the mean closing price of the Shares as reported on the Market on the date the related ISO is granted.

## Article 7.      Stock Appreciation Rights

**7.1**      **Grant of SARs** . Subject to the terms and conditions of this Plan, SARs may be granted to Participants at any time and from time to time as shall be determined by the Committee. Subject to the terms and conditions of this Plan, the Committee shall have complete discretion in determining the number of SARs granted to each Participant and, consistent with the provisions of this Plan, in determining the terms and conditions pertaining to such SARs. The Grant Price for each grant of an SAR shall be determined by the Committee and shall be specified in the Award Agreement; provided, however, the Grant Price on the Grant Date must be at least equal to one hundred percent (100%) of the Market Price of the Shares as determined on the Grant Date.

**7.2**    **SAR Agreement** . Each SAR Award shall be evidenced by an Award Agreement that shall specify the Grant Price, the term of the SAR, and such other provisions as the Committee shall determine.

**7.3**    **Term of SAR** . The term of an SAR granted under this Plan shall be determined by the Committee, in its sole discretion, and except as determined otherwise by the Committee and specified in the SAR Award Agreement, no SAR shall be exercisable later than the tenth (10 th ) anniversary date of its grant. Notwithstanding the foregoing, for SARs granted to Participants outside the United States, the Committee has the authority to grant SARs that have a term greater than ten (10) years.

---

12

---

**7.4**    **Exercise of SARs** . SARs may be exercised upon whatever terms and conditions the Committee, in its sole discretion, imposes.

**7.5**    **Settlement of SARs** . Upon the exercise of an SAR, a Participant shall be entitled to receive payment from the Company in an amount determined by multiplying:

(a)       The excess of the Market Price of a Share on the date of exercise over the Grant Price; by

(b)       The number of Shares with respect to which the SAR is exercised.

At the discretion of the Committee, the payment upon SAR exercise may be in cash, Shares, or any combination thereof, or in any other manner approved by the Committee in its sole discretion. The Committee's determination regarding the form of SAR payout shall be set forth in the Award Agreement pertaining to the grant of the SAR.

**7.6**    **Termination of Employment** . Each Award Agreement shall set forth the extent to which the Participant shall have the right to exercise the SAR following termination of the Participant's employment with or provision of services to the Company, its Affiliates, and/or its Subsidiaries, as the case may be. Such provisions shall be determined in the sole discretion of the Committee, shall be included in the Award Agreement entered into with Participants, need not be uniform among all SARs issued pursuant to this Plan, and may reflect distinctions based on the reasons for termination. Unless otherwise provided in an Award Agreement, the right to exercise the SAR shall terminate on the date the Participant's employment, or service on the Board or to the Company, terminates.

**7.7**    **Other Restrictions.** The Committee shall impose such other conditions and/or restrictions on any Shares received upon exercise of an SAR granted pursuant to this Plan as it may deem advisable or desirable. These restrictions may include, but shall not be limited to, a requirement that the Participant hold the Shares received upon exercise of an SAR for a specified period of time.

**Article 8.**      **Restricted Stock and Restricted Stock Units**

**8.1**    **Grant of Restricted Stock or Restricted Stock Units.** Subject to the terms and provisions of this Plan, the Committee, at any time and from time to time, may grant Shares of Restricted Stock and/or Restricted Stock Units to Participants in such amounts as the Committee shall determine. Restricted Stock Units shall be similar to Restricted Stock except that no Shares are actually awarded to the Participant on the Grant Date.

**8.2**    **Restricted Stock or Restricted Stock Unit Agreement** . Each Restricted Stock and/or Restricted Stock Unit grant shall be evidenced by an Award Agreement that shall specify the Period(s) of Restriction, the number of Shares of Restricted Stock or the number of Restricted Stock Units granted, and such other provisions as the Committee shall determine.

---

13

---

**8.3**    **Other Restrictions** . The Committee shall impose such other conditions and/or restrictions on any Shares of Restricted Stock or Restricted Stock Units granted pursuant to this Plan as it may deem advisable including, without limitation, restrictions based upon the achievement of specific Performance Measures or other performance goals, time-based restrictions on vesting following the attainment of the Performance Measures or other performance goals, time-based restrictions, and/or restrictions under applicable laws or under the requirements of any stock exchange or market upon which such Shares are listed or traded, or holding requirements or sale restrictions placed on the Shares by the Company upon vesting of such Restricted Stock or Restricted Stock Units.

To the extent deemed appropriate by the Committee, the Company may retain the certificates representing Shares of Restricted Stock in the Company's possession until such time as all conditions and/or restrictions applicable to such Shares have been satisfied or lapse.

Except as otherwise provided in this Article 8, Shares of Restricted Stock covered by each Restricted Stock Award shall become freely transferable by the Participant after all conditions and restrictions applicable to such Shares have been satisfied or lapse (including satisfaction of any applicable tax withholding obligations), and Restricted Stock Units shall be paid in cash, Shares, or a combination of cash and Shares as the Committee, in its sole discretion shall determine.

**8.4    Certificate Legend** . In addition to any legends placed on certificates pursuant to Section 8.3, each certificate representing Shares of Restricted Stock granted pursuant to this Plan may bear a legend such as the following or as otherwise determined by the Committee in its sole discretion:

The sale or transfer of Shares of stock represented by this certificate, whether voluntary, involuntary, or by operation of law, is subject to certain restrictions on transfer as set forth in the Cinedigm Corp. 2017 Incentive Plan, and in the associated Award Agreement. A copy of this Plan and such Award Agreement may be obtained from Cinedigm Corp..

**8.5    Voting Rights** . Unless otherwise determined by the Committee and set forth in a Participant's Award Agreement, to the extent permitted or required by law, as determined by the Committee, Participants holding Shares of Restricted Stock granted hereunder may be granted the right to exercise full voting rights with respect to those Shares during the Period of Restriction. A Participant shall have no voting rights with respect to any Restricted Stock Units granted hereunder.

**8.6    Termination of Employment** . Each Award Agreement shall set forth the extent to which the Participant shall have the right to retain Restricted Stock and/or Restricted Stock Units following termination of the Participant's employment with or provision of services to the Company, its Affiliates, and/or its Subsidiaries, as the case may be. Such provisions shall be determined in the sole discretion of the Committee, shall be included in the Award Agreement entered into with each Participant, need not be uniform among all Shares of Restricted Stock or Restricted Stock Units issued pursuant to this Plan, and may reflect distinctions based on the reasons for termination.

14

**8.7    Section 83(b) Election** . The Committee may provide in an Award Agreement that the Award of Restricted Stock is conditioned upon the Participant making or refraining from making an election with respect to the Award under Code Section 83(b). If a Participant makes an election pursuant to Code Section 83(b) concerning a Restricted Stock Award, the Participant shall be required to file promptly a copy of such election with the Company.

**Article 9.    Performance Units/Performance Shares**

**9.1    Grant of Performance Units/Performance Shares** . Subject to the terms and provisions of this Plan, the Committee, at any time and from time to time, may grant Performance Units and/or Performance Shares to Participants in such amounts and upon such terms as the Committee shall determine. Performance Units and Performance Shares that are earned (as described in Section 9.3) may be subject to vesting requirements as set forth in the applicable Award Agreement. Except as the Committee may otherwise provide in an Award Agreement, Performance Units and Performance Shares may not vest prior to the expiration of at least one (1) year of a Performance Period.

**9.2    Value of Performance Units/Performance Shares** . Each Performance Unit shall have an initial value that is established by the Committee at the time of grant. Each Performance Share shall have an initial value equal to the Marker Price of a Share on the Grant Date. The Committee shall set Performance Measures in its discretion which, depending on the extent to which they are met, will determine the value and/or number of Performance Units/Performance Shares that may be earned by the Participant.

**9.3    Earning of Performance Units/Performance Shares** . Subject to the terms of this Plan, after the applicable Performance Period and vesting period, if any, have ended, the holder of Performance Units/Performance Shares shall be entitled to receive payout on the value and number of Performance Units/Performance Shares earned by the Participant over the Performance Period, to be determined as a function of the extent to which the corresponding Performance Measures have been achieved.

**9.4    Form and Timing of Payment of Performance Units/Performance Shares** . Payment of earned and vested Performance Units/Performance Shares shall be as determined by the Committee and as evidenced in the Award Agreement. Subject to the terms of this Plan, the Committee, in its sole discretion, may pay earned and vested Performance Units/Performance Shares in the form of cash or in Shares (or in a combination thereof). Any Shares may be granted subject to any restrictions deemed appropriate by the

Committee. The determination of the Committee with respect to the form of payout of such Awards shall be set forth in the Award Agreement pertaining to the grant of the Award.

**9.5      Termination of Employment** . Each Award Agreement shall set forth the extent to which the Participant shall have the right to retain Performance Units and/or Performance Shares following termination of the Participant's employment with the Company, its Affiliates, and/or its Subsidiaries, as the case may be. Such provisions shall be determined in the sole discretion of the Committee, shall be included in the Award Agreement entered into with each Participant, need not be uniform among all Awards of Performance Units or Performance Shares issued pursuant to this Plan, and may reflect distinctions based on the reasons for termination.

## Article 10.      Cash-Based Awards and Other Stock-Based Awards

**10.1      Grant of Cash-Based Awards** . Subject to the terms and provisions of the Plan, the Committee, at any time and from time to time, may grant Cash-Based Awards to Participants in such amounts and upon such terms as the Committee may determine.

**10.2      Other Stock-Based Awards** . The Committee may grant other types of equity-based or equity-related Awards not otherwise described by the terms of this Plan (including the grant or offer for sale of unrestricted Shares) in such amounts and subject to such terms and conditions, as the Committee shall determine. Such Awards may involve the transfer of actual Shares to Participants, or payment in cash or otherwise of amounts based on the value of Shares and may include, without limitation, Awards designed to comply with or take advantage of the applicable local laws of jurisdictions other than the United States.

**10.3      Value of Cash-Based and Other Stock-Based Awards** . Each Cash-Based Award shall specify a payment amount or payment range as determined by the Committee. Each Other Stock-Based Award shall be expressed in terms of Shares or units based on Shares, as determined by the Committee. The Committee may establish performance goals in its discretion. If the Committee exercises its discretion to establish performance goals, the number and/or value of Cash-Based Awards or Other Stock-Based Awards that will be paid out to the Participant will depend on the extent to which the performance goals are met.

**10.4      Payment of Cash-Based Awards and Other Stock-Based Awards** . Payment, if any, with respect to a Cash-Based Award or an Other Stock-Based Award shall be made in accordance with the terms of the Award, in cash or Shares as the Committee determines.

**10.5      Termination of Employment** . The Committee shall determine the extent to which the Participant shall have the right to receive Cash-Based Awards or Other Stock-Based Awards following termination of the Participant's employment with or provision of services to the Company, its Affiliates, and/or its Subsidiaries, as the case may be. Such provisions shall be determined in the sole discretion of the Committee, such provisions shall be included in the Award Agreement entered into with each Participant, but need not be uniform among all Awards of Cash-Based Awards or Other Stock-Based Awards issued pursuant to the Plan, and may reflect distinctions based on the reasons for termination.

## Article 11.      Transferability of Awards

**11.1      Transferability.** Except as provided in Section 11.2 below, during a Participant's lifetime, his or her Awards shall be exercisable only by the Participant (except Options and SARs may be exercised by the Participant's duly appointed personal representative). Awards shall not be transferable other than by will or the laws of descent and distribution; no Awards shall be subject, in whole or in part, to attachment, execution, or levy of any kind; and any purported transfer in violation hereof shall be null and void. The Committee may establish such procedures as it deems appropriate for a Participant to designate a beneficiary to whom any amounts payable or Shares deliverable in the event of, or following, the Participant's death, may be provided.

**11.2      Committee Action.** The Committee may, in its discretion, determine that notwithstanding Section 11.1, any or all Awards (other than ISOs) shall be transferable to and exercisable by such transferees, and subject to such terms and conditions, as the Committee may deem appropriate; provided, however, no Award may be transferred for value (as defined in the General Instructions to Form S-8).

## Article 12.      Performance Measures

**12.1    Performance Measures** . The Performance Measures upon which the payment or vesting of an Award to a Covered Employee that is intended to qualify as Performance-Based Compensation shall be limited to the following:

(a)    Net earnings or Net Income (before or after taxes);

(b)    Earnings per share (basic or diluted);

(c)    Net sales or revenue growth;

(d)    Net operating profit;

(e)    Return measures (including, but not limited to, return on assets, capital, invested capital, equity, sales, or revenue);

(f)    Cash flow (including, but not limited to, throughput, operating cash flow, free cash flow, cash flow return on equity, and cash flow return on investment);

(g)    Earnings before or after taxes, interest, depreciation, and/or amortization;

(h)    Earnings before taxes;

(i)    Gross or operating margins;

(j)    Corporate value measures;

(k)    Capital expenditures;

(l)    Unit volumes;

(m)    Productivity ratios;

(n)    Share price (including, but not limited to, growth measures and total shareholder return);

(o)    Cost or expense;

(p)    Margins (including, but not limited to, debt or profit);

(q)    Operating efficiency;

(r)    Market share;

(s)    Customer satisfaction;

(t)    Working capital targets or any element thereof;

(u)    Economic value added or EVA® (net operating profit after tax minus the sum of capital multiplied by the cost of capital);

(v)    Health, safety and environmental performance;

(w)    Corporate advocacy metrics;

(x)    Strategic milestones (including, but not limited to, debt reduction, improvement of cost of debt, equity or capital, completion of projects, achievement of synergies or integration objectives, or improvements to credit rating, inventory turnover, weighted average cost of capital, implementation of significant new processes, productivity or production, product quality, and any combination of the foregoing);

(y)    Strategic sustainability metrics (including, but not limited to, corporate governance, enterprise risk management, employee development, and portfolio restructuring); and

(z)    Stockholder equity or net worth.

Any one or more Performance Measure(s) may be used to measure the performance of any Participant, the Company, Subsidiary, and/or Affiliate as a whole or any business unit or line of business of the Company, Subsidiary, and/or Affiliate or any combination thereof, as the Committee may deem appropriate, or any of the above Performance Measures on an absolute, gross, total, net per share, average, adjusted or relative basis (or measure based on changes therein), including, as compared to the performance of a group of comparator companies, or published or special index that the Committee, in its sole discretion, deems appropriate, or the Company may select Performance Measure (n) above as compared to various stock market indices. The Committee also has the authority to provide for accelerated vesting of any Award based on the achievement of performance goals pursuant to the Performance Measures specified in this Article 12.

**12.2    Evaluation of Performance.** The Committee may provide in any such Award that any evaluation of performance may include or exclude any of the following events that occurs during a Performance Period: (a) asset write-downs, (b) litigation or claim judgments or settlements, (c) the effect of changes in tax laws, accounting principles, or other laws or provisions affecting reported results, (d) any reorganization and restructuring programs, (e) unusual and/or nonrecurring items as described in management's discussion and analysis of financial condition and results of operations appearing in the Company's annual report to shareholders for the applicable year, (f) acquisitions or divestitures, and (g) foreign exchange gains and losses. To the extent such inclusions or exclusions affect Awards to Covered Employees, they shall be prescribed in a form that meets the requirements of Code Section 162(m) for deductibility.

**12.3    Adjustment of Performance-Based Compensation.** The Committee shall not use discretion to adjust the payout of Performance-Based Compensation upwards once the Performance Measures have been established. The Committee shall retain the discretion to adjust such Awards downward, either on a formula or discretionary basis or any combination, as the Committee determines.

**12.4    Committee Discretion.** In the event that applicable tax and/or securities laws change to permit Committee discretion to alter the governing Performance Measures without obtaining shareholder approval of such changes, the Committee shall have sole discretion to make such changes without obtaining shareholder approval. In addition, in the event that the Committee determines that it is advisable to grant Awards that are not Performance-Based Compensation, the Committee may make such grants without satisfying the requirements of Code Section 162(m) and base vesting on Performance Measures other than those set forth in Section 12.1.

## Article 13.    Nonemployee Director Awards

The Board or Committee shall determine all Nonemployee Director Awards. The terms and conditions of any grant to any such Nonemployee Director shall be set forth in an Award Agreement.

## Article 14.    Minimum Vesting of Share-Based Awards

Notwithstanding any other provision of this Plan to the contrary, Awards granted pursuant to Article 6, 7 and 8 of this Plan shall be subject to a minimum vesting period of at least one (1) year, provided, however, (a) such vesting may be cliff or graded (starting no earlier than one (1) year after grant), (b) the Committee may provide for earlier vesting as specified in an Award Agreement, and (c) no more than five percent (5%) of the maximum number of Shares authorized for issuance under this Plan pursuant to Section 4.1(a) may be granted with a minimum vesting period of less than one (1) year.

## Article 15.    Dividend Equivalents

Any Participant selected by the Committee may be granted dividend equivalents based on the dividends declared on Shares that are subject to any Award, to be credited as of dividend payment dates, during the period between the date the Award is granted and the date the Award is exercised, vests or expires, as determined by the Committee. Such dividend equivalents shall be converted to cash or additional Shares by such formula and at such time and subject to such limitations as may be determined by the Committee. Notwithstanding the foregoing, for all Awards, the payment of dividends prior to an Award becoming vested shall be prohibited, and the Committee shall determine the extent to which dividends may accrue during the vesting period and become payable upon vesting. Dividends and dividend equivalents may not be paid on unexercised Options and SARs.

**Article 16.        Beneficiary Designation**

Each Participant under this Plan may, from time to time, name any beneficiary or beneficiaries (who may be named contingently or successively) to whom any benefit under this Plan is to be paid in case of his death before he receives any or all of such benefit. Each such designation shall revoke all prior designations by the same Participant, shall be in a form prescribed by the Committee, and will be effective only when filed by the Participant in writing with the Company, or the Company's designated agent, during the Participant's lifetime. In the absence of any such beneficiary designation, benefits remaining unpaid or rights remaining unexercised at the Participant's death shall be paid to or exercised by the Participant's executor, administrator, or legal representative.

**Article 17.        Rights of Participants**

**17.1        Employment** . Nothing in this Plan or an Award Agreement shall interfere with or limit in any way the right of the Company, its Affiliates, and/or its Subsidiaries, to terminate any Participant's employment, or service on the Board or to the Company, at any time or for any reason not prohibited by law, nor confer upon any Participant any right to continue his employment, or service as a Nonemployee Director or Third Party Service Provider, for any specified period of time.

Neither an Award nor any benefits arising under this Plan shall constitute an employment contract with the Company, its Affiliates, and/or its Subsidiaries and, accordingly, subject to Articles 3 and 19, this Plan and the benefits hereunder may be terminated at any time in the sole and exclusive discretion of the Committee without giving rise to any liability on the part of the Company, its Affiliates, and/or its Subsidiaries.

**17.2        Participation** . No individual shall have the right to be selected to receive an Award under this Plan, or, having been so selected, to be selected to receive a future Award.

**17.3        Rights as a Shareholder** . Except as otherwise provided herein, a Participant shall have none of the rights of a shareholder with respect to Shares covered by any Award until the Participant becomes the record holder of such Shares.

**Article 18.        Change of Control**

**18.1        Change of Control of the Company** . Notwithstanding any other provision of this Plan to the contrary, the provisions of this Article 18 shall apply in the event of a Change of Control, unless otherwise determined by the Committee in connection with the grant of an Award as reflected in the applicable Award Agreement or severance compensation agreement.

20

(a)        If, upon a Change of Control, a Participant receives a new Award which qualifies as a "Replacement Award" (as defined below), the Replacement Award shall continue subject to the terms of the Replacement Award.

(b)        If, upon a Change of Control that results in the Company's Shares no longer being traded on the NASDAQ Global Market or another established securities market and no Replacement Award is granted to a Participant, the unvested portion of an Award whose vesting is based only on a service requirement shall become immediately vested and exercisable, as applicable, upon the Change of Control.

(c)        Notwithstanding subparagraph (a) and except as may be otherwise provided in an Award Agreement, upon a Change of Control, with respect to Awards that are Performance Shares or Performance Units issued pursuant to Article 9 of the Plan, a pro-rata portion of the Award shall be immediately earned, vested and payable; such portion shall be determined based on the portion of the Performance Period that has elapsed as of (i) the date of the Change of Control, if the Performance Measure is based on stock price, or (ii) the end of the last full calendar quarter preceding or commensurate with the date of the Change of Control if the Performance Measure is not based on stock price (in each case, the "Adjusted Measurement Date"). The Award amount that will be considered earned and payable will be calculated based on the higher of target or actual performance measured as of the Adjusted Measurement Date. To the extent any earned Awards that are Performance Shares or Performance Units have not been paid prior to the Change of Control because they are subject to vesting, such earned but unvested Awards shall become immediately vested, and payable upon the Change of Control.

(d)        Except as provided in subparagraph (c) or as otherwise provided in an Award Agreement, if, following a Change of Control, the Company's Shares continue to be traded on the NASDAQ Global Market or another established securities market, outstanding

Awards shall continue in effect and be treated as Replacement Awards as described in subparagraph (a).

(e)    Notwithstanding any of subparagraphs (a), (b) or (d) of this Section 18.1, the Committee may, in its sole discretion, determine that any or all outstanding Awards granted under the Plan, whether or not exercisable, will be canceled and terminated, and that in connection with such cancellation and termination, the holder of such Award may receive for each Share subject to such Awards a cash payment (or the delivery of shares of stock, other securities or a combination of cash, stock and securities equivalent to such cash payment) equal to the difference, if any, between the consideration received by shareholders of the Company in respect of a Share in connection with such transaction and the purchase price per share, if any, under the Award multiplied by the number of Shares subject to such Award; provided that if such product is zero or less or to the extent that the Award is not then exercisable, the Awards will be canceled and terminated without payment therefor.

21

**18.2    Replacement Awards.** An Award shall be considered a Replacement Award if: (i) it has a value at least equal to the value of the Award it is replacing as determined by the Committee in its sole discretion; (ii) it relates to publicly traded equity securities of the Company or its successor in the Change of Control or another entity that is affiliated with the Company or its successor following the Change of Control; and (iii) its other terms and conditions are not less favorable to the Participant than the terms and conditions of the Award it is replacing (including the provisions that would apply in the event of a subsequent Change of Control). Without limiting the generality of the foregoing, the Replacement Award may take the form of a continuation of the Award it is replacing if the requirements of the preceding sentence are satisfied. The determination of whether the conditions of this Section 18.2 are satisfied shall be made by the Committee, as constituted immediately before the Change of Control, in its sole discretion.

**18.3    Reduction of Excess Parachute Payments** . Except as may be provided in a severance compensation agreement between the Company and the Participant, if, in connection with a Change of Control, a Participant's Award will cause the Participant to be liable for federal excise tax under Code Section 4999 levied on certain "excess parachute payments" as defined in Code Section 280G ("Excise Tax"), then the payments made pursuant to the Awards shall be reduced (or repaid to the Company, if previously paid or provided) as provided below:

(a)    If the payments due upon a Change of Control under this Plan and any other agreement between a Participant and the Company, exceed 2.99 times the Participant's "base amount," as defined in Code Section 280G, and it is determined that any Excise Tax is payable by a Participant, the Participant shall receive either (i) all payments otherwise due; or (ii) the reduced payment amount described in the next sentence, whichever will provide the Participant with the greater after-tax economic benefit taking into account for these purposes any applicable Excise Tax. To the extent necessary, and in compliance with the Code, a reduced payment amount shall be calculated by reducing the payments to the minimum extent necessary so that no portion of any payment, as so reduced or repaid, constitutes an excess parachute payment. .

(b)    Whether payments are to be reduced pursuant to this Section 18.3, and the extent to which they are to be so reduced, will be determined solely by the Company in good faith and the Company will notify the Participant in writing of its determination.

(c)    In no event shall a Participant be entitled to receive any kind of gross-up payment or Excise Tax reimbursement from the Company.

**Article 19.    Amendment, Modification, Suspension, and Termination**

**19.1    Amendment, Modification, Suspension, and Termination.** Subject to Section 19.3, the Committee may, at any time and from time to time, alter, amend, modify, suspend, or terminate this Plan and any Award Agreement in whole or in part; provided, however, that, (i) without the prior approval of the Company's shareholders and except as provided in Section 4.3, Options or SARs issued under this Plan will not be repriced, repurchased (including a cash buyout), replaced, or regranted through cancellation, or by lowering the Option Price of a previously granted Option or the Grant Price of a previously granted SAR, (ii) any amendment of the Plan must comply with the rules of the Market, and (iii) no material amendment of this Plan shall be made without shareholder approval if shareholder approval is required by law, regulation, or stock exchange rule.

22

19.2    **Adjustment of Awards Upon the Occurrence of Certain Unusual or Nonrecurring Events** . Subject to the requirements of Sections 12.2 and 12.3, the Committee may make adjustments in the terms and conditions of, and the criteria included in, Awards in recognition of unusual or nonrecurring events (including, without limitation, the events described in Section 4.3 hereof) affecting the Company or the financial statements of the Company or of changes in applicable laws, regulations, or accounting principles, whenever the Committee determines that such adjustments are appropriate in order to prevent unintended dilution or enlargement of the benefits or potential benefits intended to be made available under this Plan. The determination of the Committee as to the foregoing adjustments, if any, shall be conclusive and binding on Participants under this Plan.

19.3    **Awards Previously Granted** . Notwithstanding any other provision of this Plan to the contrary (other than Section 19.4), no termination, amendment, suspension, or modification of this Plan or an Award Agreement shall adversely affect in any material way any Award previously granted under this Plan, without the written consent of the Participant holding such Award.

19.4    **Amendment to Conform to Law.** Notwithstanding any other provision of this Plan to the contrary, the Committee may amend the Plan or an Award Agreement, to take effect retroactively or otherwise, as deemed necessary or advisable for the purpose of conforming the Plan or an Award Agreement to any present or future law relating to plans of this or similar nature (including, but not limited to, Code Section 409A), and to the administrative regulations and rulings promulgated thereunder. By accepting an Award under this Plan, a Participant agrees to any amendment made pursuant to this Section 19.4 to any Award granted under the Plan without further consideration or action.

19.5    **Compliance with the Exchange Act.** It is the Company's intent that the Plan comply in all respects with Rule 16b-3 under the Exchange Act and any related regulations. If any provision of this Plan is later found not to be in compliance with such Rule and regulations, the provisions shall be deemed null and void. All grants to, and exercises of Options by Insiders under this Plan shall be executed in accordance with the requirements of Section 16 of the Exchange Act and regulations promulgated thereunder.

## Article 20.    Withholding

20.1    **Tax Withholding** . The Company shall have the power and the right to deduct or withhold from any amounts due and owing to the Participant, or require a Participant to remit to the Company, up to the maximum statutory amount to satisfy federal, state, and local taxes, domestic or foreign, required by law or regulation to be withheld with respect to any taxable event arising as a result of this Plan.

20.2    **Share Withholding** . With respect to withholding required upon the lapse of restrictions on Restricted Stock and Restricted Stock Units, or upon the achievement of Performance Measures related to Performance Shares, or any other taxable event arising as a result of an Award granted hereunder, the Committee may establish provisions in the applicable Award Agreements to satisfy the withholding requirement, in whole or in part, by having the Company withhold whole Shares having a Market Price on the date the tax is to be determined up to the maximum statutory total tax withholding that could be imposed on the transaction.

## Article 21.    Successors

All obligations of the Company under this Plan with respect to Awards granted hereunder shall be binding on any successor to the Company, regardless of whether the existence of such successor is the result of a direct or indirect purchase, merger, consolidation, or otherwise, of all or substantially all of the business and/or assets of the Company.

## Article 22.    General Provisions

22.1    **Forfeiture Events.** Any Awards granted under the Plan will be subject to recoupment in accordance with any clawback policy that the Company currently has in effect, or is required to adhere to, adopt or modify, pursuant to the listing standards of any national securities exchange or association on which the Company's securities are listed or as is otherwise required by the Dodd-Frank Wall Street Reform and Consumer Protection Act or the Sarbanes-Oxley Act of 2002, or other applicable law ("Clawback Policy"). In addition, the Committee or the Board may impose such clawback, suspension, restriction, recovery, or recoupment provisions in an Award Agreement as the Committee or the Board determines necessary or appropriate, including, but not limited to, a reacquisition right in respect of previously acquired Shares or other cash or property, including the gains realized thereon, as set forth in the Award Agreement. These conditions may include, without limitation, actions by the Participant which constitute a conflict of interest with the Company, are prejudicial to the Company's interests, or are in violation of any non-compete agreement or obligation, any confidentiality agreement or obligation, the Company's applicable policies or the Participant's terms and conditions of employment. The Committee may require, upon exercise, payment or delivery pursuant to an award, that the Participant certify in a manner acceptable to the Company that he or she is in compliance with the terms and conditions of the Award. No recovery of compensation under this Section will be an event giving rise to a right to resign for "good reason" or "constructive termination" (or similar term) under any agreement or otherwise with the Company.

**22.2**    **Legend** . The certificates for Shares may include any legend which the Committee deems appropriate to reflect any restrictions on transfer of such Shares.

**22.3**    **Gender and Number** . Except where otherwise indicated by the context, any masculine term used herein also shall include the feminine, the plural shall include the singular, and the singular shall include the plural.

**22.4**    **Severability** . In the event any provision of this Plan shall be held illegal or invalid for any reason, the illegality or invalidity shall not affect the remaining parts of this Plan, and this Plan shall be construed and enforced as if the illegal or invalid provision had not been included.

24

**22.5**    **Requirements of Law** . The granting of Awards and the issuance of Shares under this Plan shall be subject to all applicable laws, rules, and regulations, and to such approvals by any governmental agencies or national securities exchanges as may be required.

**22.6**    **Delivery of Title** . The Company shall have no obligation to issue or deliver evidence of title for Shares issued under this Plan prior to:

(a)    Obtaining any approvals from governmental agencies that the Company determines are necessary or advisable; and

(b)    Completion of any registration or other qualification of the Shares under any applicable national or foreign law or ruling of any governmental body that the Company determines to be necessary or advisable.

**22.7**    **Inability to Obtain Authority** . The inability of the Company to obtain authority from any regulatory body having jurisdiction, which authority is deemed by the Company's counsel to be necessary to the lawful issuance and sale of any Shares hereunder, shall relieve the Company of any liability in respect of the failure to issue or sell such Shares as to which such requisite authority shall not have been obtained.

**22.8**    **Investment Representations** . The Committee may require any individual receiving Shares pursuant to an Award under this Plan to represent and warrant in writing that the individual is acquiring the Shares for investment and without any present intention to sell or distribute such Shares.

**22.9**    **Employees Based Outside the United States** . Notwithstanding any provision of this Plan to the contrary, in order to comply with the laws in other countries in which the Company, its Affiliates, and/or its Subsidiaries operate or have Employees, Nonemployee Directors, or Third Party Service Providers, the Committee, in its sole discretion, shall have the power and authority to:

(a)    Determine which Affiliates and Subsidiaries shall be covered by this Plan;

(b)    Determine which Employees, Nonemployee Directors, and/or Third Party Service Providers outside the United States are eligible to participate in this Plan;

(c)    Modify the terms and conditions of any Award granted to Employees, Nonemployee Directors, and/or Third Party Service Providers outside the United States to comply with applicable foreign laws;

(d)    Establish subplans and modify exercise procedures and other terms and procedures, to the extent such actions may be necessary or advisable. Any subplans and modifications to Plan terms and procedures established under this Section 21.9 by the Committee shall be attached to this Plan document as appendices; and

25

(e)    Take any action, before or after an Award is made, that it deems advisable to obtain approval or comply with any necessary local government regulatory exemptions or approvals.

Notwithstanding the above, the Committee may not take any actions hereunder, and no Awards shall be granted, that would violate applicable law.

**22.10    Uncertificated Shares** . To the extent that this Plan provides for issuance of certificates to reflect the transfer of Shares, the transfer of such Shares may be effected on a noncertificated basis, to the extent not prohibited by applicable law or the rules of any stock exchange.

**22.11    Unfunded Plan** . Participants shall have no right, title, or interest whatsoever in or to any investments that the Company, and/or its Subsidiaries, and/or its Affiliates may make to aid it in meeting its obligations under this Plan. Nothing contained in this Plan, and no action taken pursuant to its provisions, shall create or be construed to create a trust of any kind, or a fiduciary relationship between the Company and any Participant, beneficiary, legal representative, or any other individual. To the extent that any individual acquires a right to receive payments from the Company, its Subsidiaries, and/or its Affiliates under this Plan, such right shall be no greater than the right of an unsecured general creditor of the Company, a Subsidiary, or an Affiliate, as the case may be. All payments to be made hereunder shall be paid from the general funds of the Company, a Subsidiary, or an Affiliate, as the case may be and no special or separate fund shall be established and no segregation of assets shall be made to assure payment of such amounts except as expressly set forth in this Plan.

**22.12    No Fractional Shares** . No fractional Shares shall be issued or delivered pursuant to this Plan or any Award. The Committee shall determine whether cash, Awards, or other property shall be issued or paid in lieu of fractional Shares or whether such fractional Shares or any rights thereto shall be forfeited or otherwise eliminated.

**22.13    Retirement and Welfare Plans** . Neither Awards made under this Plan nor Shares or cash paid pursuant to such Awards, except pursuant to Covered Employee annual incentive awards, may be included as "compensation" for purposes of computing the benefits payable to any Participant under the Company's or any Subsidiary's or Affiliate's retirement plans (both qualified and non-qualified) or welfare benefit plans unless such other plan expressly provides that such compensation shall be taken into account in computing a Participant's benefit.

**22.14    Deferred Compensation.** If any Award would be considered non-qualified deferred compensation as defined under Code Section 409A and if this Plan fails to meet the requirements of Code Section 409A with respect to such Award, then such Award shall be null and void. However, the Committee may permit deferrals of compensation pursuant to the terms of a Participant's Award Agreement, a separate plan or a subplan which meets the requirements of Code Section 409A and any related guidance. Additionally, to the extent any Award is subject to Code Section 409A, notwithstanding any provision herein to the contrary, the Plan does not permit the acceleration or delay of the time or schedule of any distribution related to such Award, except as permitted by Code Section 409A, the regulations thereunder, and/or the Secretary of the United States Treasury. To the extent the Plan or an Award Agreement is required to be interpreted under Code Section 409A, such interpretation shall be consistent, to the extent feasible as determined by the Company, with the intent to not cause the imposition of penalties under Code Section 409A.

**22.15    Nonexclusivity of this Plan** . The adoption of this Plan shall not be construed as creating any limitations on the power of the Board or Committee to adopt such other compensation arrangements as it may deem desirable for any Participant.

**22.16    No Constraint on Corporate Action.** Nothing in this Plan shall be construed to: (i) limit, impair, or otherwise affect the Company's or a Subsidiary's or an Affiliate's right or power to make adjustments, reclassifications, reorganizations, or changes of its capital or business structure, or to merge or consolidate, or dissolve, liquidate, sell, or transfer all or any part of its business or assets; or (ii) limit the right or power of the Company or a Subsidiary or an Affiliate to take any action which such entity deems to be necessary or appropriate.

**22.17    Governing Law** . The Plan and each Award Agreement shall be governed by the laws of the State of Delaware, excluding any conflicts or choice of law rule or principle that might otherwise refer construction or interpretation of this Plan to the substantive law of another jurisdiction. Unless otherwise provided in the Award Agreement, recipients of an Award under this Plan are deemed to submit to the exclusive jurisdiction and venue of the federal or state courts of Delaware, to resolve any and all issues that may arise out of or relate to this Plan or any related Award Agreement.

**22.18    Section 162(m).** It is the intention of the Company that, unless otherwise provided by the Committee, awards determined in accordance with this Plan shall be excluded from the deduction limitations contained in Code Section 162(m). Therefore, subject to the Committee's determination that an Award need not meet the Performance-Based Compensation exception contained in Code Section 162(m), if any Plan provision is found not to be in compliance with such exception, that provision shall be deemed amended so that the Plan does so

comply to the extent permitted by law and deemed advisable by the Committee, and in all such events the Plan shall be construed in favor of its meeting the Performance-Based Compensation exception contained in Code Section 162(m).

As evidence of its adoption of this amendment and restatement of the Plan, the Company has caused this document to be executed by its duly authorized officer the 31 st day of August, 2017.

**CINEDIGM CORP.**

By:  /s/ Christopher J. McGurk
        Name: Christopher J. McGurk
        Title: Chief Executive Officer

27



**Cinedigm Stockholders Approve Bison Transaction**

LOS ANGELES (August 31, 2017)--  Cinedigm Corp. (NASDAQ: CIDM) announced today that the proposal included in its recent proxy to issue 20,000,000 shares to sell to Bison Entertainment Investment Limited, the wholly owned subsidiary of Bison Holding Company Ltd. ("Bison Capital"), has been approved by the Company's stockholders at their annual meeting. The Company has agreed to sell to Bison Capital 20,000,000 shares (the "Shares") of Cinedigm's Class A common stock, par value $0.001 per share, for an aggregate purchase price of up to $30,000,000, of which up to 400,000 of the Shares may be sold to members of the Company's management instead of Bison Capital.

The transaction, when consummated, will result in Bison having majority voting control of Cinedigm and 2 of 7 seats on the Cinedigm Board of Directors.

Chris McGurk, Cinedigm Chairman and Chief Executive Officer, noted, " We believe this transaction with Bison will be game changing for Cinedigm as it will create multiple significant financial, strategic and operational opportunities for the Company. "

The Bison transaction is subject to certain other approvals including CFIUS review (Committee on Foreign Investment in the United States).

**About Cinedigm:**

Cinedigm powers custom content solutions to the world's largest retail, media and technology companies. We provide premium feature films and series to digital platforms including iTunes, Netflix, and Amazon, cable and satellite providers including Comcast, Dish Network and DirecTV, and major retailers including Walmart and Target. Leveraging Cinedigm's unique capabilities, content and technology, the Company has emerged as a leader in the fast-growing over-the-top (OTT) channel business, with four channels under management that reach hundreds of millions of devices while also providing premium content and service expertise to the entire OTT ecosystem. Learn more about Cinedigm at www.cinedigm.com.

www.cinedigm.com. [CIDM-E]

Cinedigm Corporation
Jill Newhouse Calcaterra, 310-466-5135
jcalcaterra@cinedigm.com

# EXHIBIT 4

SEC Form 4

**FORM 4**

| | | |
|---|---|---|
| Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b). | **UNITED STATES SECURITIES AND EXCHANGE COMMISSION** Washington, D.C. 20549 **STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP** Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934 or Section 30(h) of the Investment Company Act of 1940 | **OMB APPROVAL** OMB Number: 3235-0287 Estimated average burden hours per response: 0.5 |

Check this box to indicate that a transaction was made pursuant to a contract, instruction or written plan for the purchase or sale of equity securities of the issuer that is intended to satisfy the affirmative defense conditions of Rule 10b5-1(c). See Instruction 10.

| 1. Name and Address of Reporting Person* MCGURK CHRISTOPHER J | 2. Issuer Name and Ticker or Trading Symbol Cineverse Corp. [ CNVS ] | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| (Last)      (First)      (Middle) 244 FIFTH AVENUE, SUITE M289 C/O CINEVERSE CORP. | 3. Date of Earliest Transaction (Month/Day/Year) 08/01/2023 | X  Director                          10% Owner X  Officer (give title    Other (specify      below)              below)      CEO and      Chairman |
| (Street) NEW YORK      NY      10001 | 4. If Amendment, Date of Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) X  Form filed by One Reporting Person |
| (City)      (State)      (Zip) | | Form filed by More than One Reporting Person |

## Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Class A Common Stock | 08/01/2023 | | A | | 195,784(1) | A | $0 | 292,519 | D | |
| Class A Common Stock | | | | | | | | 19,116 | I | By Christopher and Jamie McGurk Living Trust(2) |

## Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned
### (e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Stock Option (Right to buy) | $280 | | | | | | | (3) | 08/22/2023 | Class A Common Stock | 7,500 | | 7,500 | D | |
| Stock Appreciation Right | $29.4 | | | | | | | (4) | 06/07/2028 | Class A Common Stock | 35,000 | | 35,000 | D | |
| Stock Appreciation Right | $10.8 | | | | | | | (5) | 11/19/2030 | Class A Common Stock | 125,000 | | 125,000 | D | |
| Stock Appreciation Right | $9.6 | | | | | | | (6) | 10/17/2032 | Class A Common Stock | 125,000 | | 125,000 | D | |

**Explanation of Responses:**

1. Constitutes shares received as payment of annual bonus under Management Annual Incentive Plan.
2. The reporting person is a trustee of the Christopher and Jamie McGurk Living Trust.
3. One-third of the options vested on March 31 of each of 2015, 2016 and 2017.

# EXHIBIT 5

Exhibit 10.1

## AMENDMENT NO. 6
## TO
## CINEVERSE CORP. 2017 EQUITY INCENTIVE PLAN

AMENDMENT NO. 6, dated as of December 8, 2023 (this "Amendment"), to the 2017 Equity Incentive Plan (as amended, the "Plan") of Cineverse Corp., a Delaware corporation (the "Corporation").

WHEREAS, the Corporation maintains the Plan, effective as of August 31, 2017; and

WHEREAS, the Board of Directors of the Corporation deems it to be in the best interest of the Corporation and its stockholders to amend the Plan in order to increase the maximum number of shares of the Corporation's Class A Common Stock, par value $.001 per share, which may be issued and sold under the Plan from 904,913 shares to 2,054,913 shares.

NOW, THEREFORE, BE IT RESOLVED the Plan is hereby amended as follows:

1. The first sentence of Section 4.1(a) shall be revised and amended to read as follows:

"The maximum number of Shares available for issuance to Participants under this Plan, inclusive of Shares issued and Shares underlying outstanding awards granted on or after the Effective Date, is 2,054,913 Shares, which includes 6,414 unused Shares carried over from the Existing Incentive Plan."

2. This Amendment shall be effective as of the date first set forth above.

3. In all respects not amended, the Plan is hereby ratified and confirmed and remains in full force and effect.

CINEVERSE CORP.

By: /s/Gary S. Loffredo
Name: Gary S. Loffredo
Title: Chief Legal Officer, Secretary and Senior Advisor

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, DC 20549**

**FORM 10-K**

(Mark One)

☒ ANNUAL REPORT UNDER SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

**For the fiscal year ended: March 31, 2023**

☐ TRANSITION REPORT UNDER SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

**Commission File Number: 000-31810**

# Cineverse Corp.

(Exact name of registrant as specified in its charter)

| Delaware | 22-3720962 |
|---|---|
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification No.) |
| **244 Fifth Avenue, Suite M289, New York, NY** | **10001** |
| (Address of principal executive offices) | (Zip Code) |

**(212) 206-8600**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol | Name of each exchange on which registered |
|---|---|---|
| **CLASS A COMMON STOCK, PAR VALUE $0.001 PER SHARE** | **CNVS** | **NASDAQ CAPITAL MARKET** |

Securities registered pursuant to Section 12(g) of the Act: **NONE**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.　　Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Exchange Act.　　Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.　　Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).　　Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act

| Large accelerated filer | Accelerated filer | Non-accelerated filer | Smaller reporting company | Emerging growth company |
|---|---|---|---|---|
| ☐ | ☐ | ☒ | ☒ | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).　　Yes ☐ No ☒

The aggregate market value of the voting and non-voting common equity held by non-affiliates of the issuer based on a price of $7.90 per share, the closing price of such common equity on the Nasdaq Global Market, as of September 30, 2022, was $58,637,073.46. For purposes of the foregoing calculation, all directors, officers and shareholders who beneficially own 10% of the shares of such common equity have been deemed to be affiliates, but the Company disclaims that any of such persons are affiliates.

As of June 27, 2023, 11,682,903 shares of Class A Common Stock, $0.001 par value were outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

None.

- restructuring or refinancing our remaining indebtedness; and
- seeking additional funding.

We cannot assure you, however, that our business will generate sufficient cash flow from operations, or that we will be able to make future borrowings in amounts sufficient to enable us to pay the principal and interest on our current indebtedness or to fund our other liquidity needs. We may need to refinance all or a portion of our indebtedness on or before maturity. We cannot assure you that we will be able to refinance any of our indebtedness on commercially reasonable terms or at all.

*We have incurred long term losses.*

We have incurred long term losses and have financed our operations principally through equity investments and borrowings. As of March 31, 2023, we had negative working capital, defined as current assets less current liabilities, of $(7.8) million, and cash and cash equivalents of $7.2 million, total equity of $39.1 million, and $8.8 million net cash flows used in operating activities.

Our net losses and cash outflows may increase as and to the extent that we increase the size of our business operations, increase our sales and marketing activities, increase our content distribution rights acquisition activities, enlarge our customer support and professional services and acquire additional businesses. These efforts may prove to be more expensive than we currently anticipate which could further increase our losses. We must continue to increase our revenues in order to become profitable. We cannot reliably predict when, or if, we will become profitable. Even if we achieve profitability, we may not be able to sustain it. If we cannot generate operating income or positive cash flows in the future, we will be unable to meet our working capital requirements.

*Many of our corporate actions may be controlled by our officers, directors and principal stockholders; these actions may benefit these principal stockholders more than our other stockholders.*

As of June 21, 2023, our directors, executive officers and principal stockholders, those known by us to beneficially own more than 5% of the outstanding shares of our Common Stock, beneficially own, directly or indirectly, in the aggregate, approximately 13.3% of our outstanding Common Stock. Certain of these stockholders are under the common control of one of our directors. These stockholders, as a group, may have significant influence over our business affairs, with the ability to control matters requiring approval by our security holders, including elections of directors and approvals of mergers or other business combinations. In addition, certain corporate actions directed by our officers may not necessarily inure to the proportional benefit of our other stockholders.

*We are subject to risks from our equity investment in a foreign company.*

In November 2017, Bison, a Hong Kong-based entity that does business in mainland China as well as other locations, became our majority owner, although their ownership has since been reduced to less than 10%. In January 2018, we announced a strategic alliance with A Metaverse Company, a leading Chinese entertainment company, formerly Starrise Media Holdings Limited ("Metaverse"), to release films in China theatrically and to digital platforms, and to evaluate opportunities to jointly produce Chinese/American film co-productions, and in February and April 2020, we acquired approximately 26% of the outstanding ordinary shares of Metaverse, which percentage has declined to approximately 17%. Metaverse's ordinary shares are listed on the Hong Kong Stock Exchange, although the trading of such shares was halted on April 1, 2022. We have partnered with Metaverse in the past, and continue to do so, with respect to the release of U.S.-sourced content in China and China-sourced content in the U.S. We may experience consequences from economic and regulatory events and requirements outside of the United States that affect the value of these shares and their value to us, including changes in regulatory requirements that affect Metaverse, fluctuations in international currency exchange rates, volatility in international political and economic environments, public disclosure requirements, and unforeseen developments and conditions, including terrorism, war, epidemics and international tensions and conflicts. No assurance can be made that, if we were to sell these shares on the Hong Kong Stock Exchange in Hong Kong currency, we would receive the full value in U.S. dollars upon repatriating the proceeds, based on fluctuating currency exchange rates.

9

Our business could be adversely affected by the effects of a widespread outbreak of contagious disease, including the outbreak of COVID-19. The COVID-19 pandemic and related economic repercussions created significant volatility and uncertainty impacting the Company's results during recent years. As part of our Content & Entertainment segment, the Company sells DVDs and Blu-ray discs at brick-and-mortar stores. With the closure of non-essential retail stores beginning in the spring of 2020, the sale of physical discs through our retail partners declined although this was partially offset by digital purchases of physical product. However, the level of these sales has substantially recovered.

## Risks Related to Common Stock

***The liquidity of our Common Stock is uncertain; the limited trading volume of our Common Stock may depress the price of such stock or cause it to fluctuate significantly.***

Although our Common Stock is listed on Nasdaq, there has been a limited public market for our Common Stock and there can be no assurance that a more active trading market for our Common Stock will develop. As a result, you may not be able to sell your shares of our Common Stock in short time periods, or possibly at all. The absence of an active trading market may cause the price per share of our Common Stock to fluctuate significantly.

***Substantial resales or future issuances of our Common Stock could depress our stock price.***

The market price for our Common Stock could decline, perhaps significantly, as a result of resales or issuances of a large number of shares of our Common Stock in the public market or even the perception that such resales or issuances could occur. In addition, we have outstanding a substantial number of options and warrants exercisable for shares of our Common Stock that may be exercised in the future. These factors could also make it more difficult for us to raise funds through future offerings of our equity securities.

***You will incur substantial dilution as a result of certain future equity issuances.***

We have a substantial number of options and warrants currently outstanding which may be immediately exercised for shares of Common Stock. To the extent that these options or warrants are exercised, or to the extent we issue additional shares of Common Stock in the future, as the case may be, there will be further dilution to holders of shares of the Common Stock.

***Our issuance of preferred stock could adversely affect holders of Common Stock.***

Our Board of Directors is authorized to issue series of preferred stock without any action on the part of our holders of Common Stock. Our Board of Directors (the "Board of Directors") also has the power, without stockholder approval, to set the terms of any such series of preferred stock that may be issued, including voting rights, dividend rights, preferences over our Common Stock with respect to dividends or if we liquidate, dissolve or wind up our business and other terms. If we issue preferred stock in the future that has preference over our Common Stock with respect to the payment of dividends or upon our liquidation, dissolution or winding up, or if we issue preferred stock with voting rights that dilute the voting power of our Common Stock, the rights of holders of our Common Stock or the price of our Common Stock could be adversely affected.

***Our stock price has been volatile and may continue to be volatile in the future; this volatility may affect the price at which you could sell our Common Stock.***

The trading price of our Common Stock has been volatile and may continue to be volatile in response to various factors, some of which are beyond our control. Any of the factors listed below could have a material adverse effect on an investment in our securities:

- actual or anticipated fluctuations in our quarterly financial results or the quarterly financial results of companies perceived to be similar to us;

- changes in the market's expectations about our operating results;

12

# EXHIBIT 6

## CONFIDENTIALITY AND NON-DISCLOSURE AGREEMENT GOVERNING THE INSPECTION OF BOOKS AND RECORDS

IT IS HEREBY STIPULATED AND AGREED, by and between Cineverse Corp. (the "Company") and Roy Hallett ("Stockholder"), that this Confidentiality and Non-Disclosure Agreement Governing the Inspection of Books and Records (the "Agreement"), dated as of ~~June~~ *August* 28, 2024, shall govern all information and documents of any kind or type (the "Documents") made available for inspection by the Company or its counsel in response to or in connection with Stockholder's demand letter dated March 8, 2024 seeking to inspect documents pursuant to Section 220 of the Delaware General Corporation Law.

1.    The Company shall produce to the Stockholder copies of Documents called for by the Demand, as modified by such limitations as to scope as may be mutually agreed by the Company and the Stockholder. The Company may designate as "Confidential" any Documents that the Company believes contain confidential information ("Confidential Information"). The Company shall have the right to designate Documents as Confidential Information by stamping the Document (or any page thereof) with the legend "Confidential." The inadvertent failure by the Company to designate material as "Confidential" shall not be a waiver by the Company of any claim of confidentiality as to such material or subject matter.

2.    Stockholder shall not use, utilize, exploit, disclose, publish, disseminate or communicate the contents of Confidential Information to anyone, either directly or indirectly, except as expressly allowed by this Agreement. By producing any Confidential Information to Stockholder, the Company does not admit that Stockholder has a proper purpose for the inspection of such information and expressly reserves the right to assert that: the Demand does not comply with Delaware law or any other applicable law; Stockholder has not stated a proper purpose; the stated purposes of the Demand are not Stockholder's actual purpose; the stated purposes of the Demand do not have a credible basis; the Demand is overly broad and seeks documents not

reasonably related to Stockholder's stated purpose; and that for any other reason, Stockholder is not entitled to the inspection demanded.

3.      Stockholder reserves all rights to seek or enforce his legal rights as a stockholder of the Company, including his rights pursuant to Section 220 of the Delaware General Corporation Law, and his right to challenge a designation of Confidential in any subsequent derivative action, to the extent permitted by Delaware law. The Company reserves all of its rights and defenses with respect to any action or proceeding initiated by Stockholder, whether pursuant to Section 220 or otherwise.

4.      Confidential Information may be used by Stockholder solely for the purposes stated in the Demand, subject to any modifications or amendments agreed to by the Company and Stockholder, except that Confidential Information shall not be used to assist, support or facilitate any litigation of any kind other than (a) stockholder derivative litigation on behalf of the Company in the Delaware Court of Chancery or, if the Court of Chancery lacks subject matter jurisdiction, in another court in Delaware having proper jurisdiction, concerning the subject matters described in the Demand, or (b) intervention in stockholder derivative litigation on behalf of the Company concerning the subject matters described in the Demand. Stockholder will ensure that any complaint or other filing made in such derivative litigation that contains Confidential Information shall be filed under seal as a "Confidential Filing" pursuant to Delaware Court of Chancery Rule 5.1 or, if such complaint or filing is made in a different Court, pursuant to that Court's rules governing confidentiality. Confidential Information shall not be used for any other purpose, including, without limitation, any business, commercial, or political purpose.

5.      Confidential Information may be disclosed by Stockholder only to his legal and financial advisors, other legal counsel, consultants or experts as Stockholder has retained for the purpose of fulfilling the purposes stated in the Demand (the "Qualified Persons"), and (b) to any appropriate court as provided for in this Agreement. Any Qualified Person to whom

Stockholder discloses Confidential Information shall safeguard such Confidential Information to prevent disclosure to any others and will not maintain or store the Confidential Information in such a way that creates an unreasonable risk of deliberate or inadvertent disclosure of the Confidential Information to others. Stockholder agrees that, prior to disclosing any Confidential Information to any Qualified Person, Stockholder will ensure that such Qualified Person executes Exhibit A attached hereto. Stockholder and each Qualified Person will not maintain or store the Confidential Information in such a way that creates an unreasonable risk of deliberate or inadvertent disclosure of the Confidential Information to others.

6.    The Company expressly reserves the right to withhold or redact documents protected from disclosure by the attorney-client privilege, the work product privilege or any other applicable privilege or doctrine.

7.    If information subject to a claim of attorney-client privilege, attorney work product or any other privilege or protection is inadvertently produced to Stockholder, such production shall in no way prejudice or otherwise constitute a waiver of any claim of privilege, work product or other privilege or protection. If a claim of inadvertent production is made with respect to information, then in the custody of Stockholder, Stockholder shall promptly return or destroy the information and all copies thereof to the Company, and Stockholder shall not use such information for any purpose. Stockholder shall promptly certify such destruction in writing. Should Stockholder thereafter seek to compel production of such material, Stockholder shall not assert the fact or circumstance of the inadvertent production as a ground for compelling production of such information or any other information to Stockholder or any other person.

8.    If Stockholder or a Qualified Person to whom disclosure of Confidential Information has been made believes that he, she or it may be compelled by interrogatory, subpoena, civil investigatory demand or any similar process relating to any legal proceeding, investigation or

hearing to disclose any Confidential Information, he, she or it shall (a) provide the Company and its counsel with prompt written notice within three business days of the receipt of such request so that the Company may seek a protective order or other appropriate remedy; (b) reasonably cooperate with the Company in pursuing any such course of action; and (c) not voluntarily produce or disclose Confidential Information to any person or entity not a party to this Agreement without the prior consent of the Company pending any ruling from a court of competent jurisdiction requiring such production or disclosure. In the event that a protective order or other remedy is not obtained, Stockholder and any such Qualified Person shall disclose only such Confidential Information as they are legally compelled to disclose and shall exercise best efforts to obtain assurances that confidential treatment will be accorded to any Confidential Information that is compelled to be disclosed.

9.    Any notice required or permitted herein shall be made to the Company by sending notice in the timeliest fashion to its counsel at Richards, Layton & Finger, P.A. Notice may be made by e-mail.

10.    Stockholder agrees that the stockholder derivative lawsuit referenced in Paragraph 4 above, if one is filed, shall be filed in the Delaware Court of Chancery or, if the Court of Chancery lacks subject matter jurisdiction, another court in Delaware having proper jurisdiction. All documents and information made available for inspection by the Company in response to the Demand shall be deemed incorporated by reference into any complaint, petition or other court filing Stockholder files that (i) relies upon Confidential Information or (ii) otherwise concerns the subject matter identified in the Demand, to the extent permitted by Delaware law.

11.    If Stockholder determines to commence a lawsuit using Confidential Information, Stockholder and counsel retained by Stockholder shall comply with Delaware Court of Chancery Rule 5.1, or other similar provision, governing confidential treatment for complaints, and redact all references to Confidential Information in any pleadings filed with the court, serve

an unredacted copy of such pleadings on the Company's counsel, and file a motion to file the legal pleading and any other documents containing Confidential Information under seal. If such permission is denied, Stockholder or counsel retained by Stockholder shall provide three business days' written notice to the Company prior to the filing of any such legal pleading with the court in an unredacted form.

12.    The parties and their counsel agree that any claim, dispute, controversy or causes of action between or among the parties to this Agreement or any of their affiliates concerning this Agreement (including the negotiation, execution or performance hereof) and/or the Company's document production in response to the Demand (including, but not limited to, any claim by Stockholder that the terms and restrictions of this Agreement should not apply to any Confidential Information) shall be heard and determined exclusively in the Delaware Court of Chancery or, in the event that the Delaware Court of Chancery declines to accept jurisdiction over such litigation, any state or federal court of competent jurisdiction located in the State of Delaware. Stockholder agrees and consents to submit to personal jurisdiction of the Delaware Court of Chancery in connection with any matter to enforce any provision of this Agreement, agrees not to attempt to deny or defeat such personal jurisdiction by motion or other request, and agrees and consents to service of process in connection with any such action by registered or certified mail.

13.    Stockholder agrees that if Stockholder decides that he does not intend to pursue the Demand any further, Stockholder will promptly so inform the Company in writing.

14.    Stockholder and any Qualified Person(s) with whom Confidential Information was shared will destroy all Confidential Information (including any notes or other documents that refer to such Confidential Information) promptly upon completing the purposes described in the Demand or in no event later than six months after: (i) the entry of a final judgment, or the conclusion of any appeals therefrom, in any stockholder derivative lawsuit referenced in Paragraph 4, or (ii) the date on which Stockholder informs the Company in writing that

Stockholder does not intend to pursue the Demand any further. When the Confidential Information is destroyed, Stockholder and any Qualified Persons who received the information will certify, upon written request from the Company, that they have so destroyed such documents. Notwithstanding this provision, Stockholder may retain copies of all formal correspondence and/or court filings pertaining to this Demand.

15.     Stockholder and any Qualified Person to whom Confidential Information is disclosed agree that the Company would not have an adequate remedy at law in the event that this Agreement is breached outside the context of shareholders rights and agree that the Company will be entitled to seek specific performance and/or injunctive relief with respect to the terms hereof. Such remedies shall not be deemed to be the exclusive remedies for any breach of this Agreement but shall be in addition to any other remedies which may exist at law or in equity.

16.     This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to its conflict of laws principles.

17.     This Agreement may be executed in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute one and the same instrument.

18.     This Agreement may not be amended, modified, or waived except by a separate writing executed by the Stockholder or counsel retained by Stockholder and the Company or its counsel that expressly so amends, modifies, or waives this Agreement.

19.     The waiver by any party of any breach of this Agreement shall not be deemed or construed as a waiver of any other right under or breach of this Agreement. Failure or delay in exercising any right, power, or privilege hereunder shall not operate as a waiver thereof,

and no single or partial exercise of any right, power, or privilege hereunder shall preclude any other or further exercise of any right, power or privilege.

20.    This Agreement and any writing(s) memorializing the agreed-upon scope of production as contemplated by Paragraph 1 hereof together constitute the only agreement between each of the Stockholder and the Company with respect to the subject matter hereof and supersedes all prior agreements, understandings, negotiations, and discussions, whether oral or written.

21.    If any portion of this Agreement should be deemed by a court or other tribunal of valid jurisdiction to be void or unenforceable, in whole or in part, the other provisions of this Agreement shall continue to be valid and the parties shall replace the void or unenforceable provision with one that is valid and enforceable and most nearly approximates their original intentions.

22.    This Agreement will be deemed to have been mutually prepared by the parties (including each Qualified Person) and will not be construed against any of them by reason of authorship.

STIPULATED AND AGREED TO BY:

By:_____
Roy Hallett
1552 N Azurite Place
Kuna, ID 83634
(208) 219-2850

*Stockholder*

RICHARDS, LAYTON & FINGER, P.A.

By:_____
Matthew W. Murphy, Esq.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
(302) 651-7700

*Attorney for Cineverse Corp.*

# EXHIBIT 7

**Chairman's Letter to Cinedigm Shareholders Outlines Stock Repurchase Program, Acquisition of Leading Faith and Family Streaming Properties and the Company's Future Outlook**

March 02, 2023 at 11:16 am EST

Share

LOS ANGELES, March 2, 2023 /PRNewswire/ -- **Cinedigm Corp.** ("Cinedigm" or the "Company") (NASDAQ: CIDM), a premier content streaming technology and entertainment company super-serving enthusiast audiences, today released the following comments by Chairman and CEO Chris McGurk:



Dear Fellow Shareholders,

Following a quarter that underscored how our diversified strategy led to very strong top and bottom-line performance, I would like to discuss the stock repurchase program we announced yesterday and share why it is tangible evidence of the confidence that the Board of Directors and I have in the future of the Company.

## Cinedigm Stock Repurchase Program

Effective immediately, Cinedigm is implementing a stock repurchase program of up to 10 million shares. Our Board has authorized the Company to repurchase Class A shares from time to time in the open market over the next 12 months at its discretion.

Why are we doing this? Our balance sheet is very strong, with essentially no debt, and our recent upside performance has increased our cash on hand even further from the end of last quarter. This gives us complete confidence that we can execute this significant stock repurchase program without hampering planned operating expenditures, such as key content acquisitions. Most importantly, we believe that purchasing undervalued Cinedigm shares is a superb investment strategy for the Company.

Clearly, macroeconomic and geopolitical factors have severely depressed equity markets across the board, especially for companies of our size and in our sector. Rather than relying solely on quarterly reports and day-to-day announcements about Company activities, this program allows us to directly show you that we are confident in the strategy and goals we have laid out. We are effectively putting our money where our mouth is.

I personally own more than two million shares of Cinedigm stock, so I understand the frustration that all our shareholders are feeling now, particularly given our strong operational and financial performance. With this repurchase program, we are choosing .. signal that we fully agree with the analysts who study and follow Cinedigm, and who have targeted our stock price at $2.25-$5.00 per share.

They are correct in doing so, given Cinedigm's rapid growth, including the creation of dozens of new jobs, as we develop industry-leading new technology and bypass the major studios and streaming "gatekeepers" to provide enthusiast audiences the films and TV programs they cannot find elsewhere.

This plan is also important in relation to our NASDAQ listing minimum price issue. On that matter, I believe there is potential to further extend our cure period.

## Content Strategy – Spanning Horror to Faith & Family

This week, we announced the acquisition of two established faith and family media properties, Dove.org and Christian Cinema, from the Giving Company. This is our eighth acquisition in the past two years, and like the others, it emphasizes how Cinedigm's unique content strategy, distribution footprint, and technology capabilities meet the needs of enthusiast audiences.

Among our more than two dozen streaming brands, the Dove Channel is one of our most successful, rapidly growing in a segment of the industry that is estimated to be a $1.5 billion revenue business in North America, with a projected compound growth rate of 20% over the next five years. This past weekend's box office success of "Jesus Revolution" demonstrates the huge opportunity in this important and growing entertainment segment.

Dove.org, best known for the "Dove Seal of Approval" given to thousands of titles over the years, publishes movie reviews, news, podcasts, and movie ratings for films, TV shows,

video games, and online content through its website, email newsletters, and social channels to help families make more informed media choices. Alongside Christian Cinema, a leading TVOD service for faith-based films that we will be expanding on the content and distribution side, we have a great opportunity to grow our customer base, add immediately accretive revenue, and gain multiple new avenues for growth across all touchpoints, from theatrical releases to streaming exclusives and more. Dove.org has been our partner on the Dove Channel for years, so it will fit perfectly with the 360-degree approach we are taking with faith & family.

In fact, this approach has been very successful for us in the horror genre, which couldn't be more different, yet has a similarly passionate fan base. We are now well-positioned to compete in two of the hottest genres in Hollywood, as we look to take this winning approach to other genres in which we have a strong presence, including anime, Asian content, and indie film. We will continue to look for other accretive M&A opportunities that support this strategy while we fully leverage our content expertise, our growing 60,000 title library, and our best-in-class proprietary Matchpoint content and streaming technology platform.

## Cinedigm's Future

Over the last few years, we have completely transformed Cinedigm from its original incarnation as a digital cinema technology innovator into a leading, pure-play, independent streaming content and technology company. Not only have we doubled the size of our content and streaming business over the last two years, but we have also attained a scale that puts us on a similar revenue and audience track as Pluto TV and Tubi just a few years before they were acquired by Paramount and FOX, respectively.

But we are not stopping there. Our goal is to build a business that can stand shoulder-to-shoulder with the largest platforms in the industry, but to do so while being profitable. We are fully committed to achieving that goal by the end of this fiscal year, through aggressively streamlining and the successful implementation of the high margin, low incremental-cost business initiatives that we have repeatedly highlighted over the last year: our flagship ad-supported service Cineverse; Cinedigm Ad Solutions; the Cinedigm Podcast Network; and our Matchpoint platform, which we like to call our "Operating System for Streaming."

Looking to the future, I'd like to emphasize the following points:

- Our key strategic initiatives have been very successful, giving us renewed confidence in achieving our Company goal of more than 50% per year streaming revenue growth and $150 million in annual revenues within 2-4 years while significantly improving our margins to attain sustained profitability.

- The heart of any streaming service is its film and TV library, and we have been focused on building one of the largest and most diverse in the industry. From major theatrical hits and Academy Award winners, to anime, faith & family, and horror favorites, to name a few, we now have close to 60,000 movies and shows under license – with nearly 25,000 added this year alone. As we race to build the biggest, most diverse library in the world on our quest to become "the Spotify of independent film & TV", we are building both valuable assets and a massive competitive advantage.

- Speaking of competitive advantages, Matchpoint, our streaming OS that powers content management, content preparation, content delivery, programming, video streaming apps, analytics and more, is the ultimate differentiator. It not only powers most of our owned-and-operated streaming services but is also available to third-party partners on a SaaS basis. Like Netflix and Disney Streaming (formerly BAMtech, with the remaining 15% acquired by Disney last year for $900M), Matchpoint gives us a huge competitive, creative and cost-savings advantage within the industry.

  - Our focus has been on leveraging the power of content processing at scale, and by utilizing AI and machine learning, Matchpoint automates tasks that previously required a large army of employees to accomplish by hand. For example, this past January, Matchpoint delivered 9,000 titles comprising 50,000 assets into the streaming ecosystem through 100% machine-based automation. For perspective, that is 2.3 times the total number of movies on Netflix or 7.2 times the number of movies on Hulu that we processed in just a single month.

  - We think Matchpoint is one of our key "secret weapons" that gives us a big competitive and operating advantage, dramatically reduces costs to achieve profitability and supports a much higher valuation for the Company when fully appreciated and understood. As former customers of high-cost (yet ineffective) technology vendors within the streaming technology ecosystem, we have developed what we consider to be a superior, best-in-class platform on the

market today. And now, other key streaming companies that need these technologies (but don't have a decade to waste building them from scratch) are knocking on our door. Expect more news on this front very soon.

- On the back of Matchpoint, our flagship streaming service, Cineverse, recently launched earlier this fiscal year. Our vision is simple: to build a home to access – whether you buy, rent, stream with ads, or subscribe commercial-free – the 97% of movies and shows not available on the major streamers. Our goal is to have hundreds of thousands of titles over the next 30 months that, like Spotify before us, are expertly hand-curated or easily searched. As of today, we now have over 19,000 titles available on Cineverse. Beyond that, we're developing a next-generation assistant with encyclopedic knowledge of our library – and film and TV history in general – that, through natural language conversation, can help you find your next favorite content based on mood, theme, daypart, and more. From our partnership with genomic indexing company Katch, to our own proprietary algorithms, we hope to make finding something to watch nearly as fun as the watching itself.

- Beyond Cineverse, Cinedigm continues to be a leader in the free, ad-supported streaming television (FAST) market, one of the fastest growing and most profitable segments of the streaming industry. Having launched our first FAST channel in 2016, we were one of the early pioneers in the segment and have built a portfolio of more than two dozen properties. As this market heats up, companies ranging from Warner Bros. Discovery to Netflix, Microsoft, Google and others are looking to enter the space, and we expect every major media company in the world that generates advertising from cable and broadcast television to be a FAST player within the next couple of years. As FAST eventually becomes the replacement for basic cable, we find ourselves in an enviable and rare strategic position.

Finally, as Cinedigm has completed its transformation to a streaming content and technology business this fiscal year, I'm excited to announce we will be rebranding the company to reflect this momentous turning point for the company. This branding will accentuate our position and narrative for today and the future. Stay tuned for more details on this over the next few months.

In conclusion, I want to thank all our shareholders for their support and patience. Our future continues to look very bright. I look forward to communicating with all of you again soon.

Sincerely,

Chris McGurk

Chairman & CEO

Electronically Filed
7/22/2025 10:16 AM
Fourth Judicial District, Ada County
Trent Tripple, Clerk of the Court
By: Breanna Johnson, Deputy Clerk

Matthew T. Christensen, ISB: 7213
JOHNSON MAY
199 N. Capitol Blvd., Ste. 200
Boise, Idaho 83702
Telephone: (208) 384-8588
Facsimile:  (208) 629-2157
Email: mtc@johnsonmaylaw.com

Yee-Wallace, Cynthia

IN THE DISTRICT COURT OF THE FOURTH JUDICIAL DISTRICT

OF THE STATE OF IDAHO, IN AND FOR THE COUNTY OF ADA

| | |
|---|---|
| ROY HALLETT, an individual<br><br>               Plaintiff,<br><br>vs.<br><br>CINEVERSE CORP, a Delaware Corporation,<br>CHRISTOPHER MCGURK, an individual,<br>GARY LOFFREDO, an individual,<br><br>              Defendants. | Case No.:  CV01-25-13141<br><br>**SUMMONS** |

TO:    **GARY LOFFREDO**

**NOTICE:  YOU HAVE BEEN SUED BY THE ABOVE-NAMED PLAINTIFF.  THE COURT MAY ENTER JUDGMENT AGAINST YOU WITHOUT FURTHER NOTICE UNLESS YOU RESPOND WITHIN 21 DAYS.  READ THE INFORMATION BELOW.**

YOU ARE HEREBY NOTIFIED that in order to defend this lawsuit, an appropriate written response must be filed with the above designated court at 200 W Front St., Boise, ID 83702; (208) 287-6900 within twenty-one (21) days after service of this Summons on you.  If you fail to respond, the Court may enter judgment against you as demanded by Plaintiff in the Complaint.

A copy of the Complaint is served with this Summons.  If you wish to seek the advice of or representation by an attorney in this matter, you should do so promptly so that your written response, if any, may be filed in time and other legal rights protected.

SUMMONS – 1

An appropriate written response requires compliance with Rule 2 and other Idaho Rules of Civil Procedure and must also include:

1. The title and number of this case.

2. If your response is an Answer to the Complaint, it must contain admissions or denials of the separate allegations of the Complaint and other defenses you may claim.

3. Your signature, mailing address, and telephone number, or the signature, mailing address, and telephone number of your attorney.

4. Proof of mailing or delivery of a copy of your response to Plaintiff's attorney, as designated above.

To determine whether you must pay a filing fee with your response, contact the Clerk of the above-named court.

DATED ___7/22/2025 10:16 AM___                    Trent Tripple

CLERK OF THE DISTRICT COURT

By: _____
Deputy Clerk

SUMMONS – 2

Electronically Filed
7/22/2025 10:16 AM
Fourth Judicial District, Ada County
Trent Tripple, Clerk of the Court
By: Breanna Johnson, Deputy Clerk

Matthew T. Christensen, ISB: 7213
JOHNSON MAY
199 N. Capitol Blvd., Ste. 200
Boise, Idaho 83702
Telephone: (208) 384-8588
Facsimile:  (208) 629-2157
Email: mtc@johnsonmaylaw.com

Yee-Wallace, Cynthia

IN THE DISTRICT COURT OF THE FOURTH JUDICIAL DISTRICT

OF THE STATE OF IDAHO, IN AND FOR THE COUNTY OF ADA

| | |
|---|---|
| ROY HALLETT, an individual<br><br>                    Plaintiff,<br><br>vs.<br><br>CINEVERSE CORP, a Delaware Corporation,<br>CHRISTOPHER MCGURK, an individual,<br>GARY LOFFREDO, an individual,<br><br>                    Defendants. | Case No.: CV01-25-13141<br><br>**SUMMONS** |

**TO:    CHRISTOPHER MCGURK**

**NOTICE:  YOU HAVE BEEN SUED BY THE ABOVE-NAMED PLAINTIFF.  THE COURT MAY ENTER JUDGMENT AGAINST YOU WITHOUT FURTHER NOTICE UNLESS YOU RESPOND WITHIN 21 DAYS.  READ THE INFORMATION BELOW.**

YOU ARE HEREBY NOTIFIED that in order to defend this lawsuit, an appropriate written response must be filed with the above designated court at 200 W Front St., Boise, ID 83702; (208) 287-6900 within twenty-one (21) days after service of this Summons on you.  If you fail to respond, the Court may enter judgment against you as demanded by Plaintiff in the Complaint.

A copy of the Complaint is served with this Summons.  If you wish to seek the advice of or representation by an attorney in this matter, you should do so promptly so that your written response, if any, may be filed in time and other legal rights protected.

SUMMONS – 1

An appropriate written response requires compliance with Rule 2 and other Idaho Rules of Civil Procedure and must also include:

1. The title and number of this case.

2. If your response is an Answer to the Complaint, it must contain admissions or denials of the separate allegations of the Complaint and other defenses you may claim.

3. Your signature, mailing address, and telephone number, or the signature, mailing address, and telephone number of your attorney.

4. Proof of mailing or delivery of a copy of your response to Plaintiff's attorney, as designated above.

To determine whether you must pay a filing fee with your response, contact the Clerk of the above-named court.

DATED ___7/22/2025 10:16 AM___

Trent Tripple

CLERK OF THE DISTRICT COURT

By: _____

Deputy Clerk

Electronically Filed
7/22/2025 10:16 AM
Fourth Judicial District, Ada County
Trent Tripple, Clerk of the Court
By: Breanna Johnson, Deputy Clerk

Matthew T. Christensen, ISB: 7213
JOHNSON MAY
199 N. Capitol Blvd., Ste. 200
Boise, Idaho 83702
Telephone: (208) 384-8588
Facsimile:  (208) 629-2157
Email: mtc@johnsonmaylaw.com

Yee-Wallace, Cynthia

IN THE DISTRICT COURT OF THE FOURTH JUDICIAL DISTRICT

OF THE STATE OF IDAHO, IN AND FOR THE COUNTY OF ADA

| | |
|---|---|
| Roy Hallett, an individual<br><br>             Plaintiff,<br><br>vs.<br><br>CINEVERSE CORP, a Delaware Corporation,<br>CHRISTOPHER MCGURK, an individual,<br>GARY LOFFREDO, an individual,<br><br>           Defendants. | Case No.: CV01-25-13141<br><br>**SUMMONS** |

**TO:    CINEVERSE CORP**

**NOTICE:  YOU HAVE BEEN SUED BY THE ABOVE-NAMED PLAINTIFF.  THE COURT MAY ENTER JUDGMENT AGAINST YOU WITHOUT FURTHER NOTICE UNLESS YOU RESPOND WITHIN 21 DAYS.  READ THE INFORMATION BELOW.**

YOU ARE HEREBY NOTIFIED that in order to defend this lawsuit, an appropriate written response must be filed with the above designated court at 200 W Front St., Boise, ID 83702; (208) 287-6900 within twenty-one (21) days after service of this Summons on you.  If you fail to respond, the Court may enter judgment against you as demanded by Plaintiff in the Complaint.

A copy of the Complaint is served with this Summons.  If you wish to seek the advice of or representation by an attorney in this matter, you should do so promptly so that your written response, if any, may be filed in time and other legal rights protected.

SUMMONS – 1

An appropriate written response requires compliance with Rule 2 and other Idaho Rules of Civil Procedure and must also include:

1.  The title and number of this case.

2.  If your response is an Answer to the Complaint, it must contain admissions or denials of the separate allegations of the Complaint and other defenses you may claim.

3.  Your signature, mailing address, and telephone number, <u>or</u> the signature, mailing address, and telephone number of your attorney.

4.  Proof of mailing or delivery of a copy of your response to Plaintiff's attorney, as designated above.

To determine whether you must pay a filing fee with your response, contact the Clerk of the above-named court.

DATED _7/22/2025 10:16 AM_____

Trent Tripple

CLERK OF THE DISTRICT COURT

By: _____

Deputy Clerk

SUMMONS – 2

Electronically Filed
8/1/2025 8:12 AM
Fourth Judicial District, Ada County
Trent Tripple, Clerk of the Court
By: Megan Posey, Deputy Clerk

# IN THE DISTRICT COURT OF THE FOURTH JUDICIAL DISTRICT OF THE STATE OF IDAHO, IN AND FOR THE COUNTY OF ADA

Roy Hallett

**Plaintiff(s):**

vs.

**DECLARATION OF SERVICE**

Cineverse Corp., et al.

**Defendant(s):**

**Case Number: CV01-25-13141**

GILBERT DEL VALLE

COMES NOW, _____, hereby declares and says: That I am over the age of eighteen (18) years, and not a party to the action or related to any of the parties in the above entitled action. I received a true copy of the **Summons and Complaint** and delivered the same upon **Cineverse Corp.** by delivering to and leaving with:

(Name)_____LYNANNE GARES_____(Title)_____MANAGING AGENT_____

of **Corporation Service Company**, Registered Agent for **Cineverse Corp.**, a person authorized to accept service on behalf of **Cineverse Corp.**

At:(Address)___251 LITTLE FALLS DRIVE_____

(City, State, Zip)___WILMINGTON, DE 19808_____

on _____07/28/2025_____ (date), at ____12:15____ o'clock __P__ .m.

I declare under penalty of perjury pursuant to the law of the State of Idaho that the foregoing is true and correct.

(Date)___07/28/2025_____

GILBERT DEL VALLE          **PROCESS SERVER**

Our Reference Number: 224980
Client Reference: > Matthew T. Christensen

Electronically Filed
8/7/2025 8:10 AM
Fourth Judicial District, Ada County
Trent Tripple, Clerk of the Court
By: Breanna Johnson, Deputy Clerk

## IN THE DISTRICT COURT OF THE FOURTH JUDICIAL DISTRICT OF THE STATE OF IDAHO, IN AND FOR THE COUNTY OF ADA

**Roy Hallett**

**Plaintiff(s):**

vs.

**Cineverse Corp., et al.**

**Defendant(s):**

**DECLARATION OF SERVICE**

Case Number: CV01-25-13141

COMES NOW, _Mannie Suscreba_, hereby declares and says: That I am over the age of eighteen (18) years, and not a party to the action or related to any of the parties in the above entitled action. I received a true copy of the **Summons and Complaint** and delivered the same upon **Gary Loffredo** by delivering to and leaving with:

a. (Name)_____, PERSONAL SERVICE (personally and in person)
or
b. (Name) _Lisa Loffredo_____, SUBSTITUTE SERVICE (by leaving with a person over the age of eighteen (18) years, who stated the below address to be the residence and usual place of abode of themselves and the individual being served)

At:(Address) _62 Wheeler Road_____

(City, State, Zip) _Wayne NJ 07470_____

on _8/2/2025_____ (date), at _7:56_ o'clock _A_.m.

I declare under penalty of perjury pursuant to the law of the State of Idaho that the foregoing is true and correct.

(Date) _8/6/25_____

_____
**PROCESS SERVER**

Our Reference Number: 224982
Client Reference: > Matthew T. Christensen

# EXHIBIT C

Kenneth C. Shumard, ISB No. 9931
**HAWLEY TROXELL ENNIS & HAWLEY LLP**
877 W Main St #200
Boise, Idaho 83702
Tel.: (208) 344-6000
Fax: (208) 954-5200
Email: kshumard@hawleytroxell.com

*Counsel for Defendants*

### IN THE DISTRICT COURT OF THE FOURTH JUDICIAL DISTRICT

### OF THE STATE OF IDAHO, IN AND FOR THE COUNTY OF ADA

| | |
|---|---|
| Roy Hallet, an individual,<br><br>                      Plaintiff,<br><br>     v.<br><br>CINEVERSE CORP., a Delaware Corporation, CHRISTOPHER MCGURK, an individual, GARY LOFFREDO, an individual,<br><br>                      Defendants. | Case No.<br><br>**NOTICE OF REMOVED ACTION** |

**TO: ROY HALLET, HIS COUNSEL OF RECORD, and THE CLERK OF THE DISTRICT COURT OF THE FOURTH JUDICIAL DISTRICT OF THE STATE OF IDAHO, IN AND FOR THE COUNTY OF ADA:**

PLEASE TAKE NOTICE that on August 26, 2025, Defendants Cineverse Corporation ("Cineverse"), Christopher McGurk, and Gary Loffredo (collectively "Defendants"), caused to be filed in the United States District Court for the District of Idaho a Notice of Removal and accompanying filings for the above-entitled action, pursuant to 28 U.S.C. §§ 1332, 1441, and 1446, a copy of which (excluding its exhibits) is attached hereto as **Exhibit A**.

NOTICE OF REMOVED ACTION - 1

PLEASE TAKE FURTHER NOTICE that, pursuant to 28 U.S.C. § 1446(d), the filing of the Notice of Removal, together with the filing of this Notice with this Court and the service of the Notice of Removal and this Notice on the other parties, effects the removal of this action to federal court, and this Court may proceed no further with this action unless and until this action is remanded.

DATED: August 26, 2025                     Respectfully submitted,


                                  By:   _/s/Kenneth C. Shumard_
                                        Kenneth C. Shumard
                                        **HAWLEY TROXELL ENNIS & HAWLEY LLP**
                                        877 W Main St #200
                                        Boise, Idaho 83702
                                        Tel.: (208) 344-6000
                                        Fax: (208) 954-5200

                                        *Counsel for Defendants*

NOTICE OF REMOVED ACTION - 2

## CERTIFICATE OF SERVICE

I, the undersigned, declare under penalty of perjury, that I am over the age of eighteen (18) years, and I am not a party to, nor interested in, this action. On this date, I caused to be served a true and correct copy of the foregoing **NOTICE OF REMOVAL** by Idaho's iCourt electronic filing system to:

Matthew T. Christensen, ISB: 7213
JOHNSON MAY
199 N. Capital Blvd., Ste. 200
Boise, ID 83702
Tel.: (208) 384-8588
Fax: (208) 629-2157
mtc@johnsonmaylaw.com

DATED: August 26, 2025

By:   */s/Kenneth C. Shumard*
Kenneth C. Shumard

*Counsel for Defendants*

NOTICE OF REMOVED ACTION - 3